MARK C. GILLESPIE (19265)
JOSHUA B. CUTLER (16434)
*Assistant Utah Solicitors General*
DAVID N. WOLF (6688)
LANCE SORENSON (10684)
ANIKKA HOIDAL (16489)
*Assistant Utah Attorneys General*
OFFICE OF THE UTAH ATTORNEY GENERAL
*dnwolf@agutah.gov*
*lancesorenson@agutah.gov*
*ahoidal@agutah.gov*
*jbcutler@agutah.gov*
*markgillespie@agutah.gov*

*Counsel for Defendant*

---

## IN THE UNITED STATES DISTRICT COURT
## IN AND FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>*Plaintiff,*<br><br>v.<br><br>DEIDRE M. HENDERSON, in her official capacity as Lieutenant Governor and chief election officer for the State of Utah,<br><br>*Defendant.* | **DEFENDANT LIEUTENANT GOVERNOR DEIDRE HENDERSON'S MOTION TO DISMISS**<br><br>Case No. 2:26-cv-000166-DBB-DAO<br><br>Judge David Barlow<br><br>Magistrate Judge Daphne A. Oberg |

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................ii

TABLE OF AUTHORITIES.........................................................................iii

MOTION, RELIEF SOUGHT, AND GROUNDS .........................................1

INTRODUCTION ........................................................................................1

BACKGROUND...........................................................................................2

    A.   Federal Statutes Regulating State Voting Records.............................2

    B.   Utah's Voter Registration and Voter List Maintenance Laws.........5

    C.   Plaintiff's Demands for Utah Voters' Sensitive Information ...........6

    D.   Procedural History .............................................................................9

LEGAL STANDARD..................................................................................10

ARGUMENT ...............................................................................................11

    I.   The Information Plaintiff Seeks Are Not Covered "Records," as Defined in the Civil Rights Act, and Thus Not Subject to Disclosure.........11

    II.   The Civil Rights Act Does Not Require Disclosure of Utah Voters' Sensitive Personal Information. ...................................................14

    III.   Plaintiff Has Failed to Provide a Valid Basis and Purpose for Its Demand for Voter Information as Required by the Civil Rights Act. .........18

CONCLUSION............................................................................................23

CERTIFICATE OF SERVICE.....................................................................25

## TABLE OF AUTHORITIES

### Cases

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ................................................................ 10

*Biden v. Nebraska,*
   600 U.S. 477 (2023) ................................................................. 2

*Bledsoe v. Carreno,*
   53 F.4th 589 (10th Cir. 2022) ................................................ 10

*Bufkin v. Collins,*
   604 U.S. 369 (2025) ............................................................... 18

*Chevron Mining Inc. v. United States,*
   863 F.3d 1261 (10th Cir. 2017) ............................................. 13

*Dean v. United States,*
   556 U.S. 568 (2009) ............................................................... 15

*Foster v. Love,*
   522 U.S. 67 (1997) ................................................................... 1

*Gomillion v. Lightfoot,*
   364 U.S. 339 (1960) ................................................................. 4

*Honeycutt v. United States,*
   581 U.S. 443 (2017) ............................................................... 12

*Kennedy v. Lynd,*
   306 F.2d 222 (5th Cir. 1962) ........................................... 16, 20

*Learning Res., Inc. v. Trump,*
   607 U.S. ___, No. 24–1287, 2026 WL 477534 (U.S. Feb. 20, 2026).................. 15, 16

*Moore v. Harper,*
   600 U.S. 1 (2023) ..................................................................... 1

*Navajo Nation v. Dalley,*
   896 F.3d 1196 (10th Cir. 2018) ............................................. 12

*Project Vote, Inc. v. Kemp,*
   208 F. Supp. 3d 1320 (N.D. Ga. 2016) ................................... 21

*Project Vote/Voting for Am., Inc. v. Long*,
   752 F. Supp. 2d 697 (E.D. Va. 2010) ........................................................... 21

*Pub. Int. Legal Found., Inc. v. Bellows*,
   92 F.4th 36 (1st Cir. 2024) ........................................................................... 21

*Pulsifer v. United States*,
   601 U.S. 124 (2024) ...................................................................................... 18

*Safe Streets All. v. Hickenlooper*,
   859 F.3d 865 (10th Cir. 2017) ...................................................................... 10

*Tashjian v. Republican Party of Connecticut*,
   479 U.S. 208 (1986) ........................................................................................ 1

*True the Vote v. Hosemann*,
   43 F. Supp. 3d 693 (S.D. Miss. 2014) .................................................... 17, 21

*United States v. Alabama*,
   362 U.S. 602 (1960) ........................................................................................ 4

*United States v. Benson*,
   __ F. Supp. 3d __, 2026 WL 362789 (W.D. Mich. Feb. 10, 2026) ...... 9, 11, 12, 13, 17

*United States v. Oregon*,
   __ F. Supp. 3d __, 2026 WL 318402 (D. Or. Feb. 5, 2026) .................... 9, 21, 22, 23

*United States v. Weber*,
   __ F. Supp. 3d __, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026) ............... 9, 19, 20, 21

*West Virginia v. EPA*,
   597 U.S. 697 (2022) ...................................................................................... 16

*Whitman v. Am. Trucking Ass'ns*,
   531 U.S. 457 (2001) ...................................................................................... 16

*Wild Watershed v. Hurlocker*,
   961 F.3d 1119 (10th Cir. 2020) .................................................................... 15

## Constitutions

U.S. Const. art. I, § 4, cl. 1 ................................................................................. 1

## Statutes

7 U.S.C. § 2146a(b) .......................................................................................... 15

52 U.S.C. § 20501 ............................................................................................ 3, 19

52 U.S.C. § 20507 ....................................................................................... 3, 20, 21

52 U.S.C. § 20701 ........................................................... 2, 5, 11, 12, 13, 14

52 U.S.C. § 20702 ............................................................................................ 13

52 U.S.C. § 20703 ............................................................... 2, 5, 10, 11, 18

52 U.S.C. § 20704 ............................................................................................ 17

52 U.S.C. § 21083 ................................................................... 4, 13, 14, 15

Utah Code § 20A-2-104 ....................................................................... 6, 14

Utah Code § 20A-2-502 .................................................................... 5, 6, 14

Utah Code § 20A-2-504 ............................................................................ 6

Utah Code § 20A-2-506 ............................................................................ 6

## Rules

DUCivR 7-1(a) ......................................................................................... 1

Fed. R. Civ. P. 12(b)(6) ......................................................................... 1

## Other Authorities

Civil Rights Act, Pub. L. No. 86-449, 74 Stat. 86 ......................................... 4

Help America Vote Act, Pub. L. No. 107-252, 116 Stat. 1666 .................... 4

## MOTION, RELIEF SOUGHT, AND GROUNDS

Defendant Deidre M. Henderson, in her official capacity as Lieutenant Governor of the State of Utah, respectfully moves this Court to dismiss Plaintiff United States's Complaint. *See* Fed. R. Civ. P. 12(b)(6); DUCivR 7-1(a). The basis for this motion is that Plaintiff has not alleged facts stating a claim for relief under Title III of the Civil Rights Act of 1960.

## INTRODUCTION

Federalism and the separation of powers are the central features of our constitutional order. The Framers envisioned a robust system of dual sovereignty in which the States maintained a strong independent role—including in running elections. For that reason, "the Constitution grants to the States a broad power to prescribe the 'Times, Places and Manner of holding Elections for Senators and Representatives.'" *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 217 (1986) (quoting U.S. Const. art. I, § 4, cl. 1). The Constitution also allows Congress a role in the electoral process—specifically, that of "establishing uniform rules for federal elections, binding on the States," where necessary. *Foster v. Love*, 522 U.S. 67, 69 (1997). But on a fundamental level, it is the States that wield the "constitutional power to prescribe rules regulating federal elections." *Moore v. Harper*, 600 U.S. 1, 27 (2023); *see also Foster*, 522 U.S. at 69.

Plaintiff now aims to upset that balance. In this litigation—as in 29 similar lawsuits against other States and the District of Columbia, none of which have yet been successful—the executive branch of the federal government claims the power

to compel the State of Utah ("the State" or "Utah") to hand over sensitive personal information belonging to millions of Utah voters. For support, it cites the Civil Rights Act of 1960 (CRA)—a 66-year-old statute under which it has "never previously claimed powers of this magnitude" before. *Biden v. Nebraska*, 600 U.S. 477, 501 (2023). Plaintiff reads this statute to confer a "sweeping power to obtain" state voting records, requiring States to ignore their own voter privacy laws in the process. Dkt. 1 ("Compl.") ¶ 2.

Plaintiff is mistaken. The CRA does not require Utah to hand over its own internal voting rolls, which the State created for its own purposes, and which are not "records" that have "come into [its] possession" as the statute specifies. 52 U.S.C. § 20701. The CRA does not prohibit Utah from redacting sensitive voter information, as required by State law. And it does not authorize the federal government to sidestep Congress's unambiguous requirement that the federal government provide a valid statement of "the basis and the purpose" for its voting-record request. 52 U.S.C. § 20703.

## BACKGROUND

### A. Federal Statutes Regulating State Voting Records

Three federal statutes form the backdrop for Plaintiff's demand for voter information in this case: the National Voter Registration Act of 1993 (NVRA), the Help America Vote Act of 2002 (HAVA), and the Civil Rights Act of 1960. Each statute imposes voter record maintenance requirements on States—requirements with which Utah complies.

***The NVRA.*** Congress enacted NVRA 33 years ago in an effort to "establish
procedures that will increase the number of eligible citizens who register to vote in
elections for Federal office," "protect the integrity of the electoral process," and
"ensure that accurate and current voter registration rolls are maintained." 52
U.S.C. § 20501(b). To that end, the NVRA requires States to take particular steps to
maintain their voter rolls, including to "ensure that any eligible applicant is
registered to vote in an election" and "provide that the name of a registrant may not
be removed from the official list of eligible voters," except in narrow circumstances.
*Id.* § 20507(a). For the most frequent situations requiring registrant removal—that
is, the voter's death or change of residence—the NVRA tasks States with conducting
a "general program that makes a reasonable effort to remove the names of ineligible
voters." *Id.* § 20507(a)(4). And the NVRA also contains a public disclosure provision
mandating that "[e]ach State shall maintain for at least 2 years and shall make
available for public inspection and, where available, photocopying at a reasonable
cost, all records concerning the implementation of programs and activities
conducted for the purpose of ensuring the accuracy and currency of official lists of
eligible voters," with exceptions not relevant here. *Id.* § 20507(i)(1).

***HAVA.*** A decade after the NVRA became law, Congress enacted HAVA to
"provide funds to States to replace punch card voting systems," "establish the
Election Assistance Commission to assist in the administration of Federal
elections," and "establish minimum election administration standards for States
and units of local government with responsibility for the administration of Federal

elections." Help America Vote Act, Pub. L. No. 107-252, 116 Stat. 1666 (enacted Oct. 29, 2002) (codified as amended at 52 U.S.C. §§ 20901–21145). HAVA requires States to "implement, in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level that contains the name and registration information of every legally registered voter in the State." 52 U.S.C. § 21083(a)(1)(A). It further mandates that States protect their voter registration lists from "unauthorized access," *id.* § 21083(a)(3), and "perform list maintenance" as outlined in the statute, *id.* § 21083(a)(2)(A). HAVA generally concentrates electoral administration authority at the State level; Congress specifically provided that "[t]he specific choices on the methods of complying with the requirements of [HAVA] shall be left to the discretion of the State." *Id.* § 21085.

***The CRA.*** The CRA was enacted to "enforce constitutional rights," including voting rights. Civil Rights Act, Pub. L. No. 86-449, 74 Stat. 86 (enacted May 6, 1960). At the time, "racially discriminatory practices calculated to deprive [African American] citizens of their voting rights in violation of the Fifteenth Amendment" were distressingly common in several States. *United States v. Alabama*, 362 U.S. 602, 602 (1960); *see also, e.g.*, *Gomillion v. Lightfoot*, 364 U.S. 339 (1960). To ensure that States comply with the statute, the CRA imposed a record-preservation requirement: all State "officer[s] of election" must "retain and preserve, for a period of twenty-two months" following a federal election, "all records and papers which come into his possession relating to any application, registration, payment of poll

tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. It further provides that "[a]ny record or paper required by [the CRA] to be retained and preserved shall, upon demand in writing by the Attorney General or his representative . . . be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative." *Id.* § 20703. When such a request is made, the CRA also imposes a reciprocal requirement on the federal government: "[t]his demand shall contain a statement of the basis and the purpose therefor." *Id.*

### B. Utah's Voter Registration and Voter List Maintenance Laws

Utah guarantees its residents' right to vote through a comprehensive statutory framework. In order to facilitate free and fair elections, Utah's laws both conform to the requirements found in the NVRA, HAVA, and the CRA and protect the sensitive and private information of its voters.

As required by federal law (and necessary for functional elections), Utah maintains an accurate voter database. Utah's lieutenant governor is required to "develop, manage, and maintain a statewide voter registration system to be used by county clerks to maintain an updated statewide voter registration database" that conforms to State law. Utah Code § 20A-2-502(1)(a). That database is "regularly update[d]"—on a weekly or monthly basis, depending on the type of data at issue— with changes to voters' names, addresses, or status. *Id.* § 20A-2-502(1)(b). To maintain the accuracy of the database, the lieutenant governor "[r]egularly monitor[s] the system" and implements "security measures" to ensure that the voter

5

information is correct and up to date. *Id.* § 20A-2-502(1)(c)–(d). A voter's name is removed from the database upon her death, change of residence, written request, conviction of a qualifying offense, or registration to vote within another state. *Id.* § 20A-2-504(2).

Utah's laws also require the preservation of its voter registration records. Every "record concerning the implementation of programs and activities conducted for the purpose of ensuring that the official register is accurate and current" is "preserve[d] for at least two years," including the official register itself. *Id.* § 20A-2-506(1)(a), -506(2)(a). A "static copy" of the official register for every election is routinely made and stored for "at least 22 months." *Id.* § 20A-2-506(3). And with certain exceptions, all voter registration records are also "made available for public inspection" and photocopying. *Id.* § 20A-2-506(2)(b)–(c). Names and addresses in the voter registration records are generally available to the public, and years of birth are available to some requestors as well. *Id.* §§ 20A-2-104(2)(a), -104(4).

But because voters must provide sensitive personal information to register to vote (including date of birth, contact information, driver license number, and Social Security Number digits), Utah law protects that information. *Id.* Sensitive personal information in voter registration forms is available only to government officials acting in their official capacity in narrow circumstances. *Id.* § 20A-2-104(4)(d)(i).

**C. Plaintiff's Demands for Utah Voters' Sensitive Information**

On July 15, 2025, Lieutenant Governor Henderson received a letter from Michael E. Gates, an attorney in the Civil Rights Division of the U.S. Department of

Justice (DOJ). Ex. 1. Citing a need to ensure Utah's compliance with the NVRA, DOJ demanded that Lieutenant Governor Henderson produce voluminous voter-related information within 14 days, including a "current electronic copy of Utah's computerized statewide voter registration list" with "all fields contained within the list." Ex. 1 at 1. DOJ also demanded "a description of the steps that you have taken, and when those steps were taken, to ensure that the state's list maintenance program has been properly carried out in full compliance with the NVRA." *Id.* Later that month, Henderson sent a comprehensive response detailing Utah's voter maintenance process and ongoing compliance. Ex. 2 at 8.

DOJ sent a second (and more pointed) demand two weeks later, on August 14. This time relying on the CRA rather than the NVRA, Ex. 3 at 2, it insisted that the United States government was entitled to more information about Utah voters, including each "registrant's full name, date of birth, residential address, [and] his or her state driver's license number or the last four digits of the registrant's social security number." *Id.* at 1. DOJ made assurances that any sensitive voter information would "be kept securely," but sternly dismissed any "privacy concerns" based on State law as "clearly preempted." *Id.* at 2. DOJ gave Utah seven days to comply and later agreed to provide an additional week, but dismissed a request for a 30-day extension as "not reasonable." Ex. 4.

In light of the differences between DOJ's two letters, Utah's Director of Elections sought further clarification. The August 14 letter, which demanded "highly sensitive and personally identifiable voter information," had raised several

difficult questions given Utah's duty to "respec[t] all relevant state and federal legal requirements." Ex. 5 at 1–2. Among other things, Utah asked DOJ to clarify:

- the legal authority supporting its demand for sensitive personal information;

- whether and how DOJ would share Utah voters' personal information with other agencies or non-governmental entities;

- whether and how DOJ would use Utah voters' personal information in comparisons with other databases; and

- the relevant timeframe for the voter information DOJ sought.

*Id.* at 2–3. Above all, Utah sought to understand the legal basis for DOJ's request for sensitive voter information—whether the NVRA (which appeared not to "impose strict confidentiality requirements on the DOJ" and was the apparent basis for the July 15 letter), the CRA (which does not allow for requests covering DOJ's initial stated timeframe and was at least in part the DOJ's stated basis for the August 14 letter), or some other statute. *Id.*

Over three months later, DOJ responded—not with answers, but with a proposed Memorandum of Understanding (MOU). Ex. 6. The MOU purported to address "the parties' understanding as to the security protections for data transfer and data access by the Department of Justice," though DOJ clarified that it was "under no such obligation as a matter of law." Ex. 7 at 3. But the MOU did not address Utah's earlier questions regarding whether and how DOJ would share Utah voters' sensitive personal data with other entities. Nor did it answer Utah's question regarding the underlying legal authority for DOJ's demands; instead, it cited both the NVRA *and* the CRA, along with HAVA for good measure. *Id.* at 2.

Once again, DOJ demanded that Utah agree to and sign the MOU within seven days, and that the State turn over Utah voters' private information. Ex. 6 at 1. When Utah indicated that it would "need additional time" to deal with the "scope and complexity of the matter"—including "overlapping state and federal privacy concerns," "conflicting statutory requirements," and "common issues" shared by other States facing similar DOJ demands[1]—DOJ responded that "[a] timeline that stretches out weeks is not acceptable." Ex. 8 at 1. Lieutenant Governor Henderson did not sign the MOU.

### D. Procedural History

On February 26, 2026, Plaintiff filed this lawsuit. Dkt. 1 ("Compl."). DOJ has so far brought similar suits against 29 states and the District of Columbia,[2] and each of the three cases that have proceeded to a decision at the motion-to-dismiss stage has been dismissed. *See United States v. Weber*, __ F. Supp. 3d __, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026); *United States v. Oregon*, __ F. Supp. 3d __, 2026 WL 318402 (D. Or. Feb. 5, 2026); *United States v. Benson*, __ F. Supp. 3d __, 2026 WL 362789 (W.D. Mich. Feb. 10, 2026).

---

[1] Lieutenant Governor Henderson requested extra time, in part, to review whether complying with DOJ's request would implicate federal laws such as the Privacy Act of 1974 and the Driver's Privacy Protection Act, and to review whether DOJ had a statutory foundation for the "purposes" outlined in the MOU for which it sought private voter information.

[2] *Tracker: DOJ Lawsuits Seeking States' Sensitive Voter Data*, State Democracy *Rsch. Init.* (Mar. 4, 2026), https://statedemocracy.law.wisc.edu/our-work/tracker-doj-lawsuits-seeking-states-sensitive-voter-data.

In its complaint, Plaintiff asserts a single claim based on the CRA. Compl. ¶¶ 30–35. Plaintiff argues that it satisfied the CRA's requirement to provide "a statement of the basis and the purpose" for its demands and that Lieutenant Governor Henderson's failure to "provide the demanded federal election records" is a violation of 52 U.S.C. § 20703. *Id.* ¶¶ 34–35. Accordingly, it seeks an injunction ordering the State to hand over "Utah's computerized statewide voter registration list, with all fields, including each registrant's full name, date of birth, residential address, and either their state driver's license number, the last four digits of their Social Security number, or HAVA unique identifier," along with "such other federal election records demanded by the Attorney General." *Id.* ¶ 35. Plaintiff does not bring claims based on the NVRA or HAVA.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Bledsoe v. Carreno*, 53 F.4th 589, 606 (10th Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Although the Court draws reasonable inferences in favor of the plaintiff, it "first eliminates conclusory allegations, mere 'labels and conclusions,' and any 'formulaic recitation of the elements of a cause of action.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678). And importantly, "when legal conclusions are involved in the complaint, the tenet that [courts] accept the allegations as true is inapplicable to those conclusions." *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 878 (10th Cir. 2017) (cleaned up).

## ARGUMENT

The CRA does not authorize Plaintiff's demand for sensitive and private Utah voter information. The voter records Plaintiff demands are internal documents generated by the State, not "records [or] papers which come into [the State's] possession;" and they are not "other federal election records." That alone dooms its CRA claim, as one federal court has already explained. 52 U.S.C. § 20701; *see Benson*, 2026 WL 362789, at *9–10. Even if Plaintiff sought the type of records subject to disclosure, the CRA does not require States to disclose voters' sensitive private information. And even if Plaintiff's demands were otherwise authorized by law, Plaintiff has stated no valid "basis" or "purpose" for its demands. 52 U.S.C. § 20703. For all these reasons, its complaint should be dismissed.

### I.   The Information Plaintiff Seeks Are Not Covered "Records," as Defined in the Civil Rights Act, and Thus Not Subject to Disclosure.

At the outset, the Court should dismiss Plaintiff's complaint because the information Plaintiff seeks does not fall within the "records" that the CRA requires the State to disclose. A plain reading of the statute reveals the limits of the CRA's scope. Section 20701 of the CRA requires a state's election official to preserve "all records and papers *which come into his possession* relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." (emphasis added). And Section 20703 provides that the Attorney General can request to inspect "[a]ny record or paper *required by Section 20701 . . .* to be retained and preserved" (emphasis added). Only those records and papers that "come into [the State's] possession" are therefore subject to a request under the

CRA. And as a federal court in Michigan noted last month in rejecting Plaintiff's complaint, the "phrase 'come into [their] possession' naturally refers to a process by which someone *acquires* an item from an external source." *Benson*, 2026 WL 362789, at *9 (citing *Honeycutt v. United States*, 581 U.S. 443, 449 (2017) (defining "obtain" as "to come into possession of" (quoting *Random House Dictionary of the English Language* 995 (1966))); *accord Receive*, *Black's Law Dictionary* (12th ed. 2024) (defining "receive" as "to come into possession of or get from some outside source").

Statutory context supports what the plain text states: the CRA excludes the State's own internally generated documentation from the "records and papers" subject to disclosure. The surrounding language in Section 20701 limits the records States must preserve to those "relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. As the Michigan federal court explained, "[e]ach of these terms refers to something that the voter submits or does as part of the registration process." *Benson*, 2026 WL 362789, at *9. And each category of record included in this list are "records that election officials *receive*, rather than *create*." *Id*. It thus follows that the phrase "records and papers which come into his possession" "refer[s] to only those documents that state election officials receive from prospective voters"—an interpretation that also has the happy effect of preventing the phrase from becoming "surplusage." *Id*.; *see also Navajo Nation v. Dalley*, 896 F.3d 1196, 1215 (10th Cir. 2018) (""[W]e generally must give effect to all statutory provisions, so that

no part will be inoperative or superfluous—each phrase must have distinct meaning.'" (quoting *Chevron Mining Inc. v. United States*, 863 F.3d 1261, 1283 n.15 (10th Cir. 2017))); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 176 (2012) (courts should "avoid a reading that renders some words altogether redundant"). By its own terms, Section 20701 requires States to preserve and produce only those documents State election officials receive from voters, not documents they create for their own purposes.

The irrational implications of Plaintiff's contrary argument further support this commonsense conclusion. HAVA requires States to perform regular "maintenance" on their voter registration lists to ensure that they remain accurate and current. 52 U.S.C. § 21083(a)(2)(A). At the same time, the CRA expressly forbids State officials (on pain of imprisonment of up to one year) to "alte[r] any record or paper required by [§ 20701] to be retained and preserved." 52 U.S.C. § 20702. If voter registration lists were "records" subject to CRA disclosure, States would violate the CRA every time they updated a computerized voter list within the 22-month preservation window mandated by the CRA. That apparent paradox dissolves once it is recognized that "the existence of a statewide computerized voter list was not foreseeable to the Congress of 1960," and that the CRA's preservation and disclosure requirements do not cover such lists. *Benson*, 2026 WL 362789, at *10. It was only 42 years later that Congress chose to outline requirements for statewide electronic voter lists—in HAVA, a statute with which Utah comfortably

and consistently complies and for a violation of which Plaintiff has not brought a claim. 52 U.S.C. § 21083(a)(1)(A).

Plaintiff has demanded the same type of State-created documents from Utah as it did from Michigan—and the same analysis applies. Just as in *Benson*, Plaintiff demands an unredacted "statewide voter registration list." Compl. ¶ 20. But that voter registration list is a document created by the State itself, not a document received from a voter. Under Utah law, it is the "lieutenant governor" who must "develop, manage, and maintain a statewide voter registration system." Utah Code § 20A-2-502(1)(a). It is the "lieutenant governor" who must "regularly monitor" and "update the system" based on information obtained from various sources, including Utah's "Driver License Division," "the state registrar," the "Department of Corrections," and "other states." *Id.* §§ 20A-2-502(1)(b)–(c). And it is ultimately the "lieutenant governor" who generates, edits, and "maintain[s] a list of registered voters," using information obtained largely from other State agencies. *Id.* § 20A-2-104(3)(b). The statewide voter registration list is thus a creation of the State, not a record that "come[s] into [its] possession" from voters. 52 U.S.C. § 20701. Accordingly, the CRA does not require its disclosure to Plaintiff.

## II. The Civil Rights Act Does Not Require Disclosure of Utah Voters' Sensitive Personal Information.

The CRA not only lacks a disclosure requirement for State-created information about voters, but also lacks a requirement that sensitive and private voter information be disclosed at all.

14

Once again, the text of the CRA defeats Plaintiff's invocation of the statute right out of the gate. No provision of the CRA requires the collection or preservation of the sensitive information Plaintiff now seeks, including birth dates, partial Social Security numbers, and driver license numbers. In fact, no federal statute required States to collect such confidential information from voters at all until the enactment of HAVA in 2002. 52 U.S.C. § 21083(a)(5)(A)(i). Plaintiff nonetheless insists that the CRA not only requires Utah to turn over its voter records, but to do so in *unredacted* form—with "all fields required by HAVA contained within the list." Compl. ¶¶ 20, 35. But that insistence reads into the CRA a requirement that is simply not there. And as both the Tenth Circuit and the Supreme Court have explained, "[w]here no explicit statutory requirements exist, [courts] generally refrain from reading any in." *Wild Watershed v. Hurlocker*, 961 F.3d 1119, 1127 (10th Cir. 2020) (citing *Dean v. United States*, 556 U.S. 568, 572 (2009)). Congress knows how to require disclosure of records "in their entirety without redactions." 7 U.S.C. § 2146a(b). It did not do so here.

The lack of textual support for Plaintiff's demands is especially meaningful given the Supreme Court's "long expressed reluctance to read into ambiguous statutory text extraordinary delegations of Congress's powers." *Learning Res., Inc. v. Trump*, 607 U.S. ___, No. 24–1287, 2026 WL 477534, at *7 (U.S. Feb. 20, 2026) (plurality op.) (cleaned up).  In such "major questions" cases, the Court has reasoned that "'[b]oth separation of powers principles and a practical understanding of legislative intent' sugges[t] Congress would not have delegated 'highly

15

consequential power' through ambiguous language." *Id.* (quoting *West Virginia v. EPA*, 597 U.S. 697, 723–24 (2022)). And the Supreme Court has repeatedly refused to discover sweeping authority in "modest words" and "ancillary provisions." *See West Virginia*, 597 U.S. at 723; *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). Plaintiff's demand for the sensitive information of all Utah voters (and the voters of at least 28 other states) to "test, analyze, and assess states' VRLs for proper list maintenance and compliance with federal law," *see* Ex. 7 at 2, is a major policy departure from the CRA (and any other law)—and effectively claims a new regulatory power. Plaintiff may not make such demands without identifying "clear congressional authorization." *West Virginia*, 597 U.S. at 732 (quotation omitted).

Precedent also weighs against Plaintiff's attempt to leverage the CRA to access sensitive information. In the more than half century since the CRA's passage, no court has adopted the anything-goes interpretation urged by Plaintiff here. To the contrary, judges at the time of its passage emphasized that they were not applying the CRA's disclosure requirement to "confidential, private papers and effects," but rather "public records which ought ordinarily to be open to legitimate reasonable inspection and which by nature relate directly to the most vital of all public functions—the franchise of the citizen." *Kennedy v. Lynd*, 306 F.2d 222, 231 (5th Cir. 1962). Here, at Plaintiff's request, the State immediately offered to provide "the most current version of the public statewide voter registration list," Ex. 2 at 8—in other words, its "public records" that were "open to legitimate reasonable inspection." *Lynd*, 306 F.2d at 231. No case law, contemporaneous or recent,

suggests that it was also obligated to hand over "confidential, private" data about its voters as well. *Id.*

And for good reason. Interpreting the CRA to require States to hand over millions of voters' private information to the federal government would likely deter voter registration rather than enable it—particularly given that the CRA allows the Attorney General to share any disclosures under the CRA with "Congress," "any committee thereof," and "governmental agencies" across the federal board. 52 U.S.C. § 20704. Interpreting the CRA, a statute enacted to promote exercise of the right to vote, to require States to give away confidential and protected information of its voters would be a perverse irony. "It is hard to imagine that in enacting the [CRA], Congress intended to abrogate all protections provided for by Federal and State laws against the disclosure of private and confidential information" and thus "create a gaping hole in the statutory landscape whereby personal, otherwise protected information would lose its protection once a citizen registered to vote." *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 735 (S.D. Miss. 2014) (applying similar reasoning to the NVRA).[3]

Plaintiff's effort to newly read into the CRA a requirement to disclose sensitive, protected voter information is unavailing. Where disclosure is required, a State may comply with the CRA by producing a public version of the relevant records and redact private data to which the federal government has no claim.

---

[3] For similar reasons, every court to consider the parallel question whether the NVRA requires States to disclose private, unredacted voter information has concluded that it does not.  *See Benson*, 2026 WL 362789, at *3 (citing 12 examples).

### III.    Plaintiff Has Failed to Provide a Valid Basis and Purpose for Its Demand for Voter Information as Required by the Civil Rights Act.

Finally, even if the CRA were to require disclosure of the type of information sought here, Plaintiff has failed to provide a valid basis and purpose for its request—a prerequisite under Title III of the Civil Rights Act (CRA).

Title III of the CRA states that, when exercising authority to review or reproduce federal election records pursuant to its provisions, the DOJ's written "demand *shall* contain a statement of the basis *and* the purpose therefor." 52 U.S.C. § 20703 (emphases added). The statute's use of the term "shall" indicates that provision of the statement is compulsory and not optional. *See Bufkin v. Collins*, 604 U.S. 369, 379 (2025) ("[T]he word 'shall' imposes a mandatory command."). Further, the use of the term "and" in this directive means that Plaintiff must set forth both the "basis" and the "purpose," not just one or the other. *See Pulsifer v. United States*, 601 U.S. 124, 133 (2024) ("[I]n grammatical terms," the term "and" "is of course a conjunction—a word whose function is to connect specified items.").

The terms "basis" and "purpose" in this context are distinct. The "[p]urpose" is the "intention" behind or "reason" for the demand. *Purpose*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/purpose (last visited Mar. 13, 2026). In contrast, "basis" is "something on which" the demand "is established or based." *Basis*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/basis (last visited Mar. 13, 2026). A records request under Title III is insufficient unless Plaintiff stated the "purpose" and "basis" of the request.

18

Plaintiff did not provide an adequate purpose or basis for its request here. Plaintiff's sole relevant allegation is that the "basis of the demand was the CRA" and the purpose was to "assess [Utah's] compliance with the statewide [Voter Registration List] maintenance provisions of National Voter Registration Act ('NVRA'), 52 U.S.C. § 20501, *et seq*." Compl. ¶¶ 23–24 (alterations in original). But these statements cannot, as a matter of law, satisfy the "purpose" and "basis" preconditions underlying the Attorney General's Title III record-inspection authority.

**Invalid Purpose.** Plaintiff cannot rely on an aim to enforce *the NVRA* as a valid purpose for invoking the records-inspection provision of *the CRA*—a distinct federal statute enacted for different purposes. Rather, Plaintiff must use a records provision in the NVRA when it seeks to enforce the NVRA. That becomes clear when the CRA and NVRA are considered together.

 To begin with, Title III of the CRA was enacted long before the NVRA. So when Congress enacted the CRA, it could not possibly have intended NVRA enforcement to be a purpose for which Plaintiff's inspection authority under the CRA could be invoked. *See Weber*, 2026 WL 118807, at *9 ("Title III was not passed as a tool for NVRA compliance. The NVRA could never have been passed for this use case because the passage of Title III in 1960 preceded the NVRA by several decades which was passed in 1993.").[4] Instead, Congress included the CRA's record-

---

[4] Relatedly, as explained above, the fact that the CRA was not intended to be used to obtain "[u]niform, centralized statewide voter registration lists—like the one [Plaintiff] is seeking" from Utah in this case—is confirmed by the fact that these

inspection provision to enable *enforcement of the CRA*, not other federal statutes. *See Lynd*, 306 F.2d at 228 (explaining that the United States Attorney General is entitled to inspect records, as defined in the CRA, "in fulfillment of the duties imposed upon him *by the Civil Rights Act of 1957 and 1960*" (emphasis added)).

That the record-inspection provision of the CRA was not intended to be used for the purpose of enforcing the NVRA is further confirmed by Congress's enactment of the NVRA itself. When the NVRA was enacted in 1993, Congress included a separate record-inspection provision and enforcement mechanisms instead of relying on the CRA's provisions. *See* 52 U.S.C. §§ 20507(i) ("Each State shall maintain for at least 2 years and shall make available *for public inspection* . . . all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters . . ." (emphasis added)); 20510(a) ("The Attorney General may bring a civil action in an appropriate district court for such declaratory or injunctive relief as is necessary to carry out *this chapter*." (emphasis added)); *see also id.* § 20510(b) (similar "private right of action" for "a violation of *this chapter*" (emphasis added)). These are the provisions upon which Plaintiff must rely when seeking to enforce the NVRA.

A California federal court reached this same conclusion just two months ago in dismissing a substantially similar complaint filed by Plaintiff. *See Weber*, 2026 WL 118807, at *12. In that case, the court explained that the "NVRA puts the onus

---

types of centralized voter registration lists "were not even required until the passage of HAVA in 2002." *Weber*, 2026 WL 118807, at *9.

on states to maintain voter rolls," but that Congress included the "public inspection" provision in § 20507(i) and enforcement mechanisms in § 20510 to achieve the NVRA's objectives. *Id*. Importantly, in creating this regulatory scheme, Congress did "not distinguish between private parties and the government regarding the 'public inspection' requirement." *Id*.

In other words, when it comes to enforcement of the NVRA, Congress chose to put Plaintiff on the same footing as other members of the public, which is a right only to "public inspection." *See Oregon*, 2026 WL 318402, at *6 ("There is no separate disclosure provision [in the NVRA] applicable to the federal government, and the federal government does not enjoy any intrinsic authority to compel disclosure of these records."); *see also Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024) ("[N]othing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information in the Voter File.").[5] Congress could have provided the federal government with access to private information to enforce the NVRA, but it declined to do so. It would thus be inconsistent with that legislative choice to allow Plaintiff to rely on an arguably broader record-inspection provision from the CRA for the stated purpose of

---

[5] *See also Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1344 (N.D. Ga. 2016) ("Section 8(i) requires the disclosure of individual voter registration records, but it does not require the disclosure of sensitive information that implicates special privacy concerns."); *True the Vote*, 43 F. Supp. 3d at 739 ("[T]he NVRA Public Disclosure Provision does not require the disclosure of unredacted voter registration documents, including voter registrant birthdates."); *Project Vote/Voting for Am., Inc. v. Long*, 752 F. Supp. 2d 697, 711–12 (E.D. Va. 2010) (finding that the NVRA does not preclude redaction of Social Security Numbers in voter registration applications before public disclosure of such applications).

enforcing the NVRA. Accordingly, Plaintiff has not provided a valid "purpose" for its record request under the CRA.

***Invalid Basis.*** Additionally, Plaintiff has not provided a valid "basis" for its request. Plaintiff states that the "basis" for its request is "the CRA." Plaintiff thus suggests that the required "basis" it must disclose is the *legal* basis, as opposed to the factual basis, for its request. That is incorrect, as a federal district court recognized in dismissing a similar lawsuit by Plaintiff just last month. *See Oregon*, 2026 WL 318402, at *8. In that case, Plaintiff argued "that 'basis' refers to a legal basis rather than a factual one, and its citation to the NVRA and HAVA was sufficient" to form such a basis. *Id*. The district court rejected that assertion, instead concluding that "basis" "mean[s] a factual basis for investigating a violation of a federal statute." *Id*. at *9.

Common sense as well as the text of the CRA confirms the *Oregon* court's conclusion. As noted above, the record-inspection provision requires Plaintiff to state a purpose *and* a basis for the request. By using the conjunction "and," Congress inserted two separate requirements into the statute. Yet Plaintiff's legal-basis argument would render the "basis" requirement meaningless. As the *Oregon* court explained, "[r]eading 'basis' in the way Plaintiff suggests collapses its meaning with that of 'purpose.'" *Id*. That is because any valid purpose for demanding records would be related to Plaintiff's efforts to enforce a provision of the CRA. And "[i]f the *purpose* is to investigate violations of a statute, the *basis* must be something else; the statute underlying the investigation is nothing more than a component of the

purpose." *Id.* (emphases added). As a result, "Plaintiff's interpretation fails to give full meaning to both 'basis' and 'purpose.'" *Id.* For this reason, the Court should interpret the term "basis" in the CRA to mean the factual basis for Plaintiff's purported need for the records.

In the current case, Plaintiff has failed to allege any factual basis for its request or this action. Indeed, the only CRA violation Plaintiff has alleged in its Complaint is Defendant's failure to provide records under the record-inspection act. *See* Compl. at ¶¶ 19–29 (factual allegations). And Plaintiff does not allege that any factual basis was provided to Utah in Plaintiff's August 14, 2025 letter—the letter in which Plaintiff alleges that it stated that the "basis" for its demands was the "CRA." *Id.* at ¶¶ 22–25; *see generally* Ex. 3 (Plaintiff's Aug. 14, 2025 letter). For the reasons stated above, Plaintiff's conclusory allegations do not satisfy the CRA's requirement that it provide a valid basis for its records demand.

In sum, Plaintiff has failed to provide a valid "purpose" and "basis" for its record request, and so its CRA claim should be dismissed.

## CONCLUSION

Plaintiff demands documents beyond the CRA's scope, seeks access to private and sensitive information that the statute does not compel, and fails to meet its own obligation to provide a purpose and basis for invoking the CRA. The Court should dismiss Plaintiff's complaint.

DATED: March 13, 2026

Respectfully submitted,

*/s/ Mark C. Gillespie*
Mark C. Gillespie
Joshua B. Cutler
    Assistant Utah Solicitors General
Lance Sorenson
David N. Wolf
Anikka Hoidal
    Assistant Utah Attorneys General

*Counsel for Defendant Lieutenant Governor Deidre Henderson*

## CERTIFICATE OF SERVICE

I hereby certify that on March 13, 2026, I caused a true and correct copy of the foregoing **DEFENDANT LIEUTENANT GOVERNOR DEIDRE HENDERSON'S MOTION TO DISMISS** to be filed using the Court's electronic filing system, which effectuated service of such filing upon all counsel who have entered an appearance.

*/s/ Mark C. Gillespie*
Mark C. Gillespie
Assistant Solicitor General
*Counsel for Defendant*

**U.S. Department of Justice**

Civil Rights Division

*Voting Section*
*950 Pennsylvania Ave, NW – 4CON*
*Washington, DC 20530*

July 15, 2025

<u>Via Mail and Email</u>

The Honorable Deidre Henderson
Lieutenant Governor
P.O. Box 142220
Salt Lake City, UT 84114-2220
deidrehenderson@utah.gov

Dear Lieutenant Governor Henderson:

We write to you as the chief election official for the State of Utah to request information regarding the state's procedures for complying with the statewide voter registration list maintenance provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq*.

Please provide a list of the election officials who are responsible for implementing Utah's general program of voter registration list maintenance from November 2022 through receipt of this letter, including those responsible officials not employed by your office (such as local election officials) who are also involved in that effort. Please also provide a description of the steps that you have taken, and when those steps were taken, to ensure that the state's list maintenance program has been properly carried out in full compliance with the NVRA.

The NVRA requires each state and the District of Columbia to make available for inspection "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1). Section 11 of the NVRA authorizes the Attorney General to bring NVRA enforcement actions. *See* 52 U.S.C. § 20510.

Pursuant to Section 20507(i) of the NVRA, the Attorney General requests that you produce for inspection the following records:

The current electronic copy of Utah's computerized statewide voter registration list ("statewide voter registration list") as required by Section 303(a) of the Help America Vote Act. Please include all fields contained within the list. Please produce each list in a .xls, .csv, or delimited-text file format. Please specify what delimiter is used, if applicable, or provide a file layout along with a database user manual, coding list, or other materials that define or explain how a voter record is coded into the statewide voter registration list and reported in the electronic copy of the statewide voter registration list.

Additionally, please provide the following information in electronic form. The time period for these requests is close of registration for the November 2022 general election through the close of registration for the November 2024 general election, the same time period as the most recent report from the Election Assistance Commission's Election Administration and Voting Survey ("EAVS"). If you are unable to provide the data, please explain why the data is not available.

1. A review of the most recent EAVS report shows that Utah has the lowest rate in the nation for voter registration records removed from the voter registration rolls. Only four of Utah's twenty-nine counties provided data regarding removals in response to Question A12a. Please supply the data for the twenty-five remaining counties. Additionally, please explain what actions the State is taking to ensure that voters who should not be on the voter roll are being removed.

2. No data was listed for any county in Utah in the EAVS survey for Question A3d, which asks for information regarding registration transactions submitted by persons already registered to vote. Please provide the data on duplicate registrations for each county in Utah. If such registrations were merged or linked with another record, please provide that information. Additionally, please explain Utah's process for determining duplicates and what happens to the duplicate registrations.

3. Most counties in Utah reported no data for Questions A10b through A10f, which track the outcome of Confirmation Notices that were mailed to registrants. Only six counties provided data for any category and only two counties provided data for all categories. The information on confirmation notices that Utah did provide indicates that those reporting counties generally did not know the result of the confirmation notice. 180,061 (65.8%) of the Result of Confirmation Notice were listed as "not categorized." Please provide the data for each county in Utah for Questions A10b through A10f.

4. Most counties in Utah provided no data on the reasons that voters were removed from the registration rolls, as is requested by Questions A12b through A12h. Only two counties in Utah reported data for voters removed because they moved outside the jurisdiction. Only one county reported data for voters removed because they failed to respond to a sent confirmation notice and failed to vote in the two most recent federal elections. All other categories – including removal of deceased voters, voter's request for removal, felony, and mental incompetence – had no data reported for any county. Please provide the data for each county in Utah for Questions A12b through A12h.

5. In response to Question A12e, Utah reported an aggregate total of 45,342 registrants removed for failure to return confirmation notices. This number is 263.7% of all voters removed from the state registration list, which Utah reported as 17,196. Please provide an explanation for the discrepancy.

Please provide a description of the steps that Utah has taken, and when those steps were taken, to identify registered voters who are ineligible to vote as well as the procedures the state used to remove those ineligible voters from the registration list. Please identify the number of registered

voters identified as ineligible to vote for the time period of the close of registration for the November 2022 general election through present for each of the following reasons:

1. Non-citizen

2. Adjudicated incompetent

3. Felony conviction

For each of those voters identified in categories 1-3 above, provide their registration information on the statewide voter registration list, including their vote history.

Please provide this information within 14 days of the date of this letter. The information and materials may be sent by encrypted email to voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File Sharing (JEFS).

Should further clarification be required, please contact Maureen Riordan at maureen.riordan2@usdoj.gov. We look forward to your assistance in advance.

Sincerely,

Michael E. Gates
Deputy Assistant Attorney General
Civil Rights Division


Maureen Riordan
Acting Chief, Voting Section
Civil Rights Division

cc: Ryan Cowley
Director of Elections
350 N. State Street, Suite 200
Salt Lake City, UT 84114-2220
ryancowley@utah.gov



# STATE OF UTAH

SPENCER J. COX
GOVERNOR

OFFICE OF THE LIEUTENANT GOVERNOR
SALT LAKE CITY, UTAH
84114-2220

DEIDRE M. HENDERSON
LIEUTENANT GOVERNOR

July 31, 2025

Michael E. Gates
Deputy Assistant Attorney
U.S. Department of Justice
Civil Rights Division
Pennsylvania Ave, NW – 4CON
Washington, DC  20530

Dear Mr. Gates,

This is the response to your letter dated July 15, 2025.

The state of Utah is in compliance with federal election law including NVRA, and has implemented safe, secure, and timely safeguards and processes for maintaining voter registration lists. These safeguards and processes are outlined in the Utah Election Code at Utah Code Title 20A Chapter 2.

Utah has a robust process for voter list maintenance and monthly certification from county clerks to ensure maintenance is being done. The Lieutenant Governor provides and maintains a statewide voter registration database that county clerks use to register voters and update existing voter registrations. Clean voter rolls are the foundation for secure elections and therefore need to be routinely and systematically updated. County clerks perform routine checks and list maintenance. Clerks certify list maintenance compliance to the Lieutenant Governor and to the public on a monthly basis. Among other things, the county clerks:

- Process voter registration forms (electronic and paper) within 7 days of receipt (excluding the period between a voter registration deadline and an election canvass)
- Verify the identity of each voter at the time of registration (Utah Code 20A-2-503(1))
- Perform checks for and remove duplicate voters and voters who are registered in another state (Utah Code 20A-2-503(4))
- Remove deceased voters within 5 days of receiving notice (Utah Code 20A-2-504(3))

- Send out voter information cards to voters who have recently registered or updated their registration (Utah Code 20A-2–101.1)
- Send confirmation cards to voters who have potentially moved or have not recently voted (Utah Code 20A-2-505)
- 90 days before each election county clerks certify that they have performed, or will perform, a National Change of Address (NCOA) check before mailing the main ballot extract (Utah Code 20A-2-505)
- 90 days before each election the Lieutenant Governor ensures that deceased voters have been removed from the rolls. (Utah Code 20A-2--505(7))
- Utah participates in ERIC. A list of monthly reports that is used to help maintain the voters rolls can be found starting on page 14 of the bylaws and membership agreement (https://ericstates.org/wp-content/uploads/documents/ERIC-Bylaw-MA-FINAL.pdf). Action is taken by the county clerks on each report in the same month in which the information is received from ERIC. Please note that Utah has an exemption from the A. - Eligible but Unregistered Report

County clerks must perform an annual processing each December. Annual processing is a cleanup tool that inactivates voters who have not voted in two consecutive regular general elections and mails them a confirmation card. Additionally, it allows for the removal of voters that have not updated their voter record and have not voted in two consecutive regular general elections after receiving instructions on how to update their registration to remain on the voter rolls.

For more information, and to view the monthly certification by county, please visit: https://vote.utah.gov/voter-list-maintenance-requirements/.

The information that was not entered into the EAVS report by our county clerks, as pointed out in your letter, is due to reporting limitations of our 25 year old legacy system. The actions behind the requested data is not available in any type of aggregated report, but is documented within each individual voter record. The Office of the Lieutenant Governor has spent considerable time over the past two weeks manually compiling the requested data. Utah is in the process of implementing a modern system with enhanced reporting capabilities that will be in place at the beginning of 2027.

Utah remains one of the most proactive states for maintaining current and accurate voter registration rolls. The reference to the EAVS report Question A12a and subsequent conclusion that "Utah has the lowest rate in the nation for voter registration records removed from the voter registration rolls" is based on incomplete data and therefore inaccurate. The statewide total of removed voters between December 1, 2022 and November 30, 2024 is 109,346. When the actual

number of removed voters is used, the percentage of removals changes from 0.08% to 5.4%. Please see "Table 1" below for these numbers broken down by county.

Table 1.

| Voter Registration Removals by County | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| County | Annual Processing | Citizenship | Deceased | Duplicate Registrant | Inactivity | Moved Out of County | Requested Removal | Unspecified Removed |
| Beaver | 207 | 0 | 101 | 2 | 21 | 29 | 2 | 21 |
| Box Elder | 757 | 0 | 716 | 0 | 0 | 762 | 0 | 0 |
| Cache | 2688 | 0 | 1275 | 0 | 14 | 3962 | 15 | 517 |
| Carbon | 876 | 0 | 429 | 3 | 1 | 159 | 4 | 15 |
| Daggett | 16 | 0 | 19 | 0 | 0 | 33 | 0 | 1 |
| Davis | 5644 | 0 | 3355 | 1 | 1 | 1278 | 38 | 26 |
| Duchesne | 97 | 0 | 274 | 1 | 0 | 253 | 0 | 6 |
| Emery | 216 | 0 | 196 | 2 | 0 | 69 | 3 | 2 |
| Garfield | 15 | 0 | 98 | 1 | 4 | 52 | 2 | 31 |
| Grand | 153 | 0 | 130 | 0 | 0 | 289 | 5 | 15 |
| Iron | 886 | 0 | 655 | 0 | 0 | 286 | 4 | 12 |
| Juab | 283 | 0 | 147 | 2 | 0 | 72 | 1 | 1 |
| Kane | 112 | 0 | 136 | 0 | 0 | 97 | 3 | 0 |
| Millard | 160 | 0 | 170 | 3 | 0 | 144 | 3 | 1 |
| Morgan | 67 | 0 | 146 | 2 | 0 | 162 | 2 | 3 |
| Piute | 21 | 0 | 36 | 2 | 0 | 27 | 2 | 0 |
| Rich | 8 | 0 | 35 | 1 | 0 | 21 | 1 | 12 |
| Salt Lake | 15573 | 3 | 11143 | 12 | 272 | 5157 | 174 | 317 |
| San Juan | 559 | 0 | 192 | 7 | 0 | 237 | 2 | 32 |
| Sanpete | 397 | 0 | 437 | 0 | 0 | 210 | 10 | 3 |
| Sevier | 408 | 0 | 366 | 0 | 0 | 99 | 2 | 5 |

| Voter Registration Removals by County | | | | | | | |
|---|---|---|---|---|---|---|---|
| Summit | 1025 | 0 | 275 | 0 | 0 | 642 | 10 | 171 |
| Tooele | 1142 | 0 | 666 | 0 | 0 | 613 | 5 | 26 |
| Uintah | 875 | 0 | 466 | 0 | 0 | 247 | 2 | 6 |
| Utah | 10871 | 1 | 4943 | 1 | 1 | 3316 | 30 | 678 |
| Wasatch | 928 | 0 | 295 | 0 | 4 | 755 | 5 | 17 |
| Washington | 3063 | 0 | 2906 | 0 | 2 | 899 | 68 | 42 |
| Wayne | 69 | 0 | 60 | 0 | 0 | 71 | 13 | 17 |
| Weber | 5645 | 0 | 3136 | 5 | 1 | 1057 | 15 | 14 |
| **Total** | **52761** | **4** | **32803** | **45** | **321** | **20998** | **421** | **1991** |

The county clerks responded to A3d in the EAVS report with "Data not available" or "Does not apply," both of which seem appropriate given the limitations of the legacy system as previously noted. Individuals with a valid drivers license can submit an unlimited number of changes to their voter registration online. The system allows the county clerk to process the most recent registration which then supersedes all the other submitted changes. The prior online changes submitted by the voter do not create or constitute a duplicate registration.  This helps prevent individuals from having more than one registration record.

Clerks run duplicate checks within the system as identified through ERIC reports on a monthly basis. These checks identify and allow the clerks to correct (merge) multiple registration records for the same voter. 4,683 records were merged during the period of 12/1/2022 - 11/30/2024. "Table 2" below has a breakdown of duplicate merged records by county:

Table 2.

| Merged Records by County | |
|---|---|
| **County** | **Merged Voter Count** |
| Beaver | 12 |
| Box Elder | 166 |
| Cache | 189 |

| Merged Records by County | |
|---|---|
| Carbon | 18 |
| Daggett | 7 |
| Davis | 461 |
| Duchesne | 50 |
| Emery | 28 |
| Garfield | 11 |
| Grand | 20 |
| Iron | 113 |
| Juab | 60 |
| Kane | 18 |
| Millard | 37 |
| Morgan | 8 |
| Piute | 9 |
| Rich | 4 |
| Salt Lake | 1304 |
| San Juan | 60 |
| Sanpete | 67 |
| Sevier | 37 |
| Summit | 167 |
| Tooele | 92 |
| Uintah | 104 |
| Utah | 905 |
| Wasatch | 175 |
| Washington | 284 |
| Wayne | 19 |
| Weber | 258 |

| Merged Records by County | |
| --- | --- |
| **Total** | **4683** |

In response to your inquiry regarding Questions A10b through A10f, 269,799 voters were sent a confirmation card from 12/1/2022 - 11/30/2024. Of these, 108,699 were marked by clerks as returned. The letter noted that Utah reported the number of voters removed due to returned confirmation cards was 263.7% of all the voters that were removed from the state registration list. The correct percentage is 45.4%. This discrepancy is due to the data being incomplete, rather than for the reason stated in the letter. "Table 3" below contains a breakdown of confirmation cards sent and returned by county.

Table 3.

| Returned Confirmation Cards by County | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| **County** | **Correct address** | **Moved out of jurisdiction** | **Moved within jurisdiction** | **Other*** | **Post office change address** | **Undeliverable** | **Total** |
| Beaver | 27 | 14 | 60 | 0 | 2 | 11 | **114** |
| Box Elder | 241 | 447 | 800 | 25 | 0 | 1349 | **2862** |
| Cache | 894 | 1672 | 1283 | 601 | 131 | 4651 | **9232** |
| Carbon | 102 | 157 | 72 | 8 | 21 | 439 | **799** |
| Daggett | 16 | 20 | 15 | 5 | 1 | 20 | **77** |
| Davis | 3652 | 1647 | 3277 | 445 | 8 | 3156 | **12185** |
| Duchesne | 259 | 267 | 181 | 11 | 4 | 262 | **984** |
| Emery | 47 | 34 | 39 | 6 | 0 | 5 | **131** |
| Garfield | 34 | 15 | 15 | 13 | 1 | 0 | **78** |
| Grand | 43 | 201 | 158 | 128 | 2 | 241 | **773** |
| Iron | 240 | 368 | 1605 | 36 | 3 | 524 | **2776** |
| Juab | 197 | 124 | 86 | 18 | 2 | 141 | **568** |
| Kane | 54 | 74 | 100 | 5 | 13 | 176 | **422** |
| Millard | 126 | 64 | 105 | 20 | 1 | 192 | **508** |

| Returned Confirmation Cards by County | | | | | | |
|---|---|---|---|---|---|---|
| Morgan | 0 | 36 | 313 | 10 | 5 | 1 | **365** |
| Piute | 2 | 2 | 0 | 0 | 0 | 0 | **4** |
| Rich | 15 | 8 | 5 | 8 | 0 | 46 | **82** |
| Salt Lake | 6165 | 6619 | 1967 | 3387 | 107 | 14569 | **32814** |
| San Juan | 246 | 86 | 50 | 17 | 31 | 221 | **651** |
| Sanpete | 18 | 77 | 255 | 20 | 1 | 49 | **420** |
| Sevier | 126 | 147 | 489 | 9 | 0 | 307 | **1078** |
| Summit | 348 | 489 | 320 | 479 | 1 | 292 | **1929** |
| Tooele | 523 | 606 | 1011 | 199 | 7 | 167 | **2513** |
| Uintah | 163 | 201 | 160 | 19 | 0 | 271 | **814** |
| Utah | 2079 | 2764 | 9075 | 637 | 29 | 5629 | **20213** |
| Wasatch | 178 | 99 | 238 | 33 | 0 | 0 | **548** |
| Washington | 4621 | 621 | 2410 | 94 | 20 | 151 | **7917** |
| Wayne | 10 | 8 | 5 | 2 | 0 | 2 | **27** |
| Weber | 505 | 1675 | 4744 | 225 | 6 | 660 | **7815** |
| **Total** | **20931** | **18542** | **28838** | **6460** | **396** | **33532** | **108699** |

*Other includes all returned confirmation cards where the reason for the confirmation return was not recorded correctly.

As for your request for numbers of ineligible voters, the numbers for the period you request are as follows:

1. Non-citizen
   a. Four voters were given a status of "removable" due to a change to a non-citizen status between 12/1/2022 - 11/30/2024.
2. Adjudicated incompetent
   a. Zero voters have been removed from the voter rolls due to incompetence.
3. Felony conviction
   a. The total number of voters who were made removable due to being incarcerated felons between 12/1/2022 - 11/30/2024 was 4,225.

As for your request for the statewide voter registration database, attached is the most current version of the public statewide voter registration list. The list contains two files. One file is the list of registered voters, the other contains vote history. The top row of each file are column identifiers.

A list of the 29 Utah county clerks can be found at:
https://vote.utah.gov/contact-your-county-election-officials/. The director of elections, Ryan Cowley, can address questions or concerns relating to maintenance of the statewide voter registration system that county clerks use.


Sincerely,


Deidre M. Henderson
Lieutenant Governor
State of Utah



**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

August 14, 2025

<u>Via Mail and Email</u>

The Honorable Deidre Henderson
Lieutenant Governor
P.O. Box 142220
Salt Lake City, UT 84114-2220
deidrehenderson@utah.gov

Re:    **Complete Utah's Voter Registration List with All Fields**

Lieutenant Governor Henderson:

We have received Utah's statewide voter registration list ("VRL").  However, as the Attorney General requested, the electronic copy of the statewide VRL must contain *all fields*, including the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required under the Help America Vote Act ("HAVA")[1] to register individuals for federal elections. *See* 52 U.S.C. § 21083(a)(5)(A)(i).

We have requested Utah's VRL to assess your state's compliance with the statewide VRL maintenance provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501, *et seq*. Our request is pursuant to the Attorney General's authority under Section 11 of the NVRA to bring enforcement actions. *See* 52 U.S.C. § 20501(a).

The Help America Vote Act ("HAVA"), 52 U.S.C. § 20501, *et seq*., also provides authority for the Justice Department to seek the State's VRL via Section 401, which makes the Attorney General solely responsible for actions to enforce HAVA's computerized statewide Voter Registration List requirements. *See* 52 U.S.C. § 21111; *see also Brunner v. Ohio Republican Party*, 555 U.S. 5, 6 (2008) (*per curiam*) (finding there is no private right of action to enforce those requirements in HAVA).

---

[1] In charging the Attorney General with enforcement of the voter registration list requirements in the HAVA and in the NVRA, Congress plainly intended that Justice Department be able to conduct an independent review of each state's list.  Any statewide prohibitions are clearly preempted by federal law.

In addition to those authorities, the Attorney General is also empowered by Congress to request records pursuant to Title III of the Civil Rights Act of 1960 ("CRA"), codified at 52 U.S.C. § 20701, *et seq.* Section 301 of the CRA requires state and local officials to retain and preserve records related to voter registration and other acts requisite to voting for any federal office for a period of 22 months after any federal general, special or primary election. *See* 52 U.S.C. § 20701.

Section 303 of the CRA provides, in pertinent part, "Any record or paper required by section 20701 of this title to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative…" 52 U.S.C. § 20703.

Pursuant to the foregoing authorities, including the CRA, the Attorney General is demanding an electronic copy of Utah's complete and current VRL. The purpose of the request is to ascertain Utah's compliance with the list maintenance requirements of the NVRA and HAVA.

When providing the electronic copy of the statewide VRL, Utah must ensure that it contains *all fields*, which includes the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required under the Help America Vote Act ("HAVA")[2] to register individuals for federal elections. *See* 52 U.S.C. § 21083(a)(5)(A)(i).

To the extent there are privacy concerns, the voter registration list is subject to federal privacy protections. Section 304 of the CRA provides the answer:

Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to this chapter, or any reproduction or copy, except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury.

Moreover, HAVA specifies that the "last 4 digits of a social security number . . . shall not be considered a social security number for purposes of section 7 of the Privacy Act of 1974" (5 U.S.C. § 552a note); 52 U.S.C. § 21083(c). In addition, any prohibition of disclosure of a motor vehicle record contained in the Driver's License Protection Act, codified at 18 U.S.C. § 2721(b)(1), is exempted when the disclosure is for use by a government agency in carrying out the government agency's function to accomplish its enforcement authority as the Justice Department is now doing. That said, all data received from you will be kept securely and treated consistently with the Privacy Act.

---

[2] In charging the Attorney General with enforcement of the voter registration list requirements in the HAVA and in the NVRA, Congress plainly intended that Justice Department be able to conduct an independent review of each state's list. Any statewide prohibitions are clearly preempted by federal law.

In charging the Attorney General with enforcement of the voter registration list requirements in HAVA and in the NVRA, Congress plainly intended that DOJ be able to conduct an independent review of each state's list.  Any statewide prohibitions are preempted by federal law.

To that end, please provide the requested electronic Voter Registration List[3] to the Justice Department within seven days or by August 21, 2025.

The information and materials may be sent by encrypted email to voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File Sharing ("JEFS").  Should further clarification be required, please contact Maureen Riordan at maureen.riordan2@usdoj.gov.

Regards,

Harmeet K. Dhillon
Assistant Attorney General
Civil Rights Division

cc:    Ryan Cowley
       Director of Elections
       350 N. State Street, Suite 200
       Salt Lake City, UT 84114-2220
       ryancowley@utah.gov

---

[3] Containing *all fields*, which includes either the registrant's full name, date of birth, residential address, his or her state driver's license number or the last four digits of the registrant's social security number as required by HAVA.

## RE: [EXTERNAL] Re: Complete Voter Registration List with All Fields

**Michael.Gates2@usdoj.gov Gates, Michael (CRT)**                Friday, August 22, 2025 at 7:17:11 AM Mountain Daylight Time
To: ryancowley@utah.gov Ryan Cowley
Cc: deidrehenderson@utah.gov deidrehenderson@utah.gov, Maureen.Riordan2@usdoj.gov Riordan, Maureen (CRT),
Timothy.F.Mellett@usdoj.gov Mellett, Timothy F (CRT)

Mr. Cowley, while we are amenable to accommodating a *reasonable request*, a 30-day extension under the
circumstances is not reasonable.  The electronic form of Utah's Voter Registration List already exists and can be easily
transmitted to the Justice Department by following the instructions in our letter.  The legal authorities presented by the
Justice Department's for the transmittal of the VRL are clear.  Having said this, we will extend the time to respond for Utah
to August 29th.  Thank you.

**Michael E. Gates**

Deputy Assistant Attorney General

Civil Rights Division, U.S. Department of Justice

Cell: (202) 679-6891

---

**From:** Ryan Cowley <ryancowley@utah.gov>
**Sent:** Thursday, August 21, 2025 7:12 PM
**To:** Gates, Michael (CRT) <Michael.Gates2@usdoj.gov>
**Cc:** deidrehenderson@utah.gov; Riordan, Maureen (CRT) <Maureen.Riordan2@usdoj.gov>; Mellett, Timothy F
(CRT) <Timothy.F.Mellett@usdoj.gov>
**Subject:** [EXTERNAL] Re: Complete Voter Registration List with All Fields

Dear Michael Gates, please find attached our response to your letter dated August 14, 2025.



**Ryan Cowley** | **Director of Elections**

OFFICE OF LIEUTENANT GOVERNOR
DEIDRE M. HENDERSON
LTGOVERNOR.UTAH.GOV
801-538-1041

On Thu, Aug 14, 2025 at 12:32 PM Gates, Michael (CRT) <Michael.Gates2@usdoj.gov> wrote:

Lieutenant Governor Henderson, please find attached the Justice Department's letter requesting your state's complete
electronic Voter Registration List, with applicable legal authorities for this request.  Please note the August 21, 2025,
deadline.  Thank you.

**Michael E. Gates**

Deputy Assistant Attorney General

Civil Rights Division, U.S. Department of Justice

Cell: (202) 679-6891

Office of the Lieutenant Governor

State of Utah

SPENCER J. COX
*Governor*

DEIDRE M. HENDERSON
*Lieutenant Governor*

RYAN COWLEY
*Director of Elections*

SHELLY JACKSON
*Deputy Director of Elections*

August 29, 2025

Michael E. Gates
Deputy Assistant Attorney General
U.S. Department of Justice Civil Rights Division

Sent via email: Michael.Gates@usdoj.gov

Mr. Gates:

This letter is in response to the Department of Justice's (DOJ) request to the Lieutenant Governor for sensitive voter information, dated August 14, 2025, and follow up email on August 22, 2025. We are grateful for the additional time to prepare a response. To facilitate a clear and constructive dialogue, we kindly request clarification regarding the purpose of these requests and how the records might be utilized by the DOJ.

Background

Utah's statewide voter-registration list ("VRL") contains highly sensitive and personally identifiable voter information.  On July 15, you requested "all fields" of the VRL.  We responded on July 31 with an offer to produce certain publicly available voter data.  But in your August 14 letter, you indicated that our initial offer to produce this publicly available information was insufficient.  Instead, you renewed your request for the entire VRL and specified that our production should include voters' full names, dates of birth, and residential addresses, as well as their state driver's license numbers or the last four digits of their social security numbers.  You have asked us to respond by today.

Purpose

We seek to better understand some aspects of the requests. Notably, the initial letter referenced the National Voter Registration Act's ("NVRA") requirement for public inspection of certain records to verify the accuracy of Utah's official list of eligible voters. But the second letter outlined a different focus, this time requesting the VRL under the Civil Rights Act ("CRA")—to

ascertain Utah's compliance with the list maintenance requirements of the NVRA and HAVA." The second letter also referenced DOJ's confidentiality obligations under the CRA, but those confidentiality obligations are imposed only by the CRA, not by any statute mentioned in the first letter.

Given these variations in purpose and authority, we kindly request clarification on the specific objectives behind these requests and the applicable legal authority. Our goal is to ensure that we fully understand and address the DOJ's concerns while respecting all relevant state and federal legal requirements.

<u>Intended Use</u>

We also request clarity regarding how the requested information may be used or shared. Initially, the authority cited for the request was a statute allowing inspection of individual records. We'd like to understand whether our entire VRL—containing highly sensitive personally identifiable information—will be made available to the public, as implied by the references in the first letter. And if the DOJ considers the VRL to have been produced under the CRA (as the second letter suggests), we would appreciate clarification on which government agencies might receive the VRL from the DOJ. If any groups, agencies, or entities outside of the DOJ may have, or will be given, access to this data, we'd like clarification on both the authority and purpose for that access, as well as how the private information will be protected in accordance with the Privacy Act.

<u>Request for Clarification</u>

As demonstrated above, the DOJ has not clearly articulated the specific legal authority supporting its request for Utah's VRL containing personal identifying information of all Utah voters. Additionally, it remains unclear whether the VRL, if provided, would be maintained as strictly confidential and not disseminated to other governmental agencies or outside entities. Before proceeding with further legal analysis regarding the appropriateness of releasing the VRL, we kindly request clarification on the following points:

- What explicit authority does the DOJ rely on to request the entire VRL, including all personal identifying information of Utah voters? If this authority is based on the NVRA, should we be concerned that the NVRA does not appear to impose strict confidentiality requirements on the DOJ? Conversely, if the authority is based on the CRA, which does impose confidentiality obligations on the DOJ, under what circumstances might the DOJ share the VRL with other governmental agencies?

- Will the DOJ share the VRL with any non-governmental individuals or entities, such as advocacy organizations?

- Does the DOJ intend to match any information in the VRL against any other databases, whether federal, state, or non-governmental? If so, please specify which databases and the purposes of such comparisons.
- What is the relevant timeframe for this request? The initial communication specified a period from the close of registration for the November 2022 general election through the close of registration for the November 2024 election. This timeframe begins approximately 36 months ago. But the CRA—cited in the second letter as the authority for this request—imposes recordkeeping obligations for only 22 months following the date of any election in which a federal race is involved. Since the November 2022 election falls outside this 22-month period, we'd appreciate assistance identifying the relevant timeframe.

We are committed to working together to address these questions effectively. We appreciate your assistance in clarifying these matters to ensure compliance and mutual understanding. Please contact me with questions.

Sincerely,

Ryan Cowley
Director of Elections



Deidre Henderson <deidrehenderson@utah.gov>

---

## Full Voter Roll List with MOU
1 message

---

**Neff, Eric (CRT)** <Eric.Neff@usdoj.gov>                                    Tue, Dec 2, 2025 at 8:37 AM
To: "ryancowley@utah.gov" <ryancowley@utah.gov>
Cc: "deidrehenderson@utah.gov" <deidrehenderson@utah.gov>

Dear Mr. Crowley,


I am the new point of contact for Voter Roll Maintenance communication.  Please see the attached proposed MOU from
the Department of Justice.  This MOU in our opinion satisfies all reasonable concerns regarding privacy and data security,
which you raised in your August 29 letter (attached).  This MOU includes a request for compliance within 7 days of receipt
of this communication. Compliance requires providing all records requested in previous communications with your
Department, most notably our August 14 letter (attached).


Please do not hesitate to contact me with any questions or concerns.



Best,

Eric



### Eric Neff

Trial Attorney

Civil Rights Division

Department of Justice

150 M St. NE, Ste. 8-139

Washington, DC 20002

Eric.Neff@usdoj.gov

Cell: 202-532-3628



---

**3 attachments**

**VRLData Sharing Agreement DOJ-UT.pdf**
199K

**20250829 Owsley to CRT.pdf**
1184K

**20250814 Henderson from CRT.pdf**
240K



**U.S. Department of Justice**

Civil Rights Division

---

## CONFIDENTIAL MEMORANDUM OF UNDERSTANDING

### I.    PARTIES & POINTS OF CONTACT.

<u>Requester</u>
Federal Agency Name:  Civil Rights Division, U.S. Department of Justice
VRL/Data User:
Title:
Address:
Phone:

<u>VRL/Data Provider</u>
State Agency Name:
Custodian:
Title:
Address:
Phone:

The parties to this Memorandum of Understanding ("MOU" or "Agreement") are the Department of Justice, Civil Rights Division ("Justice Department" or "Department"), and the State of Utah ("You" or "your state").

### II.    AUTHORITY.

By this Agreement, the State of Utah ("You" or "your state") has agreed to, and will provide an electronic copy of your state's complete statewide Voter Registration List ("VRL" or "VRL/Data") to the Civil Rights Division of the U.S. Department of Justice (at times referred to as the "Department").  The VRL/Data must include, among other fields of data, the voter registrant's full name, date of birth, residential address, his or her state driver's license number or

1

the last four digits of the registrant's social security number as required under the HAVA to register individuals for federal elections. *See* 52 U.S.C. § 21083(a)(5)(A).

The authorities by which this information is requested by the Department of Justice are:

- National Voter Registration Act of 1993, 52 U.S.C. § 20501, *et seq*.

- Attorney General's authority under Section 11 of the NVRA to bring enforcement actions. See 52 U.S.C. § 20510(a).

- Help America Vote Act of 2002, 52 U.S.C. § 20901, *et seq*.

- Attorney General's authority to enforce the Help America Vote Act under 53 U.S.C. § 21111.

- Attorney General authority to request records pursuant to Title III of the Civil Rights Act of 1960 ("CRA"), codified at 52 U.S.C. § 20701, *et seq*.

- The Privacy Act of 1974, 5 U.S.C. § 552a, as amended.

## III.    PURPOSE.

A VRL is a Voter Registration List pursuant to the NVRA and HAVA, commonly referred to as "voter roll," compiled by a state – often from information submitted by counties – containing a list of all the state's *eligible* voters.  Regardless of the basis for ineligibility, ineligible voters do not appear on a state's VRL when proper list maintenance is performed by states.  The Justice Department is requesting your state's VRL to test, analyze, and assess states' VRLs for proper list maintenance and compliance with federal law.  In the event the Justice Department's analysis of a VRL results in list maintenance issues, insufficiency, inadequacy, anomalies, or concerns, the Justice Department will notify your state's point of contact   of the issues to assist your state with curing.

The purpose of this MOU is to establish the parties' understanding as to the security protections for data transfer and data access by the Department of Justice of the electronic copy of the statewide voter registration list, including all fields requested by the Department of Justice.

**IV.    TIMING OF AGREEMENT – TIME IS OF ESSENCE.**

Although the Justice Department is under no such obligation as a matter of law, because this Agreement is proposed, made, and to be entered into at your state's request as part of your state's transmission of its VRL to the Justice Department, this Agreement is to be fully executed within seven (7) days of the Justice Department presenting this Agreement to you.  Both parties agree that no part of this Agreement or execution is intended to, or will, cause delay of the transmission of your state's VRL to the Justice Department for analysis.

**V.    TIMING OF VRL/DATA TRANSFER.**

You agree to transfer an electronic copy of your state's complete statewide VRL/Data to the Civil Rights Division of the U.S. Department of Justice as described in Section III of this Agreement no later than five (5) business days from the execution of this Agreement, which is counted from the last day of the last signatory.

**VI.    METHOD OF VRL/DATA ACCESS OR TRANSFER.**

The VRL will be submitted by your state via the Department of Justice's secure file-sharing system, i.e., Justice Enterprise File Sharing (JEFS").  A separate application to use JEFS must be completed and submitted by your state through the Civil Rights Help Desk.  JEFS implements strict access controls to ensure that each user can only access their own files.  All files and folders are tied to a specific user, and each user has defined permissions that govern how they may interact with those files (e.g., read, write, or read-only).

Whenever a user attempts to access a file or folder, JEFS validates the request against the assigned permissions to confirm that the user is explicitly authorized. This process guarantees that users can only access files and folders only where they have permission. Users are also limited to the authorized type of interaction with each file or folder. Within the Department of Justice, access to JEFS is restricted to specific roles: Litigation Support, IT staff, and Civil Rights Division staff.

## VII.     LOCATION OF DATA AND CUSTODIAL RESPONSIBILITY.

The parties mutually agree that the Civil Rights Division (also "Department") will be designated as "Custodian" of the file(s) and will be responsible for the observance of all conditions for use and for establishment and maintenance of security agreements as specified in this agreement to prevent unauthorized use. The information that the Department is collecting will be maintained consistent with the Privacy Act of 1974, 5 U.S.C. § 552a. The full list of routine uses for this collection of information can be found in the Systems of Record Notice ("SORN") titled, JUSTICE/CRT – 001, "Central Civil Rights Division Index File and Associated Records," 68 Fed. Reg. 47610-01, 611 (August 11, 2003); 70 Fed. Reg. 43904-01 (July 29, 2005); and 82 Fed. Reg. 24147-01 (May 25, 2017). It should be noted that the statutes cited for routine use include NVRA, HAVA, and the Civil Rights Act of 1960, and the Justice Department is making our request pursuant to those statutes. The records in the system of records are kept under the authority of 44 U.S.C. § 3101 and in the ordinary course of fulfilling the responsibility assigned to the Civil Rights Division under the provisions of 28 C.F.R. §§ 0.50, 0.51.

VRL/Data storage is similar to the restricted access provided on JEFS and complies with the SORN: Information in computer form is safeguarded and protected in accordance with applicable Department security regulations for systems of records. Only a limited number of staff members who are assigned a specific identification code will be able to use the computer to access

4

the stored information.  However, a section may decide to allow its employees access to the system in order to perform their official duties.

All systems storing the VRL data will comply with all security requirements applicable to Justice Department systems, including but not limited to all Executive Branch system security requirements (e.g., requirements imposed by the Office of Management and Budget [OMB] and National Institute of Standards and Technology [NIST]), Department of Justice IT Security Standards, and Department of Justice Order 2640.2F.

## VIII.    NVRA/HAVA COMPLIANT VOTER REGISTRATION LIST.

After analysis and assessment of your state's VRL, the Justice Department will securely notify you or your state of any voter list maintenance issues, insufficiencies, inadequacies, deficiencies, anomalies, or concerns, the Justice Department found when testing, assessing, and analyzing your state's VRL for NVRA and HAVA compliance, i.e., that your state's VRL only includes eligible voters.

You agree therefore that within forty-five (45) days of receiving that notice from the Justice Department of any issues, insufficiencies, inadequacies, deficiencies, anomalies, or concerns, your state will clean its VRL/Data by removing ineligible voters and resubmit the updated VRL/Data to the Civil Rights Division of the Justice Department to verify proper list maintenance has occurred by your state pursuant to the NVRA and HAVA.

## IX.    CONFIDENTIALITY & DEPARTMENT SAFEGUARDS.

Any member of the Justice Department in possession of a VRL/Data will employ reasonable administrative, technical, and physical safeguards designed to protect the security and confidentiality of such data.  Compliance with these safeguards will include secure user authentication protocols deploying either: (i) Two-Factor Authentication ("2FA"), which requires users to go through two layers of security before access is granted to the system; or (ii) the

5

assignment of unique user identifications to each person with computer access plus unique complex passwords, which are not vendor supplied default passwords.

The Department will activate audit logging for the records, files, and data containing the state's VRL/Data in order to identify abnormal use, as well as to track access control, on computers, servers and/or Devices containing the VRL/Data.

For all devices storing records, files, and data containing the VRL/Data: there is (i) up-to-date versions of system security agent software that includes endpoint protection and malware protection and reasonably up-to-date patches and virus definitions, or a version of such software that can still be supported with up-to-date patches and virus definitions, and is set to receive the most current security updates on a regular basis; and (ii) up-to-date operating system security patches designed to maintain the integrity of the personal information.

For all devices storing records, files, and data containing the VRL/Data: there is (i) controlled and locked physical access for the Device; and (ii) the prohibition of the connection of the Device to public or insecure home networks.

There will be no copying of records, files, or data containing the VRL/Data to unencrypted USB drives, CDs, or external storage.  In addition, the use of devices outside of moving the records, files, or data to the final stored device location shall be limited.

Any notes, lists, memoranda, indices, compilations prepared or based on an examination of VRL/Data or any other form of information (including electronic forms), that quote from, paraphrase, copy, or disclose the VRL/Data with such specificity that the VRL/Data can be identified, or by reasonable logical extension can be identified will not be shared by the Department. Any summary results, however, may be shared by the Department.

In addition to the Department's enforcement efforts, the Justice Department may use the information you provide for certain routine, or pre-litigation or litigation purposes including:

6

present VRL/Data to a court, magistrate, or administrative tribunal; a contractor with the Department of Justice who needs access to the VRL/Data information in order to perform duties related to the Department's list maintenance verification procedures. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. § 552a(m).

**X.    LOSS OR BREACH OF DATA.**

If a receiving party discovers any loss of VRL/Data, or a breach of security, including any actual or suspected unauthorized access, relating to VRL/Data, the receiving party shall, at its own expense immediately provide written notice to the producing party of such breach; investigate and make reasonable and timely efforts to remediate the effects of the breach, and provide the producing party with assurances reasonably satisfactory to the producing party that such breach shall not recur; and provide sufficient information about the breach that the producing party can reasonably ascertain the size and scope of the breach. The receiving party agrees to cooperate with the producing party or law enforcement in investigating any such security incident. In any event, the receiving party shall promptly take all necessary and appropriate corrective action to terminate unauthorized access.

**XI.   DESTRUCTION OF DATA.**

The Department will destroy all VRL/Data associated with actual records as soon as the purposes of the list maintenance project have been accomplished and the time required for records retention pursuant to applicable law has passed. When the project is complete and such retention requirements by law expires, the Justice Department will:

1.  Destroy all hard copies containing confidential data (e.g., shredding);

2.  Archive and store electronic data containing confidential information offline in a secure location; and

3.  All other data will be erased or maintained in a secured area.

## XII.    OTHER PROVISIONS.

A.  Conflicts. This MOU constitutes the full MOU on this subject between the Department and your state. Any inconsistency or conflict between or among the provisions of this MOU, will be resolved in the following order of precedence: (1) this MOU and (2) other documents incorporated by reference in this MOU (e.g., transaction charges).

B.  Severability. Nothing in this MOU is intended to conflict with current law or regulation or the directives of Department, or the your state. If a term of this MOU is inconsistent with such authority, then that term shall be invalid but, to the extent allowable, the remaining terms and conditions of this MOU shall remain in full force and effect.

C.  Assignment. Your state may not assign this MOU, nor may it assign any of its rights or obligations under this MOU.  To the extent allowable by law, this MOU shall inure to the benefit of, and be binding upon, any successors to the Justice Department and your state without restriction.

D.  Waiver. No waiver by either party of any breach of any provision of this MOU shall constitute a waiver of any other breach. Failure of either party to enforce at any time, or from time to time, any provision of this MOU shall not be construed to be a waiver thereof.

E.  Compliance with Other Laws. Nothing in this MOU is intended or should be construed to limit or affect the duties, responsibilities, and rights of the User Agency under the National Voter Registration Act, 52 U.S.C. § 20501 *et seq*., as amended; the Help America Vote Act, 52 U.S.C. § 20901 *et seq*., as amended; the Voting Rights Act, 52 U.S.C. § *10301 et seq.*, as amended; and the Civil Rights Act, 52 U.S.C. § 10101 et seq., as amended.

F.  Confidentiality of MOU.  To the extent allowed by applicable law, this MOU, its contents, and the drafts and communications leading up to the execution of this MOU are deemed

by the parties as "confidential."  Any disclosures therefore could be made, if at all,

pursuant to applicable laws or court orders requiring such disclosures.


**SIGNATURES**

<u>VRL/Data Provider</u>
State Agency Name:
Signature: _____ Date of Execution:_____

Authorized Signatory Name Printed:_____

Title: _____


<u>Requester</u>
Federal Agency Name:  Civil Rights Division, U.S. Department of Justice

Signature: _____ Date of Execution:_____

Authorized Signatory Name Printed:_____

Title: _____



**Deidre Henderson <deidrehenderson@utah.gov>**

---

## RE: [EXTERNAL] Re: Full Voter Roll List with MOU
1 message

**Neff, Eric (CRT)** <Eric.Neff@usdoj.gov>                       Tue, Dec 9, 2025 at 1:28 PM
To: Ryan Cowley <ryancowley@utah.gov>
Cc: "deidrehenderson@utah.gov" <deidrehenderson@utah.gov>

Thank you for your reply. While this email does not specify a specific timeframe, I think it is fair to take from the reference of a Secretaries' meeting "in the next few weeks" that a signed MOU and data transfer by next week for example is unrealistic.

A timeline that stretches out weeks is not acceptable. I'd be happy to discuss further with you over the phone if you have specific concerns we can address.

Thanks,

Eric

---

**From:** Ryan Cowley <ryancowley@utah.gov>
**Sent:** Tuesday, December 9, 2025 1:11 PM
**To:** Neff, Eric (CRT) <Eric.Neff@usdoj.gov>
**Cc:** deidrehenderson@utah.gov
**Subject:** [EXTERNAL] Re: Full Voter Roll List with MOU

Mr. Neff,

This note is in response to your email dated December 2nd, and your phone message of December 8th.

We have received your requests and the proposed MOU. We are reviewing the matter and intend to fully address your requests. But, given the scope and complexity of the matter, the overlapping state and federal privacy concerns, the conflicting statutory requirements, and to ensure we provide you with a thorough and well-considered response, we will need additional time.

I note that we share the concerns of multiple Republican Secretaries of State regarding the DoJ's nationwide demand for private voter records. It is our understanding that the GOP Secretaries have set a meeting in the next few weeks to discuss these concerns. We welcome the discussion amongst the affected states and will respond to your new request once we have had the opportunity to address these common issues.

In the meantime, please review our July 31st email, which outlines the Utah statistics for voter registration removals, merged records, and returned confirmation cards. Additionally, our website posts the certification

by county clerks acknowledging their compliance with voter list maintenance requirements and ongoing execution of the State's voter list maintenance program. This includes:

- Processing registration forms within 7 days of receipt (including DMV registrations)
- Verifying the identity of voters (each time a registration is processed or updated)
- Duplicate voter checks and removals (at least monthly)
- Removal of deceased voters (within 5 business days of receiving notice)
- Information cards to recently registered or updated registrations
- Confirmation cards to those who have potentially moved or have not recently voted

These requirements and certifications include NCOA processing at least 90 days before each election and together with Utah's active use of the USCIS SAVE program demonstrate Utah's robust voter list maintenance efforts and compliance with list maintenance requirements under NVRA and Utah Election Code.

Thank you.



**Ryan Cowley | Director of Elections**

OFFICE OF LIEUTENANT GOVERNOR
DEIDRE M. HENDERSON
LTGOVERNOR.UTAH.GOV
801-538-1041

On Tue, Dec 2, 2025 at 8:37 AM Neff, Eric (CRT) <Eric.Neff@usdoj.gov> wrote:

Dear Mr. Crowley,

I am the new point of contact for Voter Roll Maintenance communication. Please see the attached proposed MOU from the Department of Justice. This MOU in our opinion satisfies all reasonable concerns regarding privacy and data security, which you raised in your August 29 letter (attached). This MOU includes a request for compliance within 7 days of receipt of this communication. Compliance requires providing all records requested in previous communications with your Department, most notably our August 14 letter (attached).

Please do not hesitate to contact me with any questions or concerns.

Best,

Eric

12/17/25, 3:58 PM States... Gmail - RE: [EXTERNAL] U.S. v... Roll Images Roll I...

Case 2:26-cv-00166-DBB-DAO    Document 18    Filed 03/13/26    PageID.150    Page 63 of 63

**Eric Neff**

Trial Attorney

Civil Rights Division

Department of Justice

150 M St. NE, Ste. 8-139

Washington, DC 20002

Eric.Neff@usdoj.gov

Cell: 202-532-3628

