# EXHIBIT 1

Case 2:26-cv-00166-DBB-DAO    Document 26-1    Filed 03/20/26    PageID.233    Page 1 of 31

Jason M. Groth (16683)
Masami T. Kanegae (20270)
American Civil Liberties Union of Utah Foundation
311 South State Street, Suite 310
Salt Lake City, Utah 84111
(801) 521-9862
jgroth@acluutah.org
mkanegae@acluutah.org

William Hughes*
Theresa J. Lee*
Sophia Lin Lakin*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
whughes@aclu.org
tlee@aclu.org
slakin@aclu.org

*application for admission pro hac vice forthcoming

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br>  v.<br><br>DEIDRE M. HENDERSON, in her official capacity as Lieutenant Governor and chief election officer for the State of Utah,<br><br>      Defendant. | **[PROPOSED] MOTION TO DISMISS OF THE LEAGUE OF WOMEN VOTERS OF UTAH**<br><br>Case No. 2:26-cv-166<br><br>District Judge David Barlow<br><br>Magistrate Judge Daphne A. Oberg |

**TABLE OF CONTENTS**

BACKGROUND ................................................................................................................ 2

    I.    The United States Seeks to Force the Disclosure of Sensitive Voter Data from Utah. ....... 2

    II.   The United States Seeks to Unlawfully Construct a National Voter Database with the

        Requested Data. ..................................................................................................... 3

    III.  The United States Seeks to Unlawfully Use the Data to Disenfranchise Voters. .............. 6

LEGAL STANDARD ....................................................................................................... 9

ARGUMENT .................................................................................................................... 9

    I.    The United States Seeks Records Outside the Scope of Title III. ....................................... 9

    II.   The United States Has Not Complied With Title III's Basis and Purpose Requirement. . 11

       A.    DOJ's statement of the basis and the purpose for its request is inadequate. ................. 11

       B.    DOJ's statement of the basis and the purpose of its request is pretextual. ................... 15

    III.  Any Records Disclosed Under the CRA Should Be Redacted to Protect the Constitutional

        Rights of the Voter. ................................................................................................ 18

CONCLUSION ................................................................................................................. 22

## TABLE OF AUTHORITIES

**Cases**

*American Federation of State, County, and Municipal Employees v. Social Security Administration*,
No. 25-cv-596 (D. Md. Jan. 16, 2026) ................................................................................... 5

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................................................... 9

*Chevron Mining Inc. v. United States*,
863 F.3d 1261 (10th Cir. 2017) .......................................................................................... 13

*Corner Post, Inc. v. Board of Governors of the Federal Reserve System*,
603 U.S. 799 (2024) ............................................................................................................. 16

*Department of Commerce v. New York*,
588 U.S. 752 (2019) ............................................................................................................. 16

*Equal Employment Opportunity Commission v. Burlington North Santa Fe Railroad*,
669 F.3d 1154 (10th Cir. 2012) .......................................................................................... 15

*Equal Employment Opportunity Commission v. Tricore Reference Laboratories*,
849 F.3d 929 (10th Cir. 2017) ............................................................................................ 15

*Fuqua v. Santa Fe County Sheriff's Office*,
157 F.4th 1288 (10th Cir. 2025) ......................................................................................... 16

*Honeycutt v. United States*,
581 U.S. 443 (2017) ............................................................................................................. 10

*Hooper v. City of Tulsa*,
71 F.4th 1270 (10th Cir. 2023) ........................................................................................... 16

*In re Coleman*,
208 F. Supp. 199 (S.D. Miss. 1962) .................................................................................... 21

*Kennedy v. Lynd*,
306 F.2d 222 (5th Cir. 1962) ................................................................................... 12, 19, 21

*Niz-Chavez v. Garland*,
593 U.S. 155 (2021) ............................................................................................................. 16

*Olmos v. Holder*,
780 F.3d 1313 (10th Cir. 2015) .......................................................................................... 19

*Petrella v. Brownback,*
    787 F.3d 1242 (10th Cir. 2015) ............................................................................................ 9

*Porter v. Ford Motor Co.,*
    917 F.3d 1246 (10th Cir. 2019) ........................................................................................ 9, 16

*Project Vote/Voting for America, Inc. v. Long,*
    682 F.3d 331 (4th Cir. 2012) ....................................................................................... 20, 21, 22

*Project Vote/Voting for America, Inc. v. Long,*
    No. 11-1809 (4th Cir. Oct. 18, 2011) .................................................................................. 21

*Public Interest Foundation, Inc. v. Bellows,*
    92 F.4th 36 (1st Cir. 2024) ............................................................................................. 20, 21

*Public Interest Legal Foundation v. Benson,*
    136 F.4th 613 (6th Cir. 2025) ............................................................................................ 14

*Public Interest Legal Foundation v. Schmidt,*
    No. 23-1590 (3d Cir. Nov. 6, 2023), https://perma.cc/3BQ9-36UJ ..................................... 21

*Public Interest Legal Foundation, Inc. v. Bellows,*
    No. 23-1361 (1st Cir. July 25, 2024) ................................................................................... 21

*Public Interest Legal Foundation, Inc. v. Dahlstrom,*
    673 F. Supp. 3d 1004 (D. Alaska 2023) .............................................................................. 20

*Public Interest Legal Foundation, Inc. v. Matthews,*
    589 F. Supp. 3d 932 (C.D. Ill. 2022) .................................................................................. 20

*Public Interest Legal Foundation, Inc. v. Matthews,*
    No. 20-CV-3190, 2022 WL 1174099 (C.D. Ill. Apr. 20, 2022) ............................................. 20

*Public Interest Legal Foundation, Inc. v. North Carolina State Board of Elections,*
    996 F.3d 257 (4th Cir. 2021) .............................................................................................. 20

*Public Interest Legal Foundationv. Benson,*
    2026 WL 568298 (U.S. Mar. 2, 2026) ................................................................................ 14

*Robbins v. Oklahoma,*
    519 F.3d 1242 (10th Cir. 2008) ............................................................................................ 9

*Sheetz v. County of El Dorado,*
    601 U.S. 267 (2024) .......................................................................................................... 21

*Tincher v. Noem*,
  No. 0:25-cv-4669 (D. Minn. Jan. 16, 2026).............................................................. 8

*United States v. Benson*,
  No. 1:25-cv-1148-HYJ-PJG, 2026 WL 362789 (W.D. Mich. Feb. 10, 2026) .......... 2, 9, 10, 11

*United States v. Cline*,
  148 F.4th 1162  (10th Cir. 2025) ..................................................................... 10

*United States v. Dobbs*,
  629 F.3d 1199 (10th Cir. 2011) ...................................................................... 10

*United States v. Oregon*,
  No. 6:25-cv-1666-MTK, 2026 WL 318402 (D. Or. Feb. 5, 2026) ............. 2, 12, 13, 14, 17, 18

*United States v. Powell*,
  379 U.S. 48 (1964)....................................................................................... 15

*United States v. Raffensperger*,
  No. 26-cv-485-ELR (N.D. Ga. Feb. 19, 2026) ......................................................... 6

*United States v. Weber*,
  No. 2:25-CV-9149-DOC-ADS, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026).. 2, 12, 13, 14, 16, 17, 18

*White v. Lucero*,
  135 F.4th 1213 (10th Cir. 2025)....................................................................... 9

**Statutes**

5 U.S.C. § 552a (e)(7)........................................................................................ 17

52 U.S.C. § 20501............................................................................................ 1, 7

52 U.S.C. § 20507......................................................................................... 13, 16, 17

52 U.S.C. § 20507 (a)(4)(A)–(B)........................................................................... 13

52 U.S.C. § 20507 (i)(1) .................................................................................. 19

52 U.S.C. § 20507(a)(4)................................................................................. 6, 14, 16

52 U.S.C. § 20507(c)(1).................................................................................... 14

52 U.S.C. § 20507(c)(2) ................................................................................................ 7

52 U.S.C. § 20507(d) ................................................................................................ 14

52 U.S.C. § 20507(d)(1)(B) ..................................................................................... 7, 16

52 U.S.C. § 20701 ............................................................................................. 1, 10, 11

52 U.S.C. § 20703 ...................................................................................... 10, 11, 12, 19

52 U.S.C. § 20901 ...................................................................................................... 1

52 U.S.C. § 21083(a)(2)(A) ...................................................................................... 14

52 U.S.C. § 21083(a)(4)(A) ..................................................................................... 7, 16

52 U.S.C. § 21085 ................................................................................................ 14, 17

52 U.S.C. § 21085 ...................................................................................................... 7

**Rules**

Federal Rules of Civil Procedure,
   Rule 12(b)(6) ....................................................................................................... 9

Federal Rules of Civil Procedure,
   Rule 12(c) ........................................................................................................... 18

Federal Rules of Civil Procedure,
   Rule 56 ............................................................................................................... 18

**Other Authorities**

*Analyzing DOJ's MOU for Voter Registration List Data for FISMA Compliance*,
   Electronic Privacy Information Center (Feb. 2026),
   https://epic.org/documents/analyzing-dojs-mou-for-voter-registration-list-data-for-
   fisma-compliance/ ............................................................................................ 5, 19

December 5, 2025 Post by @AAGDhillon,
   https://x.com/AAGDhillon/status/
   1997003629442519114 .......................................................................................... 5

Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National
   Voter Roll*, NEW YORK TIMES, Sept. 9, 2025,
   https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html ............. 4

Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, NEW YORK TIMES MAG., Nov. 16, 2025, https://www.nytimes.com/interactive/2025/11/16/magazine/trump-justice-department-staff-attorneys.html ............................................................................... 4

Jonathan Shorman, *DOJ is Sharing State Voter Roll Lists with Homeland Security*, STATELINE, Sept. 12, 2025, https://stateline.org/2025/09/12/doj-is-sharing-state-voter-roll-lists-with-homeland-security ............................................................................... 4

Jonathan Shorman, *Trump's DOJ Offers States 'Confidential' Deal to Wipe Voters Flagged by Feds as Ineligible*, STATELINE, Dec. 18, 2025, https://stateline.org/2025/12/18/trumps-doj-offers-states-confidential-deal-to-wipe-voters-flagged-by-feds-as-ineligible/ ............................................................................... 7

Jude Joffe-Block, *Trump's SAVE Tool Is Looking for Noncitizen Voters. But It's Flagging U.S. Citizens Too*, NPR, Dec. 10, 2025, https://perma.cc/6PY2-3F3D ............................................................................... 5

Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry, Tracker of Justice Department Requests for Voter Information, Brennan Center for Justice (updated Mar. 10, 2026), https://perma.cc/3KHP-GDFT ............................................................................... 2

Kyle Cheney, *Trump Administration Concedes DOGE Team May Have Misused Social Security Data*, POLITICO, Jan. 20, 2026, https://www.politico.com/news/2026/01/20/trump-musk-doge-social-security-00737245 ............................................................................... 5

Lisa Danetz, *The Justice Department's Security Measures for Collecting Voter Rolls Are Inadequate*, Brennan Center for Justice (Feb. 25, 2026), https://perma.cc/4WSD-DJKU ............................................................................... 6, 19

Miles Parks & Jude Joffe-Block, *Trump's DOJ focuses in on voter fraud, with a murky assist from DOGE*, NPR, May 22, 2025, https://perma.cc/X3Q6-AFJU ............................................................................... 4

Press Release, United States Department of Justice, *Justice Department Sues Five Additional States for Failure to Produce Voter Rolls* (Feb. 26, 2026), https://perma.cc/67UZ-KJFY ............................................................................... 3

Press Release, United States Department of Justice, *United States Announces Settlement with Kentucky Ensuring Compliance with Voter Registration List Maintenance Requirements* (July 5, 2018), https://perma.cc/G2EZUUA5 ............................................................................... 15

*Read Bondi's Letter to Minnesota's Governor*, NEW YORK TIMES, Jan. 24, 2026, https://www.nytimes.com/interactive/2026/01/24/us/pam-bondi-walz-doc.html ..................... 8

Reid Epstein & Nick Corasaniti, *Trump, in an Escalation, Calls for Republicans to 'Nationalize' Elections*, N.Y. TIMES, Feb. 2, 2026, https://www.nytimes.com/2026/02/02/us/politics/trump-nationalize-elections.html ............... 6

Sarah Lynch, *US Justice Dept Considers Handing over Voter Roll Data for Criminal Probes, Documents Show*, REUTERS, Sept. 9, 2025, https://www.reuters.com/legal/government/us-justice-dept-considers-handing-over-voter-roll-data-criminal-probes-documents-2025-09-09 .......................................................... 4

Intervenor the League of Women Voters of Utah ("LWV-UT") respectfully moves to dismiss the Complaint under Federal Rule of Civil Procedure 12(b).

In this action, the United States seeks to compel disclosure of sensitive personal voter data to which it is not entitled, using civil rights laws as a pretext. The Complaint and the documents incorporated by reference therein do not plausibly establish that the United States has provided the statutorily-required basis and purpose underlying its request for data. Even if they did, production would still be inappropriate, because the requested documents fall outside the scope of the United States' investigative authority and because nothing in the relevant statutes precludes redaction of sensitive voter information.

Congress has repeatedly legislated to ensure that all eligible Americans can participate in free, fair, and secure elections, including through the Civil Rights Act of 1960 ("CRA"), 52 U.S.C. § 20701 *et seq.*, as well as the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq.*, and the Help America Vote Act ("HAVA"), 52 U.S.C. § 20901 *et seq.* The federal government's demand for Utah's unredacted voter file—which contains sensitive personal information including driver's license numbers and/or Social Security numbers from millions of Utah voters—violates the plain text of the CRA, which unambiguously defines the scope of the records covered and the requirements imposed on the Department of Justice ("DOJ") when making a request. Public disclosure of state voting records is important to ensure transparency and voter rolls' accuracy, especially by ensuring citizens are not erroneously removed from the voter records. But releasing the State's voter records *without redaction* and for purposes unrelated to protecting voter access would only deter voter participation and undermine the right to vote.

District courts in California, Oregon, and Michigan have recently dismissed materially identical complaints seeking those states' complete voter files without leave to replead. *See United*

1

*States v. Weber*, No. 2:25-CV-9149-DOC-ADS, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026) (unpublished); *United States v. Oregon*, No. 6:25-cv-1666-MTK, 2026 WL 318402 (D. Or. Feb. 5, 2026) (unpublished); *United States v. Benson*, No. 1:25-cv-1148-HYJ-PJG, 2026 WL 362789 (W.D. Mich. Feb. 10, 2026) (unpublished). This Court should do the same.

## BACKGROUND

I.    **The United States Seeks to Force the Disclosure of Sensitive Voter Data from Utah.**

Beginning in May 2025, Plaintiff United States, through its Department of Justice ("DOJ"), began sending letters to election officials in at least forty-eight states, making escalating demands for the production of voter registration databases, with plans to gather data from all fifty states. *See* Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry, Tracker of Justice Department Requests for Voter Information, Brennan Ctr. for Just. (updated Mar. 10, 2026), https://perma.cc/3KHP-GDFT.

On July 15, 2025, the DOJ sent a letter to Defendant Deidre Henderson, the Lieutenant Governor of Utah, the state's chief election official. *See* Compl. ¶ 19, Dkt. No. 1; Proposed Intervenor-Defs. The League of Women Voters of Utah Mot. to Intervene Ex. 2, Letter of Michael E. Gates to Deidre Henderson (July 15, 2025) ("July 15 Letter"). The letter demanded an electronic copy of Utah's entire statewide voter registration list within fourteen days, citing the public records provision of the National Voter Registration Act ("NVRA"). Compl. ¶ 20; July 15 Letter at 1, 3. On July 31, Defendant responded, offering the requested list in redacted form. Compl. ¶ 21.

On August 14, the DOJ sent another letter, specifically demanding private voter information, including registrants' full name, date of birth, address, driver's license number, and the last four digits of the registrant's Social Security number. Compl. ¶ 22; Proposed Intervenor Defs.' Mot. to Intervene Ex. 3, Letter of Harmeet K. Dhillon to Deidre Henderson (Aug. 14, 2025)

2

("August 14 Letter"). The letter now relied on the Civil Rights Act of 1960. August 14 Letter at 2.

On August 29, Defendant's office responded, noting privacy concerns and seeking more information about the intended use of the data, including whether the DOJ intended to share it outside of the DOJ. Compl. ¶ 26; Proposed Intervenor Defs.' Mot. to Intervene Ex. 4, Mot. to Intervene, Letter of Ryan Cowley to Michael E. Gates (Aug. 29, 2025).

On December 2, the DOJ sent Defendant's office an email, attaching a proposed Memorandum of Understanding. Compl. ¶ 27; Proposed Intervenor Defs.' Mot. to Intervene Ex. 5, Proposed Mem. of Understanding ("MOU"). On December 9, Defendant's office responded, stating she would need more time to consider the request. Compl. ¶ 28.

On February 26, 2026, the United States responded by filing this lawsuit—one of at least thirty nearly-identical lawsuits that the DOJ has initiated against states and the District of Columbia across the country, seeking statewide voter files—attempting to compel production of this sensitive Utah voter data. *See* Press Release, U.S. Dep't of Just., *Justice Department Sues Five Additional States for Failure to Produce Voter Rolls* (Feb. 26, 2026), https://perma.cc/67UZ-KJFY.

## II.    The United States Seeks to Unlawfully Construct a National Voter Database with the Requested Data.

As documented in extensive public reporting and statements by administration officials, DOJ's requests for private, sensitive voter data from Utah and other states do not appear to relate to voter roll list maintenance under the NVRA and HAVA, the statutes invoked in the August 14 Letter. Rather, they appear to be in connection with unprecedented efforts by the United States to construct a national voter database and to otherwise use untested forms of database matching to scrutinize state voter rolls—all part of a broader effort to "nationalize" elections.

3

According to reporting, federal employees "have been clear that they are interested in a central, federal database of voter information."[1] DOJ is coordinating these unprecedented efforts with the federal Department of Homeland Security ("DHS"), according to reported statements from DOJ and DHS. *Id.*[2] One recent article extensively quoted a lawyer who recently left DOJ's Civil Rights Division, describing the Administration's aims in these cases:

> We were tasked with obtaining states' voter rolls, by suing them if necessary. Leadership said they had a DOGE person who could go through all the data and compare it to the Department of Homeland Security data and Social Security data. . . . I had never before told an opposing party, Hey, I want this information and I'm saying I want it for this reason, but I actually know it's going to be used for these other reasons. That was dishonest. It felt like a perversion of the role of the Civil Rights Division.[3]

Indeed, publicly-disclosed documents have confirmed that DOJ has asked staffers from the new "Department of Government Efficiency" ("DOGE") to identify noncitizens in state voter rolls by matching voter data with data from the Social Security Administration.[4] DOJ officials have since claimed that "we've checked 47.5 million vot[er] records" and found "several thousand non-citizens who are enrolled to vote in federal elections," although reporting indicates that these

---

[1] Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. TIMES, Sept. 9, 2025, https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html.

[2] *See also, e.g.*, Jonathan Shorman, *DOJ is Sharing State Voter Roll Lists with Homeland Security*, STATELINE, Sept. 12, 2025, https://stateline.org/2025/09/12/doj-is-sharing-state-voter-roll-lists-with-homeland-security; Sarah Lynch, *US Justice Dept Considers Handing over Voter Roll Data for Criminal Probes, Documents Show*, REUTERS, Sept. 9, 2025, https://www.reuters.com/legal/government/us-justice-dept-considers-handing-over-voter-roll-data-criminal-probes-documents-2025-09-09.

[3] Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, N.Y. TIMES MAG., Nov. 16, 2025, https://www.nytimes.com/interactive/2025/11/16/magazine/trump-justice-department-staff-attorneys.html.

[4] *E.g.*, Miles Parks & Jude Joffe-Block, *Trump's DOJ focuses in on voter fraud, with a murky assist from DOGE*, NPR, May 22, 2025, https://perma.cc/X3Q6-AFJU.

efforts are producing substantial false positives—*i.e.*, that they are flagging U.S. citizens as being non-citizens who are ineligible to vote.[5]

A recent federal court filing by DOJ further corroborates how United States officials have been seeking to use voter data in conjunction with data-matching and aggregation techniques, with these outside "election integrity" advocates. As detailed in the filing, which was made on behalf of the U.S. Social Security Administration ("SSA"):

> SSA determined in its recent review that in March 2025, a political advocacy group contacted two members of SSA's DOGE Team with a request to analyze state voter rolls that the advocacy group had acquired. The advocacy group's stated aim was to find evidence of voter fraud and to overturn election results in certain States. In connection with these communications, one of the DOGE team members signed a "Voter Data Agreement," in his capacity as an SSA employee, with the advocacy group. He sent the executed agreement to the advocacy group on March 24, 2025.

Notice of Corrections to the Record at 5, *AFSCME v. Soc. Sec. Admin.*, No. 25-cv-596 (D. Md. Jan. 16, 2026), Dkt. No. 197 ("*AFSCME* Notice").[6] The filing—which does not specify the terms of the "Voter Data Agreement" or the activities these DOGE actors or others undertook pursuant to it—also indicated that, around the same period, DOGE actors also shared unknown amounts of Social Security data on an unapproved third-party server, in a "manner [that] is outside SSA's security protocols." *Id.* at 6.[7]

---

[5]    December 5, 2025 Post by @AAGDhillon, https://x.com/AAGDhillon/status/1997003629442519114; Jude Joffe-Block, *Trump's SAVE Tool Is Looking for Noncitizen Voters. But It's Flagging U.S. Citizens Too*, NPR, Dec. 10, 2025, https://perma.cc/6PY2-3F3D.

[6] *See also* Kyle Cheney, *Trump Administration Concedes DOGE Team May Have Misused Social Security Data*, POLITICO, Jan. 20, 2026, https://www.politico.com/news/2026/01/20/trump-musk-doge-social-security-00737245.

[7] A recent analysis by experts at the Electronic Privacy Information Center identified a host of other serious security concerns and concluded that the DOJ has violated the requirements of the Federal Information Security Modernization Act of 2014 with respect to its collection and retention of voter registration list data from states. *Analyzing DOJ's MOU for Voter Registration List Data for FISMA Compliance*, Elec. Priv. Info. Ctr. (Feb. 2026), https://epic.org/documents/analyzing-dojs-mou-for-voter-registration-list-data-for-fisma-compliance/. The shortfalls include inadequate encryption of voter data, insufficient data access controls (such as multifactor authentication), and

### III.    The United States Seeks to Unlawfully Use the Data to Disenfranchise Voters.

Additional federal government documents indicate how the United States ultimately plans to use voters' sensitive personal data. This month, President Trump announced his desire to "nationalize" elections in certain states: "The Republicans should say, 'We want to take over,'" he said. "We should take over the voting, the voting in at least many—15 places. The Republicans ought to nationalize the voting."[8]

The December 2 Letter offered to send Lieutenant Governor Henderson a memorandum of understanding to address any privacy concerns; the DOJ has provided the template memorandum of understanding in related litigation, and it shows how the data requested will be used. *See* Compl. ¶ 27; MOU (draft agreement); *see also* Pls.' Mot. to Compel Prod. and Br. in Opp. to Mots. to Dismiss, Decl. of Erik Neff in Supp. of Mot. to Compel ¶ 21, *United States v. Raffensperger*, No. 26-cv-485-ELR(N.D. Ga. Feb. 19, 2026), Dkt. No. 31-2 (acknowledging MOU and representing that two states have signed it). The terms of the MOU purport to vest the United States with substantial new authority to identify supposedly ineligible voters on state voter rolls and then to compel states to remove these voters from the rolls, depriving them of the franchise.

The NVRA and HAVA give states the responsibility of conducting a "reasonable effort" to maintain voter lists and remove actually ineligible voters from the rolls. 52 U.S.C. § 20507(a)(4);

---

no audit log analysis or defined reporting process (meaning that no one will review who accesses the data and no mandated reporting of data breaches). *Id.* In addition, DOJ has failed to explain how it will vet third-party contractors who will access the data or safeguard voters' private information. *Id.* Most concerningly, the DOJ plans to "archive" the data, creating a permanent federal registry of sensitive voter information. *Id.*; *see also* Lisa Danetz, *The Justice Department's Security Measures for Collecting Voter Rolls Are Inadequate*, Brennan Ctr. for Just. (Feb. 25, 2026), https://perma.cc/4WSD-DJKU.

[8] Reid Epstein & Nick Corasaniti, *Trump, in an Escalation, Calls for Republicans to 'Nationalize' Elections*, N.Y. TIMES, Feb. 2, 2026, https://www.nytimes.com/2026/02/02/us/politics/trump-nationalize-elections.html.

6

§ 21083(a)(4)(A). The particular procedures developed for complying with HAVA's requirement to maintain a centralized voter file are thus "left to the discretion of the State." 52 U.S.C. § 21085. Moreover, the NVRA builds in significant protections for voters, requiring that, once identified, certain potentially ineligible voters *must* necessarily stay on the rolls for two election cycles so as to limit the likelihood of a state removing eligible voters by mistake. *Id.* § 20507(d)(1)(B). That is consistent with Congress's core goals in the NVRA of protecting and expanding the right to register to vote and participate in democracy. *E.g.*, 52 U.S.C. § 20501.

The terms of the MOU, however, purport to place authority to identify supposed ineligible voters in the hands of the federal government. MOU at 2, 4. The MOU makes DOJ a "Custodian" of the state's voter file and provides that DOJ will analyze the file and identify "any voter list maintenance issues, insufficiencies, inadequacies, deficiencies, anomalies, or concerns, the Justice Department found when testing, assessing, and analyzing your state's [voter list] for NVRA and HAVA compliance, i.e., that your state's [voter list] only includes eligible voters." *Id.* at 4. And under the MOU's terms, once federal officials identify supposed "ineligible voters," states would be required to "remov[e]" these voters "within forty-five (45) days" and then resubmit their voter lists for additional analysis. *Id.* at 5. These removals would be required under the terms of the MOU notwithstanding the procedural protections afforded to voters by the NVRA, including the statute's firm bar on systematic removals of voters within 90 days of an election, 52 U.S.C. § 20507(c)(2).[9]

DOJ's actions also indicate that it may target specific groups of voters in its use of the requested data. In its July 15 Letter, the DOJ requested information on "what actions the State is

---

[9] *See also* Jonathan Shorman, *Trump's DOJ Offers States 'Confidential' Deal to Wipe Voters Flagged by Feds as Ineligible*, STATELINE, Dec. 18, 2025, https://stateline.org/2025/12/18/trumps-doj-offers-states-confidential-deal-to-wipe-voters-flagged-by-feds-as-ineligible/.

taking to ensure that voters who should not be on the voter rolls are being removed" and the number of voters removed from the rolls due to a felony conviction or lack of citizenship. July 15 Letter at 2–3. Many of these same voters are uniquely vulnerable to being wrongly removed from the voter rolls based on imperfect data matching systems, including naturalized citizens (who may have indicated they were not a citizen on a government form prior to naturalization) and voters with felony convictions (who may have been previously ineligible to vote before having their rights restored).

In short, extensive public reporting, court filings, and DOJ officials' statements and admissions indicate that the United States's aim in seeking sensitive voter data is to turn states' voter rolls into a tool for unlawfully and improperly mass-challenging voters and interfering with the states' democratic processes. And recent events have further highlighted the abnormal nature of the United States' request. On January 24, 2026, Attorney General Pamela Bondi wrote a letter to Minnesota Governor Tim Walz, purporting to discuss DHS's "Operation Metro Surge" activities in the Twin Cities amidst ongoing violence against the civilian population there.[10] Like Utah, Minnesota has been sued by the federal government seeking access to its unredacted voter rolls. The letter sets out three actions that the federal government wants Minnesota to take to "restore the rule of law, support ICE officers, and bring an end to the chaos," one of which is to "allow the Civil Rights Division of the Department of Justice to access voter rolls to confirm that Minnesota's

---

[10] *Read Bondi's Letter to Minnesota's Governor*, N.Y. TIMES, Jan. 24, 2026, https://www.nytimes.com/interactive/2026/01/24/us/pam-bondi-walz-doc.html ("Bondi Letter"); *see also* Order, *Tincher v. Noem*, No. 0:25-cv-4669 (D. Minn. Jan. 16, 2026), Dkt. No. 85 (granting injunction against certain DHS practices towards the civilian population of Minneapolis-St. Paul in connection with purported immigration enforcement operations there).

8

voter registration practices comply with federal law as authorized by the Civil Rights Act of 1960."[11]

## LEGAL STANDARD

A court must dismiss a complaint if, accepting all well-pleaded factual allegations as true, it does not "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "To survive a motion to dismiss, a complaint must allege facts sufficient to make a claim for relief facially plausible." *Petrella v. Brownback*, 787 F.3d 1242, 1268 (10th Cir. 2015). In considering a motion to dismiss, a court need not accept the complaint's legal conclusions. *Iqbal*, 556 U.S. at 678. Nor are "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," sufficient. *Id.* at 678–79. "The allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008). "A court may look to documents subject to judicial notice in deciding a motion to dismiss[,]" *Porter v. Ford Motor Co.*, 917 F.3d 1246, 1248 n.2 (10th Cir. 2019), as well as "document[s] central to the plaintiff's claim and referred to in the complaint," *White v. Lucero*, 135 F.4th 1213, 1219 (10th Cir. 2025).

## ARGUMENT

### I. The United States Seeks Records Outside the Scope of Title III.

The United States' request stumbles out of the gate, because it seeks records not covered by Title III. Recently, the Western District of Michigan held that Michigan's statewide voter file was not a record that came into elections officials' possession for purposes of Title III—so the state was not obligated to produce it. *See Benson*, 2026 WL 362789, at *11. The same is true here.

---

[11] Bondi Letter at 2–3.

Section 301 of Title III requires elections officials to "retain and preserve, for a period of twenty-two months from the date of any" federal election, "all records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. Section 303—the provision granting the Attorney General authority to request records—only obligates officials to turn over "[a]ny record or paper required by [Section 301] to be retained and preserved," *id.* § 20703—that is, records that have "come into [their] possession," *id.* § 20701. While "all records and papers" is indeed sweeping language, Title III is distinct from other statutory records provisions in that it provides an immediate textual limitation on this broad language. As held by *Benson*, the phrase "come into . . . possession," refers to records that elections officials obtain, rather than those they create. 2026 WL 362789, at *9 ("Congress frequently uses the phrase 'come into possession' to refer to items that a person *obtains* rather than *creates*." (emphasis in original) (collecting federal statutes)). Indeed, binding precedent consistently equates "coming into possession" of something with obtaining or receiving it. *See Honeycutt v. United States*, 581 U.S. 443, 449 (2017) (defining "obtain" as "to get or acquire" and "to come into possession of" as a matter of 1960s and contemporary usage (internal quotation marks omitted); *United States v. Dobbs*, 629 F.3d 1199, 1203–04 (10th Cir. 2011) (defining "receive" as "to come into possession of" or "to accept an object and to have the ability to control it" (internal quotation marks omitted)); *see also United States v. Cline*, 148 F.4th 1162, 1180 (10th Cir. 2025) (describing *Honeycutt*'s use of "the common dictionary definition of *obtain* to mean to come into possession of" (emphasis in original and internal quotation marks omitted)).

As *Benson* noted with respect to Michigan, Utah's statewide voter registration file is a live, continuously updated document created by state officials—so it is not a record or paper "which

10

come[s] into [election officials'] possession." *Benson*, 2026 WL 362789, at *6, 10. This reading also makes sense in light of the history that motivated Title III, that is, the destruction of Black Americans' voter registration forms by state officials. *See id.* at *9 (citing a 1959 report from the United States Commission on Civil Rights finding that "[r]ejected [voter registration] applications were destroyed approximately 30 days after being rejected, which fact made accurate statistical review of the records impossible"). The records DOJ seeks from Utah officials are not ones that "come into [their] possession," 52 U.S.C. § 20701—they are records that those officials create themselves. DOJ's request therefore falls outside of the scope of Title III, so its demand fails as a matter of law. The case should be dismissed for this reason alone.

## II.     The United States Has Not Complied With Title III's Basis and Purpose Requirement.

Even if the DOJ sought records covered by Title III, its request fails to comply with statutory requirements. Section 303 requires that "[a]ny record or paper" retained and preserved under Section 301 "shall, upon demand in writing by the Attorney General or [her] representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or [her] representative." *Id.* § 20703. "This demand *shall* contain a statement of *the basis <u>and</u> the purpose* therefor." *Id.* (emphases added). The statements that DOJ offers fail to clear this bar twice over: one, they are inadequate, particularly considering the scope of DOJ's unprecedented demand for Utah's full and unredacted state voter registration list, and two, they are pretextual, contradicted by a growing pile of judicially-noticeable evidence. The United States has not established it is entitled to its requested relief, so the Complaint fails to state a claim for relief for this independent reason.

### A.     DOJ's statement of the basis and the purpose for its request is inadequate.

The Attorney General's access to records under Title III is not unbounded. If she makes a

11

demand for records, she must provide "a statement of the basis and the purpose therefor." 52 U.S.C. § 20703. The Complaint—and the documents incorporated into it by reference—do not allege that the DOJ has sufficiently done so.

The "basis" and "purpose" are distinct concepts. The "basis" is an explanation of why the Attorney General believes there is a violation of federal civil rights law. *See Kennedy v. Lynd*, 306 F.2d 222, 229 n. 6 (5th Cir. 1962); *Oregon*, 2026 WL 318402, at *9 (holding the basis prong requires "a factual basis for investigating a violation of a federal statute"); *Weber*, 2026 WL 118807, at *9 ("The basis is the reasoning provided by the DOJ regarding the evidence behind its investigation of a particular state and specific, articulable facts pointing to the violation of federal law."). The "purpose" is an explanation of how the requested records would help determine if there is a violation. *See Lynd*, 306 F.2d at 229 n.6; *Oregon*, 2026 WL 318402, at *11 ("[T]he 'purpose' required in a demand for records under Title III must relate to a purpose of investigating violations of individuals' voting rights.").

DOJ's requests fail to provide "a statement of the basis and the purpose" sufficient to support disclosure of the unredacted voter file. *Id*. Here, the Complaint alleges that, as stated in the August 14 Letter, "the basis of the demand was the CRA" and "the purpose of the demand was to 'assess [Utah's] compliance with the statewide [Voter Registration List] maintenance requirements of [the NVRA].'" Compl. ¶¶ 23–24 (quoting August 14 Letter at 1).

To begin with the basis, the CRA itself cannot be the basis of a demand. This would functionally erase a statutory requirement: If invoking the CRA was a sufficient basis for a request made under the CRA, then there would be no point in mandating that the DOJ include a statement of its basis. The requirement would, by definition, always be satisfied, violating basic principles of statutory interpretation. *See Chevron Mining Inc. v. United States*, 863 F.3d 1261, 1283 n.15

12

(10th Cir. 2017) ("The canon against surplusage indicates that we generally must give effect to all statutory provisions, so that no part will be inoperative or superfluous—each phrase must have distinct meaning."). Instead, to satisfy the basis requirement of the CRA, the DOJ must articulate "a factual basis for investigating a violation of federal statute." *Oregon*, 2026 WL 318402, at *9; *accord Weber*, 2026 WL 118807, at *9 ("The basis is the reasoning provided by the DOJ regarding the evidence behind its investigation of a particular state and specific, articulable facts pointing to the violation of federal law."). However, the Complaint and the August 14 Letter do not allege anything amiss with Utah's list maintenance. This omission is fatal. *See Weber*, 2026 WL 118807, at *9–10 (detailing how the United States did not meet the statutory "basis" requirement as it failed to provide any reason why it believed the state violated federal law in comparable action against California).

Even if the United States had provided a proper "basis" for its demand—and it did not—it fails to explain any connection between its purported "purpose" and the request for the full and unredacted voter file. The August 14 Letter merely states "[t]he purpose of the request is to ascertain Utah's compliance with the list maintenance requirements of the NVRA and HAVA." August 14 Letter at 2; *see also id.* at 1 (giving the purpose as "to assess [Utah]'s compliance with . . . the NVRA"). But this misunderstands Utah's obligation under the NVRA: to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters" by virtue of "death" or "a change in the residence of the registrant," 52 U.S.C. § 20507; Compl. ¶ 12.

An unredacted voter registration file is not necessary—or even helpful—to investigate Utah's compliance with the NVRA: A single snapshot of a state's voter list does not and could not provide enough information to determine if the state has made a "reasonable effort" to remove ineligible voters under Section 8 of the NVRA. 52 U.S.C. § 20507 (a)(4)(A)–(B). The NVRA and

13

HAVA both leave the mechanisms for conducting list maintenance within the State's discretion. *See* 52 U.S.C. § 20507 (a)(4), (c)(1); § 21083(a)(2)(A), § 21085. The *procedures* carried out by a state or locality establish its compliance; the unredacted voter file, at one point in time, does not. Even were the United States to use voter file data to identify voters who had moved or died on Utah's voter list at a single point in time, that would not amount to Utah failing to comply with the "reasonable effort" required by the NVRA or HAVA. *See, e.g.*, *Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 624–27 (6th Cir. 2025) (describing a "reasonable effort" as "a serious attempt that is rational and sensible" and rejecting any "quantifiable, objective standard" in this voter list maintenance context), *cert. denied*, 2026 WL 568298 (U.S. Mar. 2, 2026). Indeed, the inclusion at any particular point in time on Utah's voter registration list of some voters who may have potentially moved out of state is, if anything, to be expected. Section 8(d) of the NVRA explicitly sets out a specific set of rules and requirements for removals from the voter rolls based on changes of residence, whereby states "shall not remove" voters on these grounds unless these voters directly confirm their change of residence in writing, or unless states first provide notice and then abide by a statutory waiting period until the second general federal election after providing notice. 52 U.S.C. § 20507(d).

The basis and purpose requirement under the CRA is a "critical safeguard that ensures the request is legitimately related to the purpose of the statute." *Weber*, 2026 WL 118807, at *9. The statutory requirement is not perfunctory; it requires a specific statement as to the reason for requesting the information and how that information will aid in the investigatory analysis. *See Oregon*, 2026 WL 318402, at *9 ("If *any* purpose—regardless of its relationship to the purposes of the statute itself would suffice, then the requirement of stating the demand's purpose would serve no function."). In the context of administrative subpoenas, and specifically in assessing an

14

analogous power by which federal agencies obtain records in service of investigations, courts have found that the test of judicial enforcement of such subpoenas includes an evaluation of whether the investigation is "conducted pursuant to a legitimate purpose," *United States v. Powell*, 379 U.S. 48, 57 (1964), and whether there is "a realistic expectation rather than an idle hope that the information requested will advance [the] investigation," *EEOC v. Tricore Ref. Lab'ys*, 849 F.3d 929, 937 (10th Cir. 2017) (internal quotation marks omitted). *See also EEOC v. Burlington N. Santa Fe R.R.*, 669 F.3d 1154, 1157 (10th Cir. 2012) (requiring courts to find that the underlying charge in an administrative proceeding is valid and the material requested is relevant to that charge).

As such, even if some portion of the voter file were necessary to "assess [Utah's] compliance with the statewide [Voter Registration List] maintenance provisions of the [NVRA]," Compl. ¶ 24; August 14 Letter at 1, the United States has not provided any justification for why the full *unredacted* voter file is necessary to carry out this purported purpose. It is telling that, for decades, DOJ has neither sought nor required a full and unredacted voter file in its investigations regarding compliance with the NVRA. *See, e.g.*, Press Release, U.S. Dep't of Just., *United States Announces Settlement with Kentucky Ensuring Compliance with Voter Registration List Maintenance Requirements* (July 5, 2018), https://perma.cc/G2EZUUA5 (describing letters to all 44 states covered by the NVRA with requests for list maintenance information, but without demanding voter files). The United States' failure to articulate the basis and the purpose for its demand for the *full and unredacted* voter file, in particular, is fatal to its demand.

**B.      DOJ's statement of the basis and the purpose of its request is pretextual.**

The government's statement is not just insufficient as a matter of law; it is also pretextual. Section 303 requires a statement of "the basis and the purpose" of a records request, and by twice using the definite article, the statute requires not just *a* basis or purpose among many, but *the actual*

15

basis and purpose underlying the request. *See Niz-Chavez v. Garland*, 593 U.S. 155, 165–66 (2021); *see also, e.g.*, *Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 817 (2024) (emphasizing distinction between the definite and indefinite article). But the United States has not disclosed the actual purpose for its requests, and this Court "is not obliged to accept a contrived statement and purpose" in place of an accurate one. *Weber*, 2026 WL 118807, at *10. This is yet another ground for dismissal.

A court need not close its eyes to a "significant mismatch" between the stated and actual reasons behind a government action. *Dep't of Com. v. New York*, 588 U.S. 752, 755, 785 (2019) (rejecting agency's "contrived" justification and refusing to "exhibit a naiveté from which ordinary citizens are free"). Even on a motion to dismiss, this Court has discretion to take judicial notice of certain facts. *Porter*, 917 F.3d at 1248 n.2. For example, this court may take judicial notice of related proceedings, such as the twenty-nine other cases seeking a statewide voter file. *See Fuqua v. Santa Fe Cnty. Sheriff's Off.*, 157 F.4th 1288, 1298 (10th Cir. 2025). It may also take judicial notice of public records incorporated by reference into the Complaint—such as the MOU. *See Hooper v. City of Tulsa*, 71 F.4th 1270, 1279 n.8 (10th Cir. 2023).

Judicially noticeable materials show that compliance with the NVRA and HAVA is not the true basis and purpose for DOJ's data requests. Far from ensuring compliance with the NVRA and HAVA, the memorandum of understanding that DOJ has proposed to states actually *violates* those statutes. As noted, the NVRA and HAVA require a state to conduct a "reasonable effort" to remove ineligible voters from the rolls, 52 U.S.C. §§ 20507 (a)(4), 21083 (a)(4)(A), and the NVRA includes safeguards to protect voters from erroneous removal, 52 U.S.C. § 20507, including requirements that certain voters *must* necessarily stay on the rolls for two election cycles so as to limit the likelihood of a state removing eligible voters by mistake, *id.* § 20507(d)(1)(B). But the

16

MOU indicates multiple contemplated violations of those statutory requirements. First, it seeks to place authority to identify supposed ineligible voters in the hands of the federal government, contrary to statutory text, *id*. § 21085 (methods of complying with HAVA "left to the discretion of the State"). MOU at 2, 5. Second, its substantive terms seek to compel states to remove supposedly ineligible voters "within forty-five (45) days," MOU at 5, in a way that would violate multiple protections of the NVRA, 52 U.S.C. § 20507. The MOU shows that the United States' supposed purpose is not in compliance with federal law but *usurping* state authority in ways contrary to federal law.

Instead, public reporting and public, judicially noticeable documents confirm that the United States' *actual* purpose is not to ensure compliance with the NVRA and HAVA, but to build a national voter file through novel, error-prone forms of data-matching and to use this tool to identify supposedly ineligible voters and then challenge their right to vote. *See* Background, Sections II & III. As *Weber* characterized it, considering a more limited set of the public reporting and documents than those presented here, "[i]t appears that the DOJ is on a nationwide quest to gather the sensitive, private information of millions of Americans for use in a centralized federal database." 2026 WL 118807, at *10; *accord Oregon*, 2026 WL 318402, at *11, *13 (similar). As Congress has never authorized the creation of such a database, its creation would violate the federal Privacy Act. *See* 5 U.S.C. § 552a (e)(7) (prohibiting the creation or maintenance of any database "describing how any individual exercises rights guaranteed by the First Amendment," which necessarily includes exercising the right to vote); *Weber*, 2026 WL 118807, at *17-19 (detailing the way in which the federal government's data demands "violate the Privacy Act").

The United States' failure to honestly disclose what it is doing and will do with voters' sensitive personal information—to state *the* true purpose behind its demand for Utah voters'

17

protected personal data—is independently fatal to the CRA claim. "Congress passed the NVRA, Civil Rights Act, and HAVA to protect voting rights. If DOJ wants to instead use these statutes for more than their stated purpose, circumventing the authority granted to them by Congress, it cannot do so under the guise of a pretextual investigative purpose." *Weber*, 2026 WL 118807, at \*12; *accord Oregon*, 2026 WL 318402, at \*11 ("The presumption of regularity that has been previously extended to [the United States] that it could be taken at its word—with little doubt about its intentions and stated purposes—no longer holds.").

Under the circumstances here, the United States' invocation of Title III of the CRA fails in multiple ways to provide a statutorily sufficient "statement of the basis and the purpose" for its demand and does not comply with the CRA. Dismissal is proper.[12]

### III. Any Records Disclosed Under the CRA Should Be Redacted to Protect the Constitutional Rights of the Voter.

Even if the United States requested records covered by Title III and even if it complied with statutory requirements regarding its request—neither of which it did—to make disclosure appropriate, any sensitive personal voter information would still be subject to redaction. Title III of the CRA does not prohibit redactions to protect voter privacy and ensure compliance with federal and state law and the Constitution. Indeed, courts have found that redaction may be required to prevent the disclosure of sensitive personal information that would intolerably burden the constitutional right to vote. This reasoning applies with equal—if not greater—force here, where Utah voters and groups like LWV-UT are threatened by the DOJ's actions. *See* Proposed Intervenor Defs.' Mot. to Intervene Ex. 6, Declaration of Katharine Biele, ¶¶ 9–10.

---

[12] Dismissal on the grounds set forth above would also be proper under Federal Rule of Civil Procedure 12(c) or after discovery regarding the United States' purported basis and purpose for its requests pursuant to Federal Rule of Civil Procedure 56.

Redaction is also particularly appropriate here. The DOJ itself has admitted in court that federal officials have shared sensitive Social Security information with third parties seeking to challenge registrations and (as the DOJ itself states) to "overturn election results." *AFSCME Notice* at 5–6. A third-party audit of the DOJ's data-handling procedures has found that voter data was inadequately protected, in violation of the Federal Information Security Modernization Act of 2014. *See supra* note 7.

Title III was enacted prior to the collection of sensitive personal information, particularly driver's license or Social Security numbers, as part of voter registration. Contemporaneous caselaw distinguishes the records at issue—"public records which ought ordinarily to be open to legitimate reasonable inspection"—from "confidential, private papers and effects." *Lynd*, 306 F.2d at 231. Indeed, the public version of the voter file today is in fact "ordinarily . . . open to legitimate reasonable inspection," *id.*; it is only the uniquely sensitive fields that are not. The information collected as part of registering to vote has changed over time, meaning courts adjudicating requests for records under Title III must now consider voters' privacy interests.

Cases interpreting Section 8(i) of the NVRA, its public records provision, are instructive, because like the CRA, the NVRA is silent as to how sensitive personal information should be treated during disclosure. *See* 52 U.S.C. §§ 20703, 20507 (i)(1). Courts have consistently permitted—and in some instances required—redaction of voters' sensitive personal data before disclosure to protect voter privacy and ensure compliance with federal and state law. There as here, courts must interpret the NVRA's disclosure provisions in a manner that does not unconstitutionally burden the right to vote. *See Olmos v. Holder*, 780 F.3d 1313, 1320–21 (10th Cir. 2015) ("the canon of constitutional avoidance . . . provides that when a particular construction would raise serious constitutional problems, the court will avoid that construction"

19

(citation omitted)).

Federal courts have consistently struck this balance, interpreting the "all records concerning" language in Section 8(i)[13] to permit—and sometimes require—redaction and the protection of confidential materials. As the First Circuit has noted, "nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information in the Voter File," and such redaction "can further assuage the potential privacy risks implicated by the public release of the Voter File." *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024); *see also Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 264 (4th Cir. 2021) (NVRA disclosure provisions "must be read in conjunction with the various statutes enacted by Congress to protect the privacy of individuals and confidential information held by certain governmental agencies" and protecting sensitive information from disclosure); *Pub. Int. Legal Found., Inc. v. Dahlstrom*, 673 F. Supp. 3d 1004, 1015–16 (D. Alaska 2023) (similar); *Pub. Int. Legal Found., Inc. v. Matthews*, 589 F. Supp. 3d 932, 942 (C.D. Ill. 2022), *clarified on denial of reconsideration*, No. 20-CV-3190, 2022 WL 1174099 (C.D. Ill. Apr. 20, 2022) (similar).

Redaction also may be affirmatively required if the disclosure would "create[] an intolerable burden on [the constitutional right to vote] as protected by the First and Fourteenth Amendments." *See, e.g.*, *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 339 (4th Cir. 2012) (quotation marks and citation omitted). The Fourth Circuit, even while granting access to voter registration applications, affirmed the importance of redacting Social Security numbers,

---

[13] Specifically, Section 8(i) of the NVRA requires that: "Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters," with exceptions "to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered." 52 U.S.C. § 20507(i)(1).

20

which are "uniquely sensitive and vulnerable to abuse." *Id.*[14] The court emphasized that the NVRA reflected Congress's view that the right to vote was "fundamental," and that the unredacted release of records risked deterring citizens from registering to vote and thus created an "intolerable burden" on this fundamental right. *Id.* at 334, 339; *cf. In re Coleman*, 208 F. Supp. 199, 200 (S.D. Miss. 1962) (noting, in the context of a Title III records request, multiple considerations which could be "[s]ignificant," including whether "official records are privileged, or exempt from discovery for any sound reason of public policy," or "that an inspection of these records would be oppressive, or any unlawful invasion of any personal constitutional right"). As such, public disclosure provisions such as those in the NVRA and Title III must be interpreted to avoid this unconstitutional burden. *See Long*, 682 F.3d at 339; *Bellows*, 92 F. 4th at 56.

The same privacy and constitutional concerns warranting redactions under the NVRA apply equally to requests under the CRA. *Cf. Sheetz v. Cnty. of El Dorado*, 601 U.S. 267, 281–82 (2024) (Gorsuch, J., concurring) ("[O]ur Constitution deals in substance, not form. However the government chooses to act . . . it must follow the same constitutional rules."). Even early caselaw interpreting the CRA noted that courts retain the "power and duty to issue protective orders," *Lynd*, 306 F.2d at 230, such as the redaction of sensitive fields that courts have consistently determined are entitled to protection from disclosure. No matter the statutory mechanism, conditioning the right to vote on the release of voters' sensitive private information "creates an intolerable burden

---

[14] The United States itself has explained—on multiple occasions—that the NVRA does not prohibit the States from redacting "uniquely sensitive information" when disclosing voting records. *See, e.g.*, Br. for the United States as Amicus Curiae, *Pub. Int. Legal Found., Inc. v. Bellows*, No. 23-1361 (1st Cir. July 25, 2024), 2023 WL 4882397 at *27–28; Br. for the United States as Amicus Curiae, *Pub. Int. Legal Found. v. Schmidt*, No. 23-1590 (3d Cir. Nov. 6, 2023), https://perma.cc/3BQ9-36UJ ("States may redact certain information before disclosing Section 8(i) records."); Br. for the United States as Amicus Curiae, *Project Vote/Voting for Am., Inc. v. Long*, No. 11-1809 (4th Cir. Oct. 18, 2011), 2011 WL 4947283, at *11, 25–26.

on that right." *Long*, 682 F.3d at 339 (citation omitted).

## CONCLUSION

The United States' request for Utah's full and unredacted electronic voter file should be denied and the Complaint dismissed.

Dated: March 19, 2026

William Hughes*
Theresa J. Lee*
Sophia Lin Lakin*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
whughes@aclu.org
tlee@aclu.org
slakin@aclu.org

Respectfully submitted,

/s/ Jason M. Groth
Jason M. Groth (16683)
Masami T. Kanegae (20270)
American Civil Liberties Union of Utah
Foundation
311 South State Street, Suite 310
Salt Lake City, Utah 84111
(801) 521-9862
jgroth@acluutah.org
mkanegae@acluutah.org

\* application for admission pro hac vice forthcoming

*Counsel for Intervenor League of Women Voters of Utah*