HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

JESUS A. OSETE
Principal Deputy Assistant Attorney General
Civil Rights Division

ERIC V. NEFF
Acting Chief, Voting Section
Civil Rights Division

JOSEPH W. VOILAND
ANELISE K. POWERS
GEORGE L. CLARK
JONATHAN P. HAUENSCHILD
Civil Rights Division, Voting Section
150 M St. NE, 8th Floor
Washington, D.C. 20002
Joseph.Voiland@usdoj.gov
Telephone: 202.353.5318

TIFFANY M. ROMNEY
Assistant United States Attorney
District of Utah

Attorneys for UNITED STATES OF AMERICA

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DEIDRE M. HENDERSON, in her official capacity as Lieutenant Governor and chief election officer for the State of Utah,<br><br>Defendant. | **UNITED STATES' COMBINED RESPONSE IN OPPOSITION TO MOTIONS TO DISMISS**<br><br>No.: 2:26-cv-00166-DBB-DAO<br><br>Judge David Barlow<br><br>Magistrate Judge Daphne A. Oberg |

**TABLE OF CONTENTS**

INTRODUCTION ...........................................................................................................................1

BACKGROUND ...........................................................................................................................3

ARGUMENT................................................................................................................................4

    I.   UTAH'S SVRL FALLS WITHIN SECTION 301'S BROAD DEFINITION OF "ALL RECORDS AND PAPERS" RELATING TO REGISTRATION TO VOTE IN A FEDERAL ELECTION. .........................................................4

        A.    Utah's SVRL "relates" to applications, registrations, and other acts requisite to voting. ............4

        B.    According to Utah's statutes, the Lieutenant Governor does not create the SVRL. ...................7

        C.    In *Lynd*, the Fifth Circuit ruled that the CRA requires production of records regardless of whether a record is "prepared" or "compiled" by the official. ................................................................8

    II. THE ATTORNEY GENERAL HAS STATED A BASIS AND PURPOSE TO INVESTIGATE UTAH'S COMPLIANCE WITH FEDERAL ELECTION LAW. ........................................................................9

        A.    The Attorney General provided a basis for the demand under the CRA. ....................................9

        B.    Utah's questionable data is a sufficient basis for the United States' CRA demand. ..................11

        C.    Voter List Maintenance is a proper purpose for the demand under the CRA............................12

    III.   ENFORCEMENT OF HAVA AND THE NVRA ENSURE THAT ELIGIBLE VOTERS REMAIN ON THE ROLLS AND SAFEGUARD THE RIGHT TO VOTE. .................................................................14

    IV.   THE UNITED STATES HAS OBTAINED STATE VOTER INFORMATION UNDER THE CRA FOR DECADES, AND THE MAJOR QUESTIONS DOCTRINE IS INAPPLICABLE. .................................................16

    V.  UTAH LAW DOES NOT ALLOW THE LIEUTENANT GOVERNOR TO REJECT THE UNITED STATES' DEMAND. ..............................................................................................................22

    VI.   SECTION 304 OF THE CRA EXPRESSLY CONTEMPLATES THAT THE UNITED STATES WILL OBTAIN NON-PUBLIC VOTING RECORDS. ...........................................................................................23

    VII. THE CRA, HAVA AND NVRA REQUIRE FEDERAL OVERSIGHT OF STATE ELECTION PROCEDURES...........................................................................................................24

    VIII. THE UNITED STATES IS COMPLYING WITH FEDERAL PRIVACY LAWS. .......................................26

CONCLUSION............................................................................................................................29

## TABLE OF AUTHORITIES

**Cases**

*Ala. ex rel. Gallion v. Rogers*,
187 F. Supp. 848 (M.D. Ala. 1960) ................................................................................. 2, 6

*Alabama Ass'n of Realtors v. Dep't of Health & Human Servs.*,
594 U.S. 758 (2021) (per curiam) .................................................................................. 21

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
570 U.S. 1 (2013) ..................................................................................................... 22, 25

*Barnhart v. Peabody Coal Co.*,
537 U.S. 149 (2003) ........................................................................................................ 14

*Biden v. Nebraska*,
600 U.S. 477 (2023) ................................................................................................. 20, 21

*Brownmark Films, LLC v. Comedy Partners*,
682 F.3d 687 (7th Cir. 2012) ......................................................................................... 27

*Bryan v. United States*,
524 U.S. 184 (1998) ........................................................................................................ 16

*Coleman v. Kennedy*,
313 F.2d 867 (5th Cir. 1963) ("*Coleman II*"). ...................................................... 2, 3, 22

*Coventry Health Care of Mo., Inc. v. Nevils*,
581 U.S. 87 (2017) ........................................................................................................... 5

*Custodia Bank, Inc. v. Fed. Rsrv. Bd. of Governors*,
157 F.4th 1235 (10th Cir. 2025) ...................................................................................... 4

*Fischer v. United States*,
603 U.S. 480 (2024) ........................................................................................................ 16

*Foster v. Love*,
522 U.S. 67 (1997) .......................................................................................................... 25

*Jama v. INS*,
329 F.3d 630 (8th Cir. 2003) .......................................................................................... 14

*Kennedy v. Lynd*,
306 F.2d 222 (5th Cir. 1962) .................................................................................. *passim*

*Learning Resources, Inc. v. Trump*,
607 U.S. ___ 2026 WL 477534 at *7 (U.S. Feb. 20, 2026) (plurality opinion).............. 20, 21

*McIntyre v. Morgan*,
624 F. Supp. 658 (S.D. Ind. 1985) ................................................................................... 6

*Milner v. Dep't of Navy*,
562 U.S. 562 (2011) ........................................................................................ 5

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992) ........................................................................................ 5

*N.Y. State Dep't of Soc. Servs. v. Dublino*,
413 U.S. 405 (1973) ........................................................................................ 7

*Niz-Chavez v. Garland*,
593 U.S. 155 (2021) ...................................................................................... 13

*Purcell v. Gonzalez*,
549 U.S. 1 (2006) .......................................................................................... 15

*Taniguchi v. Kan Pac. Saipan, Ltd.*,
566 U.S. 560 (2012) ........................................................................................ 5

*United States v. Amore*,
2026 WL 1040637 (D.R.I. Apr. 17, 2026) ................................................. 9, 10

*United States v. Ass'n of Citizens Councils of La.*,
187 F. Supp. 846 (W.D. La. 1960) ............................................................... 2

*United States v. Benson, No. 1:25-cv-01148-HYJ-PJG*,
2026 WL 362789 (W.D. Mich. Feb. 10, 2026) ...................................... 6, 9, 10

*United States v. Clarke*,
573 U.S. 248 (2014) ........................................................................................ 7

*United States v. Fontes, Case No. 2:26-cv-00066*,
2026 WL 1177244 (D. Ariz. Apr. 28, 2026) ............................................... 16

*United States v. Friedrich*,
402 F.3d 842 (8th Cir. 2005) ...................................................................... 13

*United States v. Mississippi*,
380 U.S. 128 (1965) ........................................................................................ 6

*United States v. Morton Salt Co.*,
338 U.S. 632 (1950) ...................................................................................... 22

*West Virginia v. EPA*,
597 U.S. 697 (2022) ................................................................................. 19-21

**Constitutional Provisions and Statutes**

U.S. Const. art. I, § 4, cl. 1 ...................................................................... 1, 24

U.S. Const. art. VI, cl. 2 .............................................................................. 22

5 U.S.C. § 552a ........................................................................................... 28

8 U.S.C. § 1229b ......................................................................................... 13

42 U.S.C. § 1973ff-1 ................................................................................... 18

42 U.S.C. § 2000e-2 ............................................................................................ 12

42 U.S.C. §§ 3604-3606, 3617 ........................................................................... 13

44 U.S.C. § 3101 .................................................................................................. 28

52 U.S.C. § 10101 ................................................................................................ 12

52 U.S.C. § 20507 ........................................................................................... 25, 26

52 U.S.C. § 20510 ........................................................................................... 20, 21

52 U.S.C. § 20701 ......................................................................................... *passim*

52 U.S.C. § 20702 ................................................................................................ 16

52 U.S.C. § 20703 ......................................................................................... *passim*

52 U.S.C. § 20704 ......................................................................................... *passim*

52 U.S.C. § 20705 ............................................................................................. 1, 4

52 U.S.C. § 21083 ......................................................................................... *passim*

52 U.S.C. § 21111 ........................................................................................... 21, 25

Utah Code § 20A-2-102.5(1) ................................................................................. 5

Utah Code § 20A-2-104 ....................................................................................... 22

Utah Code § 20A-2-502 ...................................................................................... 7,8

Utah Code § 20A-2-507 ......................................................................................... 7

Utah Code § 20A-2-601(7)(a)–(b). ...................................................................... 22

Utah Code § 20A-3a-102 ....................................................................................... 5

**Rules and Regulations**

Fed. R. Civ. P. 12 ........................................................................................... 4, 27

28 C.F.R. §§ 0.50, 0.51 ....................................................................................... 28

68 C.F.R. 47611 .................................................................................................. 27

68 Fed. Reg. 47610-01, 611 (Aug. 11, 2003) ..................................................... 28

70 Fed. Reg. 43904-01 (July 29, 2005) .............................................................. 28

82 Fed. Reg. 24147-01 (May 25, 2017) ......................................................... 27, 28

**Other**

Nat'l Comm'n on Fed. Election Reform, To Assure Pride and Confidence in the Electoral Process 31–32 (Aug. 2001) ....................................................................... 14

U.S. Dep't of Just., FEDERAL PROSECUTION OF ELECTION OFFENSES, at 75 (8th ed. 2017) .................... 20

Plaintiff United States of America respectfully submits this Combined Response in Opposition to: (1) Defendant Lieutenant Governor Deidre Henderson's Motion to Dismiss (Dkt. 18); (2) Intervenor-Defendants National Association for the Advancement of Colored People and National Association for the Advancement of Colored People Tri-State Conference of Idaho, Nevada, and Utah's ("NAACP Intervenors") Motion to Dismiss (Dkt. 34); and (3) Intervenor-Defendant League of Women Voters of Utah's ("LWV Intervenor") Motion to Dismiss (Dkt. 46); (collectively "Defendants"). The Court should deny each motion.

## INTRODUCTION

Title III of the Civil Rights Act of 1960 ("CRA") empowers the Attorney General of the United States to demand federal election records maintained by a State. *See* 52 U.S.C. §§ 20701, 20703. When a State refuses to comply with the demand, Title III provides that the United States may seek "appropriate process to compel the production" of those federal election records. 52 U.S.C. § 20705. The United States made a written demand to the Lieutenant Governor for Utah's statewide voter registration list ("SVRL"). The Lieutenant Governor refused to comply with that demand, necessitating this action. Compl., Dkt. 1.

Arguably nothing is more fundamental to our system of government than the fairness and reliability of our elections. The Constitution gives primary authority over the conduct of federal elections to the states, but recognizing the danger of unlimited state authority in this area, the Framers also gave Congress power to "make or alter" regulations governing such elections. U.S. Const. art. I, § 4, cl. 1. History demonstrates that states have sometimes abused their authority in this area, confirming the need for the federal oversight that the Framers foresaw.

To that end, Congress enacted the CRA, requiring the retention and preservation of voter-registration records, and authorizing the Attorney General to review such records upon demand.

1

The CRA is an investigatory device, and its invocation does not imply any substantive violation of federal law. While this broad grant of investigative power arose in response to race-based civil rights abuses that were prevalent in certain regions of the country in 1960, the CRA is not limited to such abuses.

When, as here, the Attorney General has brought a federal action to enforce his broad investigatory power under the CRA, the Court's inquiry is a limited one: (1) did the Attorney General make a written demand for federal election records stating the basis and purpose; (2) was that demand made to an "officer of election" responsible for performing any act requisite to voting in federal elections; (3) did the officer of election fail or refuse to make the demanded federal election records "available for inspection, reproduction, and copying"; and (4) did the Attorney General make "a simple statement" to the Court that he satisfied these elements. *Kennedy v. Lynd*, 306 F.2d 222, 225-226 (5th Cir. 1962); 52 U.S.C. § 20703.

As noted, Title III is purely an investigative tool, its "chief purpose" being "to facilitate the investigation of the records *before suit is filed*."  *United States v. Ass'n of Citizens Councils of La.*, 187 F. Supp. 846, 847 (W.D. La. 1960) (per curiam) (emphasis added).  "[T]he function sought to be exercised by the Attorney General is … purely investigative," *Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 854 (M.D. Ala. 1960), *affirmed sub nom. Dinkens v. Attorney General*, 285 F.2d 430 (5th Cir. 1961)*,* to evaluate "possible violations of a Federal statute," *Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963) (per curiam) ("*Coleman II*"). Title III authorizes the Attorney General to determine whether a federal lawsuit "should be instituted" and "to obtain evidence for use in such cases if and when filed." *Lynd*, 306 F.2d at 228.

This brief has many sections addressing Defendants' numerous flawed arguments. It is worth noting at the outset that Defendants make so many flawed arguments because, like the local

authorities who fought the Attorney General in the 1960s, Defendants have no single strong argument for why the Attorney General should not be able to investigate state voter-registration practices in accordance with the clear mandate of the CRA.

Among other things, the Lieutenant Governor inaccurately claims that the United States has never before used the CRA to obtain statewide voter lists and then uses this factually inaccurate claim to argue that the Major Questions Doctrine bars the United States' demand. Defendants also argue that various privacy laws prohibit disclosure of the SVRL to the United States, even though both federal and state law expressly permit use for the United States and other governmental entities. The United States addresses each of Defendants' arguments below.

## BACKGROUND

On July 15, 2025, the United States sent Utah's chief election official, the Lieutenant Governor, a request for all information related to the state's procedures for NVRA and HAVA compliance. Dkt. 36-1, ¶ 7; *see also* Dkt. 36-2, Ex. 1 to First Declaration of Eric Neff ("Neff Decl."). As part of its request, the United States sought Utah's SVRL, including HAVA-required "all fields" information. *Id*. Although the Lieutenant Governor produced a publicly available version of the SVRL, this production did not fulfill the United States' request. So, the United States demanded Utah to provide the unredacted SVRL to "assess [Utah's] compliance with the [SVRL] maintenance provisions of the [NVRA]." *Id.* ¶ 10; *see also* Neff Decl., Ex. 2. The demand confirmed that all records would be maintained according to all applicable federal privacy laws. *Id*. ¶ 13.

After requesting and receiving more time to respond, the Lieutenant Governor's Office responded to this demand with a request for more information to address ongoing privacy concerns. *Id.* ¶ 15; *see also* Neff Decl., Ex. 5. The United States later sent a proposed memorandum

3

of understanding ("MOU") to satisfy "all reasonable concerns regarding privacy and data security." *Id.* ¶ 16; *see also* Neff Decl., Ex. 3.

Yet the Lieutenant Governor's office responded again with a request for "additional time"—this time saying she would meet with "Republican" and "GOP" officials before responding to the United States' demand. *Id.* ¶ 17; *see also* Neff Decl., Ex. 6. The Lieutenant Governor has refused to fulfill the demand, and this litigation follows. Compl., Dkt. 1.

**ARGUMENT**

Defendants ask the Court to dismiss the demand. *See* Dkt. 18 at 1; Dkt. 34 at 1, 8; Dkt. 46 at 1, 9–10 (all moving to dismiss under Rule 12(b)(6)).

All factual disputes and all reasonable inferences must be resolved in the United States' favor, *Custodia Bank, Inc. v. Fed. Rsrv. Bd. of Governors*, 157 F.4th 1235, 1248 (10th Cir. 2025), and within the constraints imposed by the CRA, *Lynd*, 306 F.2d at 225–30. Taking as true the allegations in the Complaint and drawing all reasonable inference in the United States' favor, the United States has satisfied each of the four elements of its CRA action. The Court should accordingly deny the motions to dismiss.

**I.    UTAH'S SVRL FALLS WITHIN SECTION 301'S BROAD DEFINITION OF "ALL RECORDS AND PAPERS" RELATING TO REGISTRATION TO VOTE IN A FEDERAL ELECTION.**

    **A.  Utah's SVRL "relates" to applications, registrations, and other acts requisite to voting.**

As the United States explains in its Motion to Compel, *see* Dkt. 36 at 4-9, a Title III proceeding" is "a special statutory proceeding in which the courts play a limited, albeit vital, role." *Lynd*, 306 F.2d at 225. Its "chief purpose" is to facilitate *pre-suit* investigation. *Citizens Councils*, 187 F. Supp. at 847. Congress broadly established the scope of federal election records covered by

4

Title III.  Section 301 of the Act provides that the retention and production requirements apply to "all records and papers" which "come into … possession" of an officer of election "relating to any application, registration, payment of poll tax, or other act requisite to voting" in a federal election "for a period of twenty-two months" from the date of any federal election.  52 U.S.C. § 20701; *see also Lynd*, 306 F.2d at 226. Regardless of who created the SVRL, no party denies that the Lieutenant Governor has "custody, possession, or control of such record or paper," and therefore she must make it "available for inspection, reproduction, and copying." 52 U.S.C. § 20703.

Utah's SVRL is a composite of individual records relating to voter registration for federal elections. When a term goes undefined in a statute, the Court must "give the term its ordinary meaning." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012). The ordinary meaning of the term "relating to," the Supreme Court has explained, "is a broad one." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992). This term means "'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with.'" *Id.* (quoting *Black's Law Dictionary* 1158 (5th ed. 1979)); *see also Milner v. Dep't of Navy*, 562 U.S. 562, 566 n.1 (2011) (the term "related" is "expansive"). As required by Section 303 of HAVA, 52 U.S.C. § 21083, Utah's SVRL identifies who is registered to vote, and it is undisputed that such a list "has 'a connection with, or reference to,' the topics" at issue, *Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87, 96 (2017) (quoting *Morales*, 504 U.S. at 384)—namely, voter "registrations." 52 U.S.C. § 20701; *cf.* Utah Code § 20A-2-102.5(1) (requiring a voter to appear on the registration list to vote); Utah Code § 20A-3a-102(1) (same).

Section 301 does not, as Defendants argue, exclude a voting record because the Lieutenant Governor "created" it. *See* Dkt. 18 at 14; Dkt. 46 at 11.  One court explained why a similar effort to impede the Attorney General's enforcement of federal election laws failed. There, as here, the

5

Attorney General sought records created by election officials—specifically, records of which voter-registration applications had been accepted and which rejected—and the court concluded that the records were covered by Section 301:

> There is nothing uncertain about that part of the Act requiring preservation and production of all records and papers which are in the possession of an election official … if those records and papers relate to the acts requisite to voting…. Regardless of when these records came into the possession of the election official, under Section 301 they must be retained and preserved for a period of twenty-two months 'from the date of any general, special, or primary election.'

*Gallion*, 187 F. Supp. at 855 (quoting 52 U.S.C. § 20701).

Despite contrary arguments, *Benson* does not preclude the United States from obtaining Utah's SVRL. *See* Dkt. 18 at 11–14; Dkt. 46 at 10–11.[1]  *Benson* agreed with the United States regarding the summary nature of a Title III proceeding, but in doing so it reached a few atextual conclusions. For example, *Benson* read Section 301 of the CRA more narrowly than Congress intended, concluding that "all records" somehow excludes records that election officials had created. *See* 2026 WL 362789 at *9–10. The United States respectfully disagrees. Such a reading carves out vast numbers of federal election records, which was plainly not Congress's intent when passing Title III. *Lynd*, 306 F.2d at 226.

Nothing in Section 301 restricts "all records and papers" to only those records and papers submitted by voters. Even assuming that the examples of documents in the statute each "refers to something that the voter submits or does," *Benson*, 2026 WL 362789 at *9, that does not mean that every record or paper "relating to" those examples, 52 U.S.C. § 20701, likewise comes from a voter. *See United States v. Mississippi*, 380 U.S. 128, 134 (1965) (stating broadly that "records of voting registration [must] be kept" under Title III); *McIntyre v. Morgan*, 624 F. Supp. 658, 664

---

[1] The United States substantially briefed the *Benson* decision in its Motion to Compel. *See* Dkt. 36 at 6–7, 13–19.

(S.D. Ind. 1985) (Section 301 "encompasses, among other things, voting registration records, poll lists, applications for absentee ballots, ballot envelopes, tally sheets, computer programs used to tabulate votes, as well as the ballots themselves.").

Limiting Section 301 to materials that a state election official has acquired from a third party would undermine the statute's purpose. Interpreting Section 301 to exclude materials that state election officers have created themselves—including statewide voter registration lists—would subvert that purpose by frustrating the United States' ability to acquire evidence that could shed light on whether a violation of the law has occurred. For example, for purposes of enforcement of voting laws, it is not enough to know what a voter-registration applicant submitted; one must know what election officials did in response. And courts "have rejected rules that would 'thwart and defeat [an agency's] appropriate investigatory powers.'" *United States v. Clarke*, 573 U.S. 248, 254 (2014) (quoting *Donaldson*, 400 U.S. 517, 533 (1971)); *accord N.Y. State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405, 419–20 (1973) ("We cannot interpret federal statutes to negate their own stated purposes."). Section 301 of the CRA thus encompasses Utah's SVRL and the Lieutenant Governor must produce it to the United States.

**B. According to Utah's statutes, the Lieutenant Governor does not create the SVRL.**

Even if the phrase "come into … possession" is incorrectly interpreted to refer only to records received from another person, the Lieutenant Governor has come into possession of the data recorded in Utah's SVRL. As the Lieutenant Governor outlines in her brief, her duty is to "develop, manage, and maintain" Utah's "statewide voter registration *system*." Dkt. 18 at 5; Utah Code § 20A-2-502(1)(a). It is Utah's "county clerks" who "maintain an updated statewide voter registration *database*" under Utah law. *Id*. (emphases added). It is the county clerks who: "(a) ensure that the database is updated, accurate, and secure; and (b) regularly report to the lieutenant governor the information [contained therein]." Utah Code § 20A-2-507.

7

In other words, the Lieutenant Governor has come into possession of the information in Utah's SVRL because she "manages and maintains" the SVRL with information she receives from the county clerks. Dkt. 18 at 5-6, citing § 20A-2-502(1)(c)–(d). She "monitors" the SVRL, but she does not create Utah's SVRL. *Id.* The United States' demand is for a copy of Utah's SVRL—i.e., an electronic copy of Utah's "database" under Utah Code § 20A-2-502(1)(a). The Lieutenant Governor has come into possession of the information in the SVRL database from Utah's county clerks under Utah Code § 20A-2-502(1)(a).

**C. In *Lynd*, the Fifth Circuit ruled that the CRA requires production of records regardless of whether a record is "prepared" or "compiled" by the official.**

Finally, *Lynd* itself dealt with—and approved the production of—records that election officials had created. In two of the district court orders on appeal in *Lynd*, the district judge ordered the production of all records "prepared or compiled" on or after a particular date, relating to voter registration. *See Lynd*, 306 F.2d at 229; *see also* Ex. 23 to Second Declaration of Eric Neff ("Neff 2d Decl."). The language of those orders makes clear that the local election officials had to produce not only records they had received from voter-registration applicants (*i.e.*, records that were "compiled") but also records they had created (*i.e.*, records that were "prepared"). In *Lynd*, the Fifth Circuit quoted, with approval, the "prepared or compiled" language from the district court's orders, *Lynd*, 306 F.2d at 229, and it affirmed the orders, *id.* at 231. Indeed, the Fifth Circuit rejected certain limitations the district court had placed on its orders and then said: "in all other respects, the orders were proper." *Id.* Moreover, in response to the Fifth Circuit's decision, the local election officials in Louisiana produced voter registration lists that they had created.

*Lynd* was decided near in time to the passage of the CRA and by the circuit with jurisdiction over the region of the country where, at that time, the CRA was primarily enforced. *Benson* is at odds with the Fifth Circuit's decision in *Lynd*. This Court should follow *Lynd* and reject *Benson's*

departure from it.

## II.   THE ATTORNEY GENERAL HAS STATED A BASIS AND PURPOSE TO INVESTIGATE UTAH'S COMPLIANCE WITH FEDERAL ELECTION LAW.

The CRA establishes a straightforward requirement for the Attorney General to make a written demand for federal election records, stating "the basis and purpose therefor." 52 U.S.C. § 20703. The United States has done that. On August 14, 2025, the United States sent the Lieutenant Governor written demand for a copy of Utah's SVRL. *See* Dkt. 36-3. As stated in that letter, the basis for the demand was Title III of the CRA, the NVRA and HAVA, and the purpose was to "assess Utah's compliance with the statewide VRL maintenance provisions of the National Voter Registration Act (NVRA)." *Id.* at 2. The Lieutenant Governor's brief tacitly admits this, referring to "the underlying legal authority for DOJ's demands … [including] the NVRA and the CRA, along with HAVA." *See* Dkt. 18 at 13.

### A.  The Attorney General provided a basis for the demand under the CRA.

Defendants contend that there is no basis for the demand because the CRA requires the Attorney General to provide a "factual" basis for the demand rather than a legal one, and that the demand contains no allegation that there is "anything amiss with Utah's list maintenance." Dkt. 46 at 13; Dkt. 18 at 21. This topic is briefed in detail in the Motion to Compel, *see* Dkt. 36 at 9-14, but the Motions to Dismiss cite new cases decided after that filing.

LWV Intervenor cites *United States v. Amore*, where the district court ruled that the Attorney General's written demand for Rhode Island's statewide voter registration list was legally insufficient under the CRA because it provided no "factual basis" suggesting Rhode Island may be violating the NVRA or HAVA. *See* Dkt. 46 at 12-14, citing *Amore*, 2026 WL 1040637, at \*5 (D.R.I. Apr. 17, 2026). Similarly, LWV Intervenor cites *United States v. Galvin*, where the District Court ruled that the CRA requires that the Attorney General's written demand for records must provide

a "factual basis," not just a legal basis, to support a demand. *See* Dkt. 46 at 13, 15, and 16, citing *Galvin*, No. 25-13816, 2026 WL 972129, at *3 (D. Mass. Apr. 9, 2026).

*Amore* and *Galvin* are incorrect.  First, *Amore* repeated the errors committed by the district courts in California and Oregon by holding that the Attorney General must state a *factual* basis for the demand. *Lynd* actually held that the "factual foundation for, or the sufficiency of," the basis put forward by the Attorney General "is not open to judicial review or ascertainment." 306 F.2d at 226.

*Galvin* acknowledged that in *Lynd* the stated basis for the demand was merely that there was "information in the possession of the Attorney General tending to show that" the states were violating the law. *Galvin,* citing *Lynd*, 306 F.2d at 229, n. 6. Nevertheless, *Galvin* ruled that the Attorney General's written demand letters did not provide a factual basis that satisfied *Lynd*. *See Galvin*, at *4. The United States respectfully disagrees with *Galvin*'s overly formalistic interpretation of CRA procedure, as well as its findings regarding the two demand letters. In contrast to *Galvin*, *Benson* noted that a similar pair of demand letters "collectively put [the State] on notice of the basis and purpose of its request, which is sufficient to comply with the CRA." *Benson,* 2026 WL 362789 at *8, n.3.

Further, *Galvin*'s formalistic approach is predictably impractical, something Congress likely would have intended to avoid in creating a pre-enforcement mechanism. If this Court were to adopt *Galvin*'s formalistic approach, the United States would request leave of Court to send the Lieutenant Governor a curing elaboration letter, thus avoiding a dismissal on the merits and the resulting unnecessary delay in resolution of the underlying legal issues. As the court said in *United States v. Thomas*, No. 3:26-cv-00021-KAD, Tr. of Oral Arg. 85:19-22 (D. Conn. Mar. 19, 2026),

10

[i]f . . . I find the [written demand] letter does not meet the requisites for a court order, aren't we just back here in six months after a new letter has been sent?" *Id*.; Neff 2d Decl., Ex. 22.

### B. Utah's questionable data is a sufficient basis for the United States' CRA demand.

Even if the Attorney General is obligated to provide a factual basis for his demand under Section 303, he has done so here. The Lieutenant Governor claims that "Utah maintains an accurate voter database" and that Utah "comfortably and consistently complies" with HAVA, Dkt. 18 at 10, 13-14. Those claims are belied by Utah's own reports to the United States Election Assistance Commission, as the Attorney General's demand letter explained:

(i). Utah has the lowest rate in the nation for voter registration records removed from the voter registration rolls. *See* Dkt. 36-2, Ex. 1 at pg. 3.

(ii). Utah lacks any data from 86 percent of its counties (25 of 29) as to why it removed voters from the rolls. *Id.*

(iii). Utah failed to report *any* data for duplicate registrations in the most recent election data report. *Id.*

(iv). Utah failed to report any data regarding the outcome of mailed confirmation notices for 79 percent of its counties (23 of 29). For the 21 percent of counties on which Utah reported this data, that data was insufficiently listed as "not categorized" 65 percent of the time. *Id.*

(v). Utah failed to report data for 93 percent of its counties (27 of 29) as to voters removed because they moved outside the jurisdiction. *Id.*

(vi). Utah's data is missing for more than 90 percent of its counties as to all other reasons for removal. *Id.*

If the United States were required to set forth a list of facts explaining why it needs to assess Utah's voter list maintenance compliance—and it does not—the United States did so here. Defendants either fail to mention the EAVS data provided by the United States in its July 15 letter

11

or fail to explain why the July 15 letter fails to provide a factual basis for the United States' demand. *See* Dkt. 34 at 13.

### C.  Voter List Maintenance is a proper purpose for the demand under the CRA.

Defendants next argue that the United States failed to provide a valid purpose for its demand. Dkt. 18 at 19; Dkt. 34 at 13; Dkt. 46 at 14. The demand's purpose is to "assess Utah's compliance with the statewide VRL maintenance provisions of the National Voter Registration Act (NVRA)." *See* Dkt. 36-3 at 2.

Title III of the CRA imposes a "sweeping" obligation on an officer of election to preserve and produce federal elections records and make them available upon "demand" of the Attorney General. *Lynd*, 306 F.2d at 226. The Lieutenant Governor mischaracterizes the United States' position as an "anything-goes interpretation," Dkt. 18 at 16, and each Defendant asks the Court to limit Title III to investigations of racial discrimination in voting. Dkt. 18 at 19-21; Dkt. 34 at 14; Dkt. 46 at 1-2, 12.

Engrafting a requirement of racial discrimination that does not exist in Title III of the CRA would violate the statute's express congressional mandate, while also undermining the Attorney General's enforcement of HAVA and the NVRA to protect voting rights. Congress used express language in the CRA where it intended a remedy to be limited to racial discrimination. *See* Section 601 of the CRA, P.L. No. 86-449, 74 Stat. 90 (applying Title VI of the CRA to violations of rights "on account of race or color") (codified as amended at 52 U.S.C. § 10101). The express language of Title VI of the CRA is consistent with express limitations Congress made to remedies in other civil rights statutes. *See*, *e.g.*, 42 U.S.C. § 2000e-2 (prohibiting employment practices "because of such individual's race [or] color" in Title VII of the CRA of 1964); 52 U.S.C. §§ 10301-10306, 10309 (prohibiting discrimination "on account of race [or] color" in the Voting Rights Act of

12

1965); 42 U.S.C. §§ 3604-3606, 3617 (prohibiting discrimination in housing or rentals "because of "race, color, … or national origin" in the Fair Housing Act of 1968). No such language limits Title III of the CRA to voting rights violations based upon racial discrimination. *See* 52 U.S.C. §§ 20701-20706.

LWV Intervenor argues that voter-list maintenance is not "*the actual* basis and purpose underlying the request." Dkt. 46 at 16 (original emphasis). They cite *Niz-Chavez v. Garland*, 593 U.S. 155, 165–66 (2021), a case involving an unrelated statute that refers to "a notice to appear," 8 U.S.C. § 1229b(d)(1), and extrapolate this to argue that "the statute's use of a definite article" means "the statement must be '*the*' factual basis [or purpose], not just a conceivable or possible basis." Dkt. 46 at 16 (quoting *Galvin*, 2026 WL 972129, *3) (emphasis added).

Nothing in the text suggests that the Attorney General is limited to a single basis or purpose in making a demand. The fundamental purpose of a notice requirement is to provide recipients with effective and timely notice that enables them to understand the basis for the complaint and take corrective action. This conclusion is reinforced by settled interpretive canons.

Under the ordinary-meaning canon, the Section 303 requirement that a demand include "the basis and the purpose," 52 U.S.C. § 20703, is most naturally read as a minimum requirement, not a limitation of later stated additional purposes or a suggestion that only one purpose is the "actual purpose." *See generally United States v. Friedrich*, 402 F.3d 842, 845 (8th Cir. 2005) ("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as having their ordinary, contemporary, common meaning."). Defendants' reading would improperly convert a floor into a ceiling.

Nor does the negative-implication canon (*expressio unius est exclusio alterius*) support Defendants' position. That canon applies, if at all, only where statutory context indicates that the

13

enumeration of items in a statute is meant to be exhaustive. *See generally Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 152 (2003). Here, there is no indication to that effect in 52 U.S.C. § 20703. Congress did not indicate that the Attorney General is permitted to state only one purpose, or that only one purpose is the actual purpose. Importing such a restriction would invert the negative-implication canon by manufacturing one from silence. Courts are obligated to "refrain from embellishing statutes by inserting language that Congress has opted to omit." *Jama v. INS*, 329 F.3d 630, 634 (8th Cir. 2003) (quoting *Root v. New Liberty Hosp. Dist.*, 209 F.3d 1068, 1070 (8th Cir. 2000)).

### III. ENFORCEMENT OF HAVA AND THE NVRA ENSURE THAT ELIGIBLE VOTERS REMAIN ON THE ROLLS AND SAFEGUARD THE RIGHT TO VOTE.

Defendants also suggest that the Attorney General's purpose of assessing compliance with HAVA and the NVRA is incompatible with the CRA's purpose of securing an individual's right to vote. *See* Dkt. 18 at 17. Again, Defendants find conflict among statutes that can be easily harmonized, for NVRA and HAVA both serve to protect voting rights.

In 2001, the bipartisan National Commission on Federal Election Reform, with former Presidents Gerald R. Ford (Rep.) and Jimmy Carter (Dem.) serving as Honorary Co-Chairs, explained why adding driver's license information and the last four of the Social Security numbers for federal elections protected individual voters:

> Any state adopting a statewide voter registration system will confront the problem of uniquely identifying voters, figuring which Joseph Smith is the same as that Joe Smith. That is why, following the Michigan example, we recommend obtaining residential addresses, with the DMV and voter registration address required in identical form. An added identifier is desirable, given the various spellings and the clerical errors that frustrate reliance only on a given name and address. For this purpose some numeric identifier can be useful. Given the danger from overuse of entire Social Security Numbers as an individual identifier we suggest that states obtain the last 4 digits of this number as an added identifier [SSN4s]. The Federal Election Commission has made the same recommendation.

Nat'l Comm'n on Fed. Election Reform, To Assure Pride and Confidence in the Electoral

14

Process 31–32 (Aug. 2001) (excerpts provided as Neff 2d Decl., Ex. 11). Furthermore, the Commission noted that it was "estimated that 92% of all registered voters also have a driver's license," *id*. at 29, which strongly supported use of a driver's license number as a unique identifier for each voter who possessed one. The Commission recognized that "accuracy" of a statewide voter registration database "can mean access." *Id*. It further explained that voter-specific identifiers "could improve the accurate exchange of information affecting voter eligibility and help avoid mistaken voter removals like those that occurred in Florida." *Id*. at 33.

Congress heeded the Commission's finding that inaccurate voter databases can disenfranchise individual voters when it enacted HAVA in 2002. It explained how list maintenance and compliance with HAVA's identifying numbers helps protect an individual's right to vote, "reduc[ing] the incidence of voters appearing at a polling place only to discover that no record of their registration can be found." H.R. Rep. 107-329, pt. 1, at 36 (2001). In addition, although often downplayed in public discourse, courts have repeatedly recognized that "[t]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (quoting *Reynolds v. Sims*, 377 U.S. 533, 555 (1964)).[2] Utilizing Title III of the CRA to ensure the accuracy of election data is not a "perverse irony," as the Lieutenant Governor claims. Dkt. 18 at 17. It is appropriate oversight in protecting voting rights.

---

[2] In 2025, North Carolina election officials admitted that the state "maintained and used a HAVA List that includes records that do not comply with the requirements for Federal elections under Section 303(a)(5)." *See* Neff Decl. ¶ 21; *see also* Neff Decl., Ex. 7, *United States v. N. Carolina Bd. of Elections*, Consent J. & Order at 4 (E.D.N.C. Sept. 8, 2025). Although some registration applications did have HAVA identifiers, others failed to include them. As a result of the United States' oversight, North Carolina has reduced the number of voter records missing an identification number under HAVA from 103,329 to 70,709. *See id.*

The Lieutenant Governor adds yet another argument in this area: she argues that updating the SVRL would violate the CRA, characterizing any update as an illegal alteration of a record. *See* Dkt. 18 at 13 ("States would violate the CRA every time they updated a computerized voter list within the 22-month preservation window mandated by the CRA."). This argument is similar to that in *United States v. Fontes*, Case No. 2:26-cv-00066, 2026 WL 1177244 (D. Ariz. Apr. 28, 2026), where the district court held that a "record" covered by 52 U.S.C. 20701 does not include a SVRL because the NVRA and HAVA require SVRLs to be constantly updated, and thus "altered" in violation of 52 U.S.C. § 20702. *Fontes*, 2026 WL 1177244, at *4-5. *Fontes* is wrong, and its distorted construction of § 20702 does not justify its misapplication of § 20701.

Defendants consistently suggest that the CRA, NVRA, and HAVA are somehow in conflict with one another, which they are not. Title III's prohibition on the willful alteration of records might apply to SVRL tampering, but it does not apply to SVRL maintenance, which is designed to ensure accuracy, not to undermine it. The surrounding verbs elucidate the meaning of "alter[]" in § 20702. *See Fischer v. United States*, 603 U.S. 480, 487 (2024). Those verbs all describe actions typically taken to make a document unavailable, inaccessible, or inaccurate for evidentiary purposes. *Id.* at 489-90 (analyzing similar list of verbs). And the use of "willfully" in criminal statutes generally requires the defendant to act "with knowledge that his conduct was unlawful." *Bryan v. United States*, 524 U.S. 184, 192 (1998). List maintenance is a statutory duty, not unlawful conduct.

IV.    **THE UNITED STATES HAS OBTAINED STATE VOTER INFORMATION UNDER THE CRA FOR DECADES, AND THE MAJOR QUESTIONS DOCTRINE IS INAPPLICABLE.**

For decades, the United States has obtained unredacted, non-publicly available voter information—including SVRLs—in assessing compliance with and enforcing federal election laws such as the Voting Rights Act, HAVA, the NVRA, and the Uniformed and Overseas Citizen

Absentee Voting Act ("UOCAVA"). In addition, prior to initiating this litigation, the United States obtained an opinion from the Department of Justice's Office of Legal Counsel ("OLC"), concluding that the CRA authorizes the Attorney General to compel States to produce unredacted SVRLs.[3]

The list of prior actions in which the United States, relying on the CRA, has obtained state election records, including SVRLs with non-public, personal voter information, is not short:

(i)     In 2006 in *United States v. Georgia*, the State of Georgia was required to produce its SVRL, including non-public drivers' license numbers and the last four digits of social security numbers, to the United States. *See* Neff Decl., Exs. 9 - 10.

(ii)    In 2007 in *United States v. Maine*, the State of Maine was required to provide to the United States, on multiple occasions, with electronic copies of Maine's statewide voter registration system. Maine was required to produce its SVRL, including the voter's full name, unique identifier, date of birth, address, voter jurisdiction, and status as an active voter or inactive voter. *See* Neff 2d Decl., Ex. 12.

(iii)   In 2008, the State of Texas was required to produce its SVRL, including non-public drivers' license numbers and the last four digits of social security numbers, to the United States. *See* Neff Decl. ¶¶ 23-24; *see also* Neff Decl., Ex. 8.

(iv)    In 2006 in *United States v. New Jersey*, the State of New Jersey was required to provide the United States with voters' non-public HAVA identifiers as part of the United States' oversight of New Jersey's SVRL maintenance. *See* Neff 2d Decl.,

---

[3] OLC provided this advice prior to publishing its formal opinion on May 12, 2026. *See* Neff 2d Decl., Ex. 21.

Ex. 13, citing *United States v. New Jersey*, No. 2:06-cv-04889 (D. N.J. Oct. 12, 2006).

(v)    In 2006 in *United States v. Indiana*, the State of Indiana was required to provide "voter registration and list maintenance records" under Section 20701.  *See* Neff 2d Decl., Ex. 14, citing *United States v. Indiana*, 1:06-cv-01000 (S.D. Ind. July 5, 2006).

(vi)    In *United States v. Indiana*, an amended consent decree required the State of Indiana to provide the state's full, non-public, unredacted SVRL, including driver license numbers and social security numbers.  *See* Neff 2d Decl., Ex. 15, citing *United States v. Indiana*, 1:06-cv-01000 (S.D. Ind. July 5, 2006). The United States was entitled to the unredacted SVRL pursuant to Title III, notwithstanding contrary state law. *Id.*  As is the case here, the United States agreed to "use the voter registration list information to assess the State's compliance with federal voting laws, including, but not limited to, the NVRA," and specified that the SVRL was to be provided in electronic format. *Id*.

(vii)    In 2009, in *United States v. Alabama*, the United States used Title III of the CRA in the enforcement of the UOCAVA. The United States sued the State of Alabama for the State's noncompliance with 42 U.S.C. § 1973ff-1(c),[4] and obtained court approval to obtain state election records from 21 Alabama counties under the authority of the CRA.  As a sample, a copy of the demand to one of the counties (Shelby) is included.  *See* Neff 2d Decl., Exs. 17 and 18, citing *United States v. Alabama*, Case No. 2:08-cv-00920 (M.D. Ala. March 28, 2009).

---

[4] UOCAVA was transferred to 52 U.S.C. §§ 20301, *et seq*.

(viii)    In 2009 in *United States v. Vermont*, again under the authority of the CRA, the United States obtained state records in enforcing UOCAVA's state-to-federal reporting requirements. *See* Neff 2d Decl., Ex. 19, citing *United States v. Vermont*, Case No. 2:08-cv-00217 (D. Vt. Feb. 26, 2009).

(ix)    In 2021 in *United States v. Georgia*, again under the authority of the CRA, the United States obtained election records in enforcing the Voting Rights Act. The Civil Rights Division sought election information from 159 counties in Georgia, with demands under Title III sent to some of those counties. As a sample, a copy of a letter sent to Newton County, Georgia is included. *See* Neff 2d Decl., Ex. 20 and *United States v. Georgia*, No. 1:21-cv-02575 (N.D. Ga. June 25, 2021).

Despite this decades-long history, the Lieutenant Governor wrongly claims that the United States' demand is something entirely new, and she uses that wrong claim to argue that the Major Questions Doctrine prevents the United States from obtaining a copy of Utah's SVRL. Dkt. 18 at 15. She makes the factually inaccurate claim that the United States has "never previously claimed" the right to obtain such data and adds the factually inaccurate suggestion that oversight of state voter lists represents a "major policy departure" from past practice under the CRA. Dkt. 18 at 7, 16.

The Major Questions Doctrine is limited to "'extraordinary cases' that call for a different approach" than ordinary statutory interpretation, "in which the 'history and the breadth of the authority that the agency has asserted,' and the 'economic and political significance' of that assertion, provide a 'reason to hesitate before concluding that Congress' meant to confer such authority." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000) (brackets omitted)). In short, the Court has "long

19

expressed 'reluctan[ce] to read into ambiguous statutory text' extraordinary delegations of Congress's powers." *Learning Resources, Inc. v. Trump*, 607 U.S. ___, Nos. 24-1287 & 25-250, 2026 WL 477534 at *7 (U.S. Feb. 20, 2026) (plurality opinion) (quoting *West Virginia*, 597 U.S. at 723 (brackets in original)).   Moreover, the Major Questions Doctrine applies only when interpreting "ambiguous statutory text." *Learning Resources*, 2026 WL 477534 at *7 (quoting *West Virginia*, 597 U.S. at 723); *see also Biden v. Nebraska*, 600 U.S. 477, 511 (2023) (Barrett, J., concurring) (noting that "none" of the Court's major-question precedents "purports to depart from the best interpretation of the text").

These precedents simply do not apply here. The United States exercises *investigatory* power under Title III, which is an express grant of authority from Congress to the Attorney General. *See* 52 U.S.C. §§ 20701-20706. A Justice Department treatise, FEDERAL PROSECUTION OF ELECTION OFFENSES, states under the heading "Retention of Federal Records: 52 U.S.C. § 20701" that "[t]he detection, investigation, and proof of election crimes—in many instances Voting Rights Act violations—often depend[s] on documentation generated during the voter registration, voting, tabulation, and election certification processes." U.S. Dep't of Just., FEDERAL PROSECUTION OF ELECTION OFFENSES, at 75 (8th ed. 2017).[5]

None of the Supreme Court's "major-questions" precedents—which analyze the scope of delegations of traditionally congressional authority—support using that doctrine to analyze an executive official's mode of investigation regarding a concededly lawful federal statute.

---

[5] In April 2024, the Department of Justice also issued guidance that explains Title III of the CRA requires election officials to retain election records. "The Act protects the right to vote by ensuring that federal elections records remain available in a form that allows the Department to investigate and prosecute both civil and criminal election matters under federal law." U.S. Dep't of Justice, *Federal Law Constraints on Post-Election 'Audits'* at 2 (April 2024), https://www.justice.gov/crt/media/1348586/dl?inline (last visited April 15, 2026).

Importantly, the Attorney General's enforcement power is not ambiguous. Both the NVRA and HAVA authorize the Attorney General to bring a civil action in an appropriate district court for declaratory and injunctive relief as necessary to carry out the requirements of the statutes. *See* 52 U.S.C. § 20510(a) (NVRA); 52 U.S.C. § 21111 (HAVA).  Moreover, the Attorney General is not claiming any delegated legislative authority. *See Learning Resources*, 2026 WL 477534 at *7 (plurality opinion); *see Biden v. Nebraska*, 600 U.S. at 508 (Barrett, J., concurring) ("emphasiz[ing] the importance of *context* when a court interprets a delegation to an administrative agency"). Each of the Supreme Court's major-questions decisions asked whether "context," "includ[ing] not just other language within the statute, but 'constitutional structure' and 'common sense,'" counseled against the Government's asserted "highly consequential power."  *Learning Resources*, 2026 WL 477534 at *7 (plurality opinion) (citations omitted). In each case, the President or an administrative agency claimed the ability to regulate private conduct or exercise some other authority typically enjoyed by Congress. *See, e.g.*, *West Virginia*, 597 U.S. at 724 ("[T]he Agency's discovery allowed it to adopt a regulatory program that Congress had conspicuously and repeatedly declined to enact itself."); *Alabama Ass'n of Realtors v. Dep't of Health & Human Servs.*, 594 U.S. 758, 760 (2021) (per curiam) ("The new, administratively imposed moratorium went further than its statutory predecessor, covering all residential properties nationwide and imposing criminal penalties on violators.").

The Attorney General also is not claiming any new authority to revise or maintain Utah's voter lists. Rather, the Attorney General seeks to verify that Utah is complying with specific requirements under federal law, including the use of a HAVA identification number for each voter. *See* 52 U.S.C. § 21083(a)(5)(D). There is no question that enforcement of HAVA is for "the purpose of investigating possible violations of a Federal statute," and so the demand for the information

21

meets the requirements of the CRA. *Coleman II*, 313 F.2d at 868; *cf. United States v. Morton Salt Co.*, 338 U.S. 632, 642-43 (1950) (confirming compliance with federal law is a legitimate purpose).

The United States has used the CRA for decades to obtain state voter registration lists. The Major Questions Doctrine is inapplicable.

**V.    UTAH LAW DOES NOT ALLOW THE LIEUTENANT GOVERNOR TO REJECT THE UNITED STATES' DEMAND.**

Defendants wrongly claim that state law prevents disclosure of this information to the Attorney General. *See* Dkt. 18 at 11; Dkt. 34 at 18, citing Utah Code § 20A-2-104(4). This is wrong, as the statute Defendants rely on expressly authorizes the Lieutenant Governor to disclose the records to "a government official or government employee acting in the government official's or government employee's capacity as a government official or government employee." Utah Code § 20A-2-104(4)(d)(i) (effective May 7, 2025). The Attorney General is a government official acting in an official capacity, and Utah law does not prevent the Lieutenant Governor from disclosing this information to the United States.

Months after the United States made its demand, the State of Utah created new subsections in its Election Code defining "government entity" and "government official" with respect to the state and its subdivisions. *See* Utah Code § 20A-2-601(7)(a)–(b). This new Utah statute comports with, and does not displace, the fact that the Lieutenant Governor is a state "officer of election" under 52 U.S.C. §§ 230701, 20703. Moreover, if there were any conflict between state and federal law, federal law would prevail. U.S. Const. art. VI, cl. 2; *see also Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 15 (2013) ("States' role in regulating congressional elections—while weighty and worthy of respect—has always existed subject to the express qualification that it 'terminates according to federal law.'") (citation omitted).

VI.     SECTION 304 OF THE CRA EXPRESSLY CONTEMPLATES THAT THE UNITED STATES WILL OBTAIN NON-PUBLIC VOTING RECORDS.

Continuing the line of privacy arguments, the Lieutenant Governor turns *Lynd* on its head to suggest *Lynd* creates an exception for "confidential, private papers and effects." Dkt. 18 at 16. To the contrary, *Lynd* recognizes that voting records "are public records" that "relate directly to the most vital of all public functions"—voting. For this reason, *Lynd* says, voting records are ordinarily "open to legitimate, reasonable inspection" because "we are *not* discussing confidential, private papers and effects." *Lynd*, 306 F.2d at 231 (emphasis added). The confidential private materials that *Lynd* distinguished from voter-registration records are materials that are generated for a private purpose, not those that are generated for a public purpose.

The Lieutenant Governor argues that the CRA "lacks a requirement that sensitive and private voter information be disclosed at all." Dkt. 18 at 19. She and the Intervenor-Defendants ask the Court to legislate a limit into Title III, restricting the duty to produce records under Title III to "redacted, publicly available" records. *See*, *e.g.*, Dkt. 18 at 14–17; Dkt. 34 at 18–21; Dkt. 46 at 19–23. The text of the CRA, though, refutes the "redacted, publicly available" argument by explicitly requiring the *nondisclosure* of records produced to the Attorney General under the Act:

> Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to this chapter, or any reproduction or copy, except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury.

52 U.S.C. § 20704. This provision only has meaning if the records that must be produced under the CRA potentially include non-public information. Section 301 refers broadly to "all records and papers" relating to registration to vote in a federal election. 52 U.S.C. § 20701. Section 304 limits the entities to whom the Attorney General may disclose those records. 52 U.S.C. § 20701. The

23

Lieutenant Governor's argument that only redacted, publicly available records may be produced makes no sense in light of Section 304 and fails as a matter of law.

The United States will strictly abide by the statutory limitations in Section 304 and other federal privacy laws. Moreover, the unredacted SVRL and other responsive federal election records can certainly be produced to the United States consistent with these federal protections through a protective order. *Lynd*, 306 F.2d at 230.[6]

**VII.    The CRA, HAVA and NVRA Require Federal Oversight of State Election Procedures.**

Defendants next argue that principles of federalism foreclose the United States from using the CRA to obtain Utah's unredacted SVRL. Dkt. 18 at 1–2; Dkt. 34 at 3–5, 17–18. Defendants suggest that the Attorney General plays no role in the conduct of federal elections and therefore that the federal laws at issue must yield to Utah's state privacy laws and generalized rights of privacy. Dkt. 18 at 14, 17; Dkt 34 at 18–21; Dkt. 46 at 20–21; 22–23. They are mistaken.

The United States Constitution vests the states with the primary responsibility for the conduct of elections. At the same time, it expressly authorizes Congress to regulate federal elections where appropriate. The Elections Clause provides, "The Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations." U.S. Const. art. I, § 4, cl. 1. The Supreme Court has explained that the Elections Clause "is a default provision; it invests the States with responsibility for the mechanics of congressional elections … but only so far as Congress declines to preempt state legislative choices…. Thus, it is

---

[6] Consistent with this approach to address any reasonable privacy concerns without impeding the Attorney General's authority to enforce federal law, the United States offered several states, including Utah, a memorandum of understanding ("MOU") memorializing these requirements. Seventeen states have provided their SVRLs, some with an MOU, some without, and one pursuant to the settlement of a CRA lawsuit. *See* Neff Decl. ¶¶ 16, 27.

well settled that the Elections Clause grants Congress 'the power to override state regulations' by establishing uniform rules for federal elections, binding on the States." *Foster v. Love*, 522 U.S. 67, 69 (1997) (citations omitted). "[T]he regulations made by Congress are paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative." *Inter Tribal Council of Ariz., Inc.*, 570 U.S. at 7-9 & n.1 (discussing the breadth of the Elections Clause).

Congress enacted broad provisions recognizing both state conduct and federal oversight in the CRA, HAVA, and the NVRA. State election officials like the Lieutenant Governor are given the primary responsibility for administering elections. HAVA requires states to implement a computerized SVRL and meet "[m]inimum standard[s] for accuracy of State voter registration records." 52 U.S.C. § 21083(a)(4). Section 303 of HAVA mandates that every state "ensure that voter registration records in the State are accurate and are updated regularly," including by use of a "system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters" and that provides "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters." *Id.*

The CRA imposes a "sweeping" obligation on the Lieutenant Governor to preserve and, on request, to produce registration records pertaining to federal elections. 52 U.S.C. § 20701; *Lynd*, 306 F.2d at 226. Only the United States, through the Attorney General, is authorized to compel records under Title III of the CRA and to enforce Section 303 of HAVA. *See* 52 U.S.C. §§ 20703, 20705 (CRA); 52 U.S.C. § 21111 (HAVA). The Attorney General likewise enforces the NVRA's requirement that all states maintain "accurate and current voter rolls" and remove ineligible voters in the conduct of federal elections. *See* 52 U.S.C. §§ 20510 (a), 20507(b), 20507(a)(4). This approach recognizes state officials as responsible for conducting elections, and federal officials as

25

responsible for election oversight. Moreover, the data the United States requests under the CRA is the same that twenty-five states—including Utah—routinely share through the Electronic Registration Information Center, ("ERIC"), to facilitate their compliance with federal list maintenance requirements.[7]

Adopting Defendants' position, under which Utah's privacy laws prevent disclosure to the Attorney General of personal information included in its SVRL, would eliminate the Attorney General's oversight role. The Attorney General can only meaningfully investigate and enforce list maintenance requirements under HAVA and the NVRA by having access to the voter identification numbers required by federal law. For each voter in Utah, that requires their driver's license number, last four digits of the social security number, or other HAVA identifying number. *See* 52 U.S.C. § 21083 (a)(5)(D). That information is necessary to identify duplicate registration records, registrants who have moved, and registrants who have died, or who are otherwise no longer eligible to vote in federal elections.[8]

## VIII.   THE UNITED STATES IS COMPLYING WITH FEDERAL PRIVACY LAWS.

Although the Lieutenant Governor does not raise Privacy Act arguments, the Intervenors do. Intervenors argue that federal privacy laws require dismissal of the United States' efforts to compel production of Utah's federal election records.  *See* Dkt. 34 at 21–25; Dkt. 46 at 18.  Those

---

[7] *See* ERIC, ERIC Overview, *available at* https://ericstates.org/ (last visited May 20, 2026).

[8] *See generally* 52 U.S.C. § 20507(a)(4) ("In the administration of voter registration for elections for Federal office, each State shall – (4) conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of – (A) the death of the registrant; or (B) a change in the residence of the registrant…"); 52 U.S.C. § 21083(a)(4) ("The State election system shall include provisions to ensure that voter registration records in the State are accurate and are updated regularly, including… (A) A system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters….").

arguments are misguided. These arguments are affirmative defenses and not a basis for dismissing the Complaint. *See generally Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012) ("courts should usually refrain from granting Rule 12(b)(6) motions on affirmative defenses") (citation omitted).

Specifically, LWV Intervenor argues that because "Congress has never authorized the creation of [a national voter file], its creation would violate the Privacy Act." Dkt. 46 at 18. This argument is doubly wrong. The United States is not building a "national voter file" or similar device. And the Privacy Act simply requires information to be securely stored and not be subject to unauthorized dissemination or use.[9]

NAACP Intervenors argue that the Privacy Act "independently prohibits" the United States' request for Utah's SVRL. Dkt. 34 at 22. They allege the United States identifies no systems of records notices ("SORN") "that would permit DOJ's collection and maintenance of Utah's entire statewide registration list." *Id.* at 23. This argument also is wrong.

The voter information that the United States is collecting is maintained according to the Privacy Act protections explained in the Department of Justice, Civil Rights Division's Privacy Policy, which is published online. The full list of routine uses for this collection of information, which include investigations and enforcement actions, can be found in the Department of Justice's SORN, most of which are identified with their citations in U.S. Dep't of Just., Privacy Act of 1974; System of Records, 82 Fed. Reg. 24147-01 (May 25, 2017), listed in a table at pages 24,148 to 24,151. The list of routine uses for this collection of information includes JUSTICE/CRT – 001,

---

[9] As *Lynd* recognized under similar circumstances, any legitimate privacy concerns can be addressed through an appropriate protective order governing the production of the demanded federal election records, including compliance with Section 304 of the CRA and the Privacy Act.

"Central Civil Rights Division Index File and Associated Records," 68 Fed. Reg. 47610-01, 611 (Aug. 11, 2003); 70 Fed. Reg. 43904-01 (July 29, 2005); and 82 Fed. Reg. 24147-01 (May 25, 2017). As referenced in SORN CRT-001 in the categories of records in the system: "The delegated legal duties and responsibilities of each section are described in detail at the Civil Rights Division Web page: *http://www.usdoj.gov/crt/crt-home.html*." 68 C.F.R. 47611. Similarly, it is noted that the purposes of the SORN are broad:

> The purposes of this system are to assist all the sections within the Division in maintaining names of Division employees and their case investigation assignments, names of defendants or investigation targets, victims, witnesses or potential witnesses, or other persons or organizations as they relate to potential or actual cases, investigations, and matters of concern to CRT.

*Id*. The statutes cited for routine use in the Department of Justice SORNs include enforcement of HAVA, the NVRA, and the CRA, as described in note 16 of the Department of Justice's Privacy Policy.[10] The United States made its requests and filed this case pursuant to those statutes. *See* Dkt. 1 ¶¶ 9–18, 24. The records in the system of records are kept under authority of 44 U.S.C. § 3101 and in the ordinary course of fulfilling the responsibility assigned to the Civil Rights Division under the provisions of 28 C.F.R. §§ 0.50, 0.51.

Consistent with the Privacy Act, 5 U.S.C. § 552a(e)(7), enforcing HAVA and the NVRA are within the scope of an authorized law enforcement activity—necessarily implying that the United States can obtain the materials. A contrary conclusion effectively would prevent the Civil

---

[10] States have frequently been the subject of voting investigations and enforcement as JUSTICE/CRT – 001 SORN advises. The United States has been involved in statewide redistricting cases where it has used statewide voter registration lists (https://www.justice.gov/crt/cases-raising-claims-under-section-2-voting-rights-act-0#tx2021) (last visited April 15, 2026).

Rights Division from engaging in any investigations or enforcement actions at all. That plainly is not what Congress intended.

The United States will strictly abide by the statutory limitations in Section 304 and other federal privacy laws. There is no requirement in federal law requiring that the United States plead its compliance with the Privacy Act in every complaint it brings in which it may obtain records that contain personally identifiable information. The Privacy Act and Section 304 of the CRA simply require that when protected information is obtained, it must be securely stored and not be subject to unauthorized dissemination or use. The Complaint, incorporating the demand, is in full compliance.

## CONCLUSION

For the foregoing reasons, the United States respectfully submits that the Court deny each Motion to Dismiss (Dkts. 18; 34; 36).

DATED: May 20, 2026

TIFFANY M. ROMNEY
Assistant United States Attorney
District of Utah

Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

JESUS A. OSETE
Principal Deputy Assistant Attorney General
Civil Rights Division

ERIC V. NEFF
Acting Chief, Voting Section
Civil Rights Division

/s/ Joseph W. Voiland
JOSEPH W. VOILAND
ANELISE K. POWERS
GEORGE L. CLARK
JONATHAN P. HAUENSCHILD
Civil Rights Division, Voting Section

Attorneys for the United States

29