DEREK BROWN
Utah Attorney General

MARK C. GILLESPIE (19265)
JOSHUA B. CUTLER (16434)
Assistant Utah Solicitors General
DAVID N. WOLF (6688)
LANCE SORENSON (10684)
ANIKKA HOIDAL (16489)
Assistant Utah Attorneys General
OFFICE OF THE UTAH ATTORNEY GENERAL
dnwolf@agutah.gov
lancesorenson@agutah.gov
ahoidal@agutah.gov
jbcutler@agutah.gov
markgillespie@agutah.gov

*Counsel for Defendant*

---

**In the United States District Court for the
District of Utah**

|  |  |
|---|---|
| The United States of America,<br><br>*Plaintiff,*<br><br>v.<br><br>Deidre M. Henderson, in her official capacity as Lieutenant Governor and chief election officer for the State of Utah,<br><br>*Defendant.* | **Defendant Lieutenant Governor Deidre M. Henderson's Combined (1) Opposition to Plaintiff's Motion to Compel and (2) Reply in Support of Motion to Dismiss**<br><br>Case No. 2:26-cv-000166-DBB-DAO<br><br>Judge David Barlow<br><br>Magistrate Judge Daphne A. Oberg |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................iii

INTRODUCTION ........................................................................................................... 1

ARGUMENT .................................................................................................................. 3

    I.    Plaintiff is not entitled to a summary proceeding; the usual rules of civil procedure apply to this suit. ................................................................ 3

    II.   Dismissal is proper because Utah's private voter information is not a "record" subject to CRA disclosure.................................................................. 7

    III.  Dismissal is proper because the CRA does not require—and Utah law does not permit—the disclosure of private voter information............. 14

    IV.  Dismissal is proper because Plaintiff has provided no valid basis and purpose to support its demands for sensitive voter information................. 21

CONCLUSION................................................................................................................ 26

CERTIFICATE OF SERVICE......................................................................................... 28

# TABLE OF AUTHORITIES

**Cases**

*Cox v. Laycock,*
    2015 UT 20, 345 P.3d 68 ............................................................................... 12

*Foster v. Love,*
    522 U.S. 67 (1997) ........................................................................................ 8

*Gibbons v. Ogden,*
    22 U.S. (9 Wheat.) 1 (1824) ........................................................................ 18

*Hillsborough Cnty., Florida v. Automated Med. Lab'ys, Inc.,*
    471 U.S. 707 (1985) ..................................................................................... 18

*Kennedy v. Lynd,*
    306 F.2d 222 (5th Cir. 1962) ................................................... 4, 6, 13, 17, 22

*Medtronic, Inc. v. Lohr,*
    518 U.S. 470 (1996) ..................................................................................... 18

*Orten v. Utah Cnty.,*
    2024 UT App 132, 558 P.3d 900.................................................................. 12

*Powell v. United States,*
    379 U.S. 48 (1964) ..................................................................................... 4, 5

*Rice v. Santa Fe Elevator Corp.,*
    331 U.S. 218 (1947) ..................................................................................... 18

*U.S. Term Limits, Inc. v. Thornton,*
    514 U.S. 779 (1995) ....................................................................................... 8

*United States v. Amore,*
    __ F. Supp. 3d __, 2026 WL 1040637 (D.R.I. Apr. 17, 2026)............. 1, 21, 22, 23, 25

*United States v. Arthrex, Inc.,*
    594 U.S. 1 (2021) ........................................................................................ 12

*United States v. Bellows,*
    __ F. Supp. 3d __, 2026 WL 1430481 (D. Me. May 21, 2026)
    .............................................................. 1, 5, 6, 7, 8, 11, 13, 19, 20, 25

*United States v. Benson,*
  819 F. Supp. 3d 753 (W.D. Mich. 2026) ......................................... 1, 4, 6, 7, 9, 10, 19

*United States v. Fontes,*
  __ F. Supp. 3d __, 2026 WL 1177244 (D. Ariz. Apr. 28, 2026).................... 1, 5, 7, 11

*United States v. Galvin,*
  __ F. Supp. 3d __, 2026 WL 972129 (D. Mass. Apr. 9, 2026) ...... 1, 21, 22, 23, 24, 25

*United States v. Oregon,*
  __ F. Supp. 3d __, 2026 WL 318402 (D. Or. Feb. 5, 2026) ............ 1, 6, 20, 22, 24, 25

*United States v. Weber,*
  816 F. Supp. 3d 1168 (C.D. Cal. 2026)................................................ 1, 4, 22, 24, 25

*United States v. Wisconsin Elections Comm'n,*
  __ F. Supp. 3d __, 2026 WL 1430354 (W.D. Wis. May 21, 2026).................... 1, 7, 10

*Voter Reference Found., LLC v. Torrez,*
  160 F.4th 1068 (10th Cir. 2025)............................................................................. 19

**Statutes**

26 U.S.C. § 7604................................................................................................................ 5

52 U.S.C. § 2108.................................................................................................. 14, 15, 19

52 U.S.C. § 20507............................................................................................................ 10

52 U.S.C. § 20510............................................................................................................ 19

52 U.S.C. § 20701................................................................................................. 7, 8, 9, 13

52 U.S.C. § 20702........................................................................................................... 7, 9

52 U.S.C. § 20703......................................................................................................... 8, 21

52 U.S.C. § 20704......................................................................................................... 8, 17

52 U.S.C. § 20705.............................................................................................................. 5

Utah Code § 20A-1-105.................................................................................................. 11

Utah Code § 20A-2-502.......................................................................................... 9, 10, 11

Utah Code § 20A-2-601.................................................................................................. 15

iv

**INTRODUCTION**

For all its bold assertions, Plaintiff's opposition lacks substance. Unable to show that Congress stripped States of the ability to protect their own voter information, it seeks special "summary proceedings" that would free it from the constraints of ordinary litigation. Unable to explain how a continuously updated voter database is subject to Title III of the Civil Rights Act of 1960 (CRA) for one purpose (production) but not another (preservation), it falls back on tautologies about federal power. And unable to refute the growing body of judicial opinions dismissing similar lawsuits, it simply labels every one of those opinions a mistake. In short, having merely skimmed the surface of the Lieutenant Governor's arguments, Plaintiff declares with no hesitation that there is "no single strong argument for why the Attorney General should not be able to investigate state voter-registration practices" by demanding sensitive and personal voter information. Dkt. 49 at 3.

That is a remarkable assertion coming from a litigant with a record of eight losses (and zero wins) on that very issue.[1] Federal courts nationwide have so far unanimously concluded that Congress has not empowered the federal government

---

[1] *See United States v. Weber*, 816 F. Supp. 3d 1168 (C.D. Cal. 2026); *United States v. Oregon*, __ F. Supp. 3d __, 2026 WL 318402 (D. Or. Feb. 5, 2026); *United States v. Benson*, 819 F. Supp. 3d 753 (W.D. Mich. 2026); *United States v. Galvin*, __ F. Supp. 3d __, 2026 WL 972129 (D. Mass. Apr. 9, 2026); *United States v. Amore*, __ F. Supp. 3d __, 2026 WL 1040637 (D.R.I. Apr. 17, 2026); *United States v. Fontes*, __ F. Supp. 3d __, 2026 WL 1177244 (D. Ariz. Apr. 28, 2026); *United States v. Wisconsin Elections Comm'n*, __ F. Supp. 3d __, 2026 WL 1430354 (W.D. Wis. May 21, 2026); *United States v. Bellows*, __ F. Supp. 3d __, 2026 WL 1430481 (D. Me. May 21, 2026).

to demand State voter registration lists. Regardless, Plaintiff is at least correct in one respect. There is no "single strong argument" for dismissing Plaintiff's complaint: there are three.

First, the voter registration list demanded by Plaintiff is not a record subject to production under the CRA. Plaintiff spends the bulk of its briefing on this point arguing that the list relates to federal elections, but the Lieutenant Governor has never argued otherwise. Instead, the Lieutenant Governor's position has always been that because she created the list herself, it did not "come into h[er] possession" and thus is not subject to the CRA. On this Plaintiff's opposition brief says very little. To date, four federal district courts have dismissed lawsuits like this one because the plain text of the CRA excludes State-created internal documents such as voter registration lists. This Court should do so as well.

Second, even if the CRA were to allow demands for some voter information, it does not authorize Plaintiff's demand for private, sensitive information about Utah voters. Utah law forbids the disclosure of such private voter information to a government official where the official does not need the information to fulfill an official duty imposed by law. And the CRA does not impose such a duty. (Nor does the Help America Vote Act of 2002 (HAVA), the National Voter Registration Act of 1993 (NVRA), or—as Plaintiff seems to suggest without directly arguing—some emanation or penumbra emerging from the confluence of all three statutes.) There is no ground for Plaintiff's insistence that the CRA requires unredacted private information.

Third and finally, Plaintiff does not satisfy the CRA's requirement that it provide a statement of the basis and the purpose for its demand. Plaintiff argues that the only basis needed is simply the CRA itself, but that circular argument would vitiate the requirement that Congress expressly included in the statute. The necessary basis must be a factual one—specific facts that point to some violation of federal law. Plaintiff offers no such basis. Nor does it offer any purpose germane to the CRA. As several courts have already held, enforcement of another statute is not a valid purpose for invoking the formidable investigatory powers unique to the CRA.

For all these reasons, Plaintiff's demand for Utah's voting records is unlawful—as is its demand that this Court adopt special summary proceedings that afford Plaintiff extra deference. This Court should deny the motion to compel and dismiss the Complaint without leave to amend.

## ARGUMENT

### I. Plaintiff is not entitled to a summary proceeding; the usual rules of civil procedure apply to this suit.

First, a preliminary matter: though its briefing largely responds to the motion to dismiss, Plaintiff raises one affirmative point, erroneously contending that ordinary civil procedure does not govern this lawsuit. That argument runs contrary to both the CRA's text and on-point Supreme Court precedent. And every court to decide the question so far has rejected it. This Court should do the same.

The scope of Plaintiff's procedural argument is breathtaking. Its motion to compel argues that "a CRA summary action functions like an administrative summons" such that "summary proceedings apply." Dkt. 36 at 6, 9; *see generally id.* at 4–9. Because "strong deference is given to the Government to investigate," Plaintiff reasons, the Court should "'not require pleadings which satisfy usual notions under the Federal Rules of Civil Procedure.'" *Id.* at 8, 5 (quoting *Kennedy v. Lynd*, 306 F.2d 222, 225–26 (5th Cir. 1962)). Instead, Plaintiff invites the Court to initiate a "'severely limited'" proceeding to decide only two issues: "'whether a written demand has been made'" for Utah's voter records, and "'whether the custodians against whom orders are sought have been given reasonable notice of the pendency of the proceeding.'" *Id.* at 6 (quoting *Lynd*, 306 F.2d at 226). In short, Plaintiff seeks a virtual transfer of venue to a realm where it enjoys "grand jury-like powers and latitude" and "'[m]ost of the Federal Rules of Civil Procedure are simply inapplicable.'" *Id.* at 5 n.4; *id.* at 6 (quoting *United States v. Benson*, 819 F. Supp. 3d 753, 766 (W.D. Mich. 2026)) (alteration in original).

The CRA requires no such thing. To begin, the statute itself says nothing about granting the federal government such special solicitude. Plaintiff cannot dispute that "[n]othing in the text of Title III requires a special statutory proceeding or any abbreviated procedures." *United States v. Weber*, 816 F. Supp. 3d 1168, 1182 (C.D. Cal. 2026). Indeed, Plaintiff appears to concede that the CRA "'contains no provision specifying the procedure'" that governs this lawsuit. Dkt. 36 at 6 (quoting *Powell v. United States*, 379 U.S. 48, 58 n.18 (1964)). But Plaintiff still insists that

4

the Fifth Circuit's 1962 decision in *Kennedy v. Lynd* entitles it to an "expedited and limited procedure" free of the strictures of the Federal Rules. *Id.*

That argument loses all force in the face of subsequent Supreme Court precedent: "[t]he Supreme Court, interpreting *identical language* in a different statute two years after the Fifth Circuit decided *Lynd*, held that because that statute 'contains no provision specifying the procedure to follow in invoking the court's jurisdiction, the Federal Rules of Civil Procedure apply.'" *United States v. Bellows*, __ F. Supp. 3d __, 2026 WL 1430481, at *5 (D. Me. May 21, 2026) (quoting *Powell*, 379 U.S. at 58 n.18) (emphasis added). The CRA provides that a district court "shall have jurisdiction by appropriate process to compel the production of such record or paper" as the government lawfully demands under the statute. 52 U.S.C. § 20705. And the statute interpreted by the Supreme Court in *Powell* used verbatim language, stating that the district court "shall have jurisdiction by appropriate process to compel" what the government properly sought under "the internal revenue laws." 26 U.S.C. § 7604(a). The Supreme Court has thus decided the issue already. Sixty-year-old Fifth Circuit reasoning notwithstanding, *Powell*'s unambiguous holding is the end of the matter. "The proceedings are instituted by filing a complaint, followed by answer and hearing"—and any additional process—prescribed by "the Federal Rules of Civil Procedure." *Powell*, 379 U.S. at 58 n.18.

Federal courts confronting this issue in identical lawsuits have uniformly reached the same conclusion. "Each court which addressed the issue found that the Federal Rules of Civil Procedure apply to the Attorney General's lawsuit." *United*

*States v. Fontes*, __ F. Supp. 3d __, 2026 WL 1177244, at \*1 n.1 (D. Ariz. Apr. 28, 2026) (collecting cases); *see also, e.g.*, *United States v. Oregon*, __ F. Supp. 3d __, 2026 WL 318402, at \*6 & n.1 (D. Or. Feb. 5, 2026) ("The Supreme Court's holding in *Powell* squarely rejects Plaintiff's contention and reliance on *Lynd*."); *Bellows*, 2026 WL 1430481, at \*5 n.8 ("[N]o district court has adopted the United States' view of *Lynd*'s "special statutory proceeding.'").[2] This Court should likewise follow the Supreme Court's direction and decline Plaintiff's invitation to read a summary-proceeding requirement into a statute that is silent on the matter.

Finally, even if Plaintiff could show that the CRA requires special government-friendly procedures, that issue is irrelevant to resolving the motions to dismiss currently before the Court. *Lynd* itself—Plaintiff's leading case—confirms that even in a "summary proceeding," if a dispute "arises as to whether or not any specified particular paper or record comes within this broad statutory classification of 'all records and papers \* \* \* relating to any \* \* \* act requisite to voting,' the Court would, of course, be open for its determination." 306 F.2d at 226. That is precisely the dispute between the parties in this suit: Plaintiff insists that the CRA empowers it to demand specific information from the State, while the Lieutenant Governor disagrees. So when it comes to the question of summary proceedings, "the court's

---

[2] Plaintiff suggests that one federal district court has "recognized the propriety of 'a summary enforcement proceeding' under Title III of the CRA." Dkt. 36 at 7 (quoting *Benson*, 819 F. Supp. 3d at 765). But even that court ultimately held that it would "apply the Rule 12(b)(6) standard to evaluate the United States' CRA claim" because the federal government's complaint took "the form of a traditional civil complaint, not a petition for summary enforcement." *Benson*, 819 F. Supp. 3d at 766. The same reasoning applies to the traditional complaint Plaintiff filed here.

analysis of the dispositive issue[s] would be the same either way," and "the court need not resolve this dispute" unless it so chooses. *United States v. Wisconsin Elections Comm'n*, __ F. Supp. 3d __, 2026 WL 1430354, at *2 (W.D. Wis. May 21, 2026).

## II.  Dismissal is proper because Utah's private voter information is not a "record" subject to CRA disclosure.

Plaintiff fares no better on the merits of its Complaint. First and foremost, Plaintiff fails to show that Utah voters' private information is a "record" as defined by, and subject to disclosure under, the CRA. That alone is grounds for dismissal, as numerous courts have already recognized. *See Benson*, 819 F. Supp. 3d at 770; *Fontes*, 2026 WL 1177244, at *6; *Wisconsin Elections Comm'n*, 2026 WL 1430354, at *5; *Bellows*, 2026 WL 1430481, at *7.

The CRA does not regulate every document or record that a State may possess. Instead, the CRA's reach extends only to "all records and papers which come into [the] possession" of a State "officer of election . . . relating to any application, registration, payment of poll tax, or other act requisite to voting" in a federal election. 52 U.S.C. § 20701. Having defined the type of records at issue, the statute goes on to impose legal obligations that involve those records:

- *First*, State election officials must "retain and preserve" CRA records for at least 22 months after the election to which they pertain. *Id.*

- *Second*, all persons are forbidden from "willfully steal[ing], destroy[ing], conceal[ing], mutilat[ing], or alter[ing] any" CRA record. *Id.* § 20702.

7

- *Third*, CRA records must "be made available for inspection, reproduction, and copying" by the United States "Attorney General or his representative," though only "upon demand in writing" that contains "a statement of the basis and the purpose" of the demand. *Id.* § 20703.

- *Fourth*, once the Attorney General obtains CRA records from a State, he or she cannot disclose them except to Congress, to "governmental agencies," or pursuant to judicial proceedings. *Id.* § 20704.

Those obligations make clear that the CRA's scope is tailored to achieve its overarching purpose of enabling the right to vote: it "requires states to preserve certain categories of evidence for a specified time following an election, to allow the Attorney General to investigate and litigate wrongdoing in the conduct of that election." *Bellows*, 2026 WL 1430481, at *6.

Unsurprisingly, the CRA's careful language does not reach beyond the "certain categories of evidence" necessary to achieve its purpose. Aware that the Constitution "invests the States with responsibility for the mechanics of [federal] elections" by "default," Congress proceeded with caution in exercising "'the power to override'" the States' authority. *Foster v. Love*, 522 U.S. 67, 69 (1997) (quoting *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 833 (1995)). It did not enact a law sweeping in "all information maintained by a State officer of election" or even "in the possession of a State officer of election." Instead, it drew a line between internal documents generated by the State for its own use and external election-related records that "come into [the] possession" of a State election official. By the statute's plain text, only the latter are subject to the CRA's requirements. 52 U.S.C. § 20701. And that makes sense, because "a voter application can be examined to determine

8

whether it was unlawfully rejected, whereas a list of those who successfully registered to vote would be little help in such an investigation." *Benson*, 819 F. Supp. 3d at 769.

The record-protection provisions of the CRA confirm that the statutory text means what it says. On pain of a $1,000 fine and up to a year in prison, the statute forbids State officials from failing to preserve a CRA record and punishes anyone who "willfully steals, destroys, conceals, mutilates, or alters" one in any way. *Id.* §§ 20701–20702. Those prohibitions make sense for external documents received by the State from voters or other outside sources; the statute requires the preservation of such documents in their original form so that the Attorney General can inspect them and use them to measure the propriety of the State's election procedures. But they do not make sense for internal, State-generated documents, particularly voter rolls that by operation of State law must be frequently updated. Failure to preserve every prior version of a constantly updated internal State voter roll is not a violation of federal law. Nor is every occasion on which a State official willfully "alters" an existing State-created document to ensure its accuracy—something Utah law requires "on at least a weekly basis." Utah Code § 20A-2-502(1)(b).

Plaintiff's primary response to this straightforward reading of the statute is misdirection. Nearly three of its four pages responding to this point are dedicated to arguing that Utah's voter list "'relates' to applications, registrations, and other acts requisite to voting." Dkt. 49 at 4–7. The Lieutenant Governor has not argued otherwise.

9

What the Lieutenant Governor *has* argued—and Plaintiff has failed to refute—is that Utah's voter list did not "come into [the] possession" of the Lieutenant Governor because it was created by her in the first place. The creation process involved information that is unquestionably beyond the scope of the CRA: the voter list is "not assembled purely from information in voter registration applications"—that is, the documents the CRA actually covers—but also "includes information that election officials obtain about individual voters from other state agencies" (and, indeed, other States). *Benson*, 819. F. Supp. 3d at 769; Utah Code § 20A-2-502(1)(b). The resulting internal list is a creature of the State—there was never a time in its existence that the Lieutenant Governor did not possess it. It is thus excluded from the category of external documents subject to the CRA.

District courts deciding parallel lawsuits have dismissed virtually identical complaints using similar reasoning. One court explained that "[t]he phrase 'come into [their] possession' naturally refers to a process by which someone acquires an item from an external source," and so the CRA most naturally refers to "only those documents that state election officials receive from prospective voters." *Benson*, 819 F. Supp. 3d at 768. In that sense, the CRA stands in contrast to other statutes that use less restrictive language (for instance, the NVRA, which refers simply to "'records' without any qualifier"). *Id.* (quoting 52 U.S.C. § 20507(i)(1)). Another court noted that the phrase "come into his possession" is "most naturally read as a synonym of 'receive' or 'acquire,' which are not words generally used to describe documents one creates." *Wisconsin Elections Comm'n*, 2026 WL 1430354, at *3. A

10

third court emphasized that this reading of the statute is "harmonious" with the remainder of the CRA, as well as other federal election statutes. *Fontes*, 2026 WL 1177244, at *4–5. And most recently, a district court concluded that the CRA's requirements "pertain to records and papers that election officials receive from prospective voters to support the exercise of the suffrage by the prospective voters, not lists or other tools created by election officials for the purpose of preserving the information provided by voters and ensuring that persons appearing to vote are registered." *Bellows*, 2026 WL 1430481, at *6. Each of these courts found the text and context of section 20701 dispositive; this Court should do the same.

Rather than urge the nonstandard reading of the CRA it has unsuccessfully pressed in other jurisdictions, Plaintiff here rests on two cursory counterarguments, neither of which are persuasive. First, it argues that the Lieutenant Governor did in fact "come into possession of the information" it seeks "because she 'manages and maintains' the [voter registration list] with information she receives from the county clerks." Dkt. 49 at 8. But Plaintiff overlooks the fact that under Utah law, the Lieutenant Governor is Utah's "chief election officer"; she "is responsible to oversee, and generally supervise, all elections and functions relating to elections in the state." Utah Code §§ 20A-1-105(1)(a)–(b). Indeed, Utah law expressly obligates the Lieutenant Governor not only to "manage" and "maintain" the State's voter registration list, but also to "develop" it in the first place. *Id.* § 20A-2-502(1)(a).

Utah law tasks the Lieutenant Governor with creating and maintaining Utah's voter list. While "no single person could fulfill that responsibility alone," the

11

list is created under her authority, and any supporting clerks work on her behalf when compiling voter-list information. *United States v. Arthrex, Inc.*, 594 U.S. 1, 11 (2021) (internal quotations omitted). The Lieutenant Governor "cannot delegate [that] ultimate responsibility or the active obligation to supervise that goes with it." *Id.* (alteration in original). That is why Utah courts have thus repeatedly recognized the Lieutenant Governor's authority in election-related matters, even those primarily involving the actions of subordinate officers or entities. *See, e.g., Cox v. Laycock*, 2015 UT 20, ¶ 20, 345 P.3d 689 (holding that "[a]s the state's chief elections officer, the lieutenant governor has an interest in the election contest," even where her role is "only supervisory"); *Orten v. Utah Cnty.*, 2024 UT App 132, ¶ 6, 558 P.3d 900 (recognizing authority of Lieutenant Governor as "chief election officer" to intervene in election-related records-access case initially targeted at counties). Plaintiff thus argues that the Lieutenant Governor "receives" information from herself—a logical impossibility. In every legally relevant sense, the Lieutenant Governor creates Utah's voter registration list.

Second, Plaintiff contends that the Fifth Circuit's decision in *Lynd* "approved the production of . . . records that election officials had created." Dkt 49 at 8. But *Lynd* did not involve any dispute over—much less a holding as to—whether the records sought by the federal government fell within the CRA's scope. As previously explained, the Fifth Circuit held that summary proceedings applied and that it thus could exercise only limited review (a holding later overruled by the Supreme Court, *see supra* 4–6), primarily over whether the Attorney General had made a written

12

demand for documents pursuant to the CRA. *Lynd*, 306 F.2d at 226. But even in summary proceedings, the *Lynd* court held that it could decide "whether or not any specified particular paper or record comes within [the CRA's] broad statutory classification" if a "genuine dispute" over that issue arose. *Id.* In *Lynd*, the issue did not arise, and the Fifth Circuit said nothing about it—much less made any holdings that should guide the Court's resolution of the question here.[3]

"Coming into possession of something most naturally implies receipt from an external source. Congress could have required the retention and production of all election-related records and papers 'in the possession of' the state election official but did not." *Bellows*, 2026 WL 1430481, at *6 n.10. Because Utah's internal voter list never "came into [the] possession" of the Lieutenant Governor as required by the CRA, the statute does not threaten her with prison for her weekly updates to the list; it does not require maintenance of hundreds of versions of the list for months on end; and it does not allow the Attorney General to demand the list in violation of Utah privacy laws.

---

[3] To the extent that Plaintiff relies on the fact that *Lynd* reversed a district court's denial of the Attorney General's demand for "*all records or papers in [the Registrar's] possession* relating . . . to the elections for federal office"—not merely those that "c[a]me into his possession," 52 U.S.C. § 20701—that atextual gloss does not survive even a cursory reading of the CRA, as explained above. *Lynd*, 306 F.2d at 227 (emphasis added); *see supra* 7–11.

13

**III.   Dismissal is proper because the CRA does not require—and Utah law does not permit—the disclosure of private voter information.**

The second and independent basis for dismissal is that the CRA does not mandate the disclosure of private, sensitive voter information. That information is protected by Utah law, which is not preempted by the CRA's limited disclosure requirements.

At the outset, it is useful to consider the specific information in dispute. Plaintiff has demanded "the current electronic copy of Utah's computerized statewide voter registration list, with all fields, including each registrant's full name, date of birth, residential address, and either their state driver's license number, the last four digits of their Social Security number, or HAVA unique identifier as required by 52 U.S.C. § 21083." Dkt. 1 at 8. Utah has offered to provide all information allowed by law; on July 31, 2025, it offered to send Plaintiff "the most current version of the public statewide voter registration list," which included all publicly available information from the list. Dkt. 36-5 at 11. Under current Utah law (after changes made during the 2026 Legislative Session, which took place during the pendency of this lawsuit), that publicly available "standard voter data" includes:

(a)   the voter's full legal name;

(b)   the voter's voter identification number and federal information processing series geographic code;

(c)   the voter's age range;

(d)   the voter's complete residential address, including the unit type and number;

(e)   the voter's county of residence;

14

(f)   the voter's mailing address, including the city;

(g)   the voter's precinct, congressional district, state House of Representatives district, state Senate district, state school board district, local school board district, county council district, and city council district;

(h)   the voter's party affiliation or status as unaffiliated;

(i)   the voter's status as active or inactive;

(j)   the last day on which the voter's voter registration record was updated; and

(k)   the voting history of the voter.

Utah Code § 20A-2-601(14). The State will provide any of this information to Plaintiff upon request, as it has already offered to do. Dkt. 36-5 at 11. But Utah law protects any additional data the State maintains about each voter, as well as the voter data belonging to any "at-risk voter" (such as a victim of domestic violence, law enforcement officer, or public figure). *Id.* § 20A-2-603(1)(b).

Thus, the only data currently in dispute—demanded by Plaintiff but protected by Utah law—is (i) all personal information of Utah at-risk voters; (ii) the specific date of birth for each Utah voter; and (iii) the State driver's license number, last four digits of a Social Security number, or HAVA unique identifier for each Utah voter.[4]

Utah law bars disclosure of the disputed data. As a rule, the Lieutenant Governor "may not disclose to [a] person . . . information from a public registered voter's voter registration record that is not standard voter data" (as defined above)

---

[4] Plaintiff does not explain how Utah's publicly available "voter identification number" is different from a "HAVA unique identifier." *Compare* Utah Code § 20A-2-601(14) *with* 52 U.S.C. § 21083(a)(1)(A)(iii) ("Under the computerized list, a unique identifier is assigned to each legally registered voter in the State.").

15

or "any information from an at-risk voter's voter registration record." *Id.* § 20A-2-603(1)(b). Plaintiff protests that because "The Attorney General is a government official acting in an official capacity," it follows that "Utah law does not prevent the Lieutenant Governor from disclosing this information to the United States." Dkt. 49 at 22. But that is wrong. Even when a government official makes a proper request, Utah law provides that the Lieutenant Governor "shall disclose to the government official only the information in a voter registration record necessary to permit the government official to fulfill an official duty imposed by law on the government official." *Id.* § 20A-2-605(1)(a); *see also id.* § 20A-2-607(1)(c) (authorizing release of voter records "to the federal government to comply with, or verify compliance with, the requirements of federal election law," but only "to the extent required by law"). And if the Lieutenant Governor "reasonably believes that the person" making the request "does not need the information requested to fulfill an official duty imposed by law on the government official" or "will provide or use the information in a manner prohibited by law," she "may not disclose the information." *Id.* § 20A-2-605(4).

Because Plaintiff does not need the disputed information to fulfill an official duty imposed by law, Utah law does not allow the Lieutenant Governor to disclose it. As previously explained, the CRA does not require the collection of the sensitive data Plaintiff demands here. Dkt. 18 at 15. Plaintiff's only argument based in the text of the CRA itself is the existence of the CRA's nondisclosure provision, which prevents the Attorney General from disclosing "any record or paper produced" by a

16

State pursuant to the CRA. 52 U.S.C. § 20704. In its view, that provision "only has meaning if the records that must be produced under the CRA potentially include non-public information." Dkt. 49 at 23.

That is incorrect. To begin with, the CRA only applies to external records provided to the State by voters. *Supra* 7–14. But even if it did cover internal State documents, Plaintiff overlooks the obvious scenario in which Section 20704 would apply. Utah law, erring on the side of privacy, requires that only the minimum amount of voter information be disclosed to government officials. But a State with a more lenient government-official exception to its privacy laws could be required to disclose more data, including potentially sensitive data, than is publicly available. Regardless of the documents subject to disclosure, Congress enacted Section 20704 to ensure that any disclosure to the government to comply with federal law would not be functionally the same as an unwanted public disclosure.

Plaintiff also raises a cursory argument that "[t]o the extent that state law conflicts with the requirements of the CRA, it is preempted." Dkt. 36 at 19. But Plaintiff offers no substantive preemption argument—no textual hook for express preemption, no evidence of field or conflict preemption—except to list some of HAVA's requirements (with which Utah complies) and say that "Title III of the CRA imposes a 'sweeping' obligation on election officials to preserve and, on request, to produce registration records pertaining to federal elections." *Id.* at 20 (quoting *Lynd*, 306 F.2d at 226). That sort of vague gesture to a federal statute's breadth is not enough to show that Congress abrogated the law of a sovereign State,

17

particularly because courts "'start with the assumption that'" historically held "'powers of the States were not to be superseded by [a] Federal Act unless that was the clear and manifest purpose of Congress.'" *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

The presumption against preemption is even stronger where, as here, both parties appear to "believe[] that state law can be read in harmony with federal law." Dkt. 36 at 20. The first rule of preemption is that the Supremacy Clause only displaces State laws that "'interfere with, or are contrary to,' federal law." *Hillsborough Cnty., Florida v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 712 (1985) (quoting *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 211 (1824)). The CRA requires a State to disclose federal-election-related documents that come into its possession; nothing in that requirement suggests, much less states in a "clear and manifest" way, that mandatory redactions applied to an internal, State-created record must dissolve in the face of a federal demand. Plaintiff offers no evidence of preemption because none exists.

Still lacking direct support from the CRA, Plaintiff opts for yet another indirect approach, this time via completely different statutes. Plaintiff contends that the CRA may be used to "investigate and enforce list maintenance requirements under HAVA and the NVRA"—and that *those* statutes, in turn, require that the federal government be given access to every Utah voter's "driver's license number, last four digits of the social security number, or other HAVA identifying number." Dkt. 49 at 26. (Plaintiff does not argue that Utah voters'

18

unredacted birth dates and the personal information of at-risk voters is required to enforce HAVA or the NVRA.)

This one-step-removed argument fails. As every court to consider the question has concluded, the NVRA does not require States to disclose private, unredacted voter information. *Benson*, 819 F. Supp. 3d at 760 (citing 12 examples). More to the point, the Tenth Circuit has already decided the question, holding that "[t]o the extent the State wishes to redact appropriate personal information before providing the voter data, the NVRA does not prohibit that limitation." *Voter Reference Found., LLC v. Torrez*, 160 F.4th 1068, 1083 n. 14 (10th Cir. 2025). So a need to enforce the NVRA does nothing to help Plaintiff here.

HAVA is even less helpful to Plaintiff, since it contains no disclosure provision at all. Instead, HAVA emphatically provides that the voter list it mandates must be "defined, maintained, and administered at the State level." 52 U.S.C. § 21083(a)(1)(A). And HAVA also "contains specific provisions that govern its enforcement, which do not independently afford the United States access to a state's current, unredacted [voter registration list]." *Bellows*, 2026 WL 1430481, at *8 (citing 52 U.S.C. § 21111). The NVRA contains a similar enforcement provision. *See* 52 U.S.C. § 20510(a). So neither the NVRA nor HAVA imposes a duty on Utah to disclose its unredacted voter information to the federal government.

Of course, Plaintiff knows all this. That is why it brought only a single cause of action, under the CRA—a federal statute that (where it applies) empowers the Attorney General to seek disclosures from States in a way that the NVRA and

19

HAVA do not. But Plaintiff cannot use the NVRA and HAVA to widen the CRA's disclosure requirement or vice versa; in making the attempt, it "undertak[es] to obtain through the Civil Rights Act what it has all but conceded it cannot obtain under the specific statutes it is seeking to enforce." *Bellows*, 2026 WL 1430481, at *8; *see also Oregon*, 2026 WL 318402, at *12 (holding that the CRA "does not require Defendants to disclose . . . Sensitive Voter Data"). Plaintiff's effort to create a hybridized disclosure requirement triggers the federalism and major-questions concerns raised in the Lieutenant Governor's motion to dismiss.[5] Dkt. 18 at 15–17. More importantly, it does violence to the text of all three statutes invoked by the Plaintiff, and it is completely unsupported by precedent.

Nothing in the CRA suggests that States must surrender unredacted personal voter information. That alone is cause for dismissal.

---

[5] Plaintiff spends considerable time attacking these second-level arguments in its opposition brief rather than building an affirmative case for its strained interpretation of the CRA. Dkt. 49 at 16–22, 24–26. As part of that effort, it lists nine cases in which it asserts that the federal government has previously obtained nonpublic voter information from States by "relying on the CRA." *Id.* at 17–19. But all nine of those cases involved memoranda of understanding or consent decrees in which the States freely chose to provide the federal government their voters' information; none involved a court holding that the CRA required it. And none of the cases involved a lawsuit under the CRA itself (as opposed to some other statute, such as HAVA, the NVRA, UOCAVA, or the Voting Rights Act), as Plaintiff has brought here.

**IV.   Dismissal is proper because Plaintiff has provided no valid basis and purpose to support its demands for sensitive voter information.**

Finally, Plaintiff still fails to show that it offered a valid basis and purpose for its CRA demand. That omission is yet another independent reason to dismiss the Complaint.

The CRA provides that any demand made by the federal government for disclosures under its provisions "shall contain a statement of the basis and the purpose therefor." 52 U.S.C. § 20703. That "crucial requirement" creates a mandatory obligation for the federal government. *United States v. Amore*, __ F. Supp. 3d __, 2026 WL 1040637, at *5 (D.R.I. Apr. 17, 2026). And the obligation has two "conceptually distinct" parts: the government must provide both a "basis" and a "purpose" for its demand. *United States v. Galvin*, __ F. Supp. 3d __, 2026 WL 972129, at *4 (D. Mass. Apr. 9, 2026).

Plaintiff disputes none of this. Dkt. 49 at 9. But it argues that it complied with the basis-and-purpose requirement. According to Plaintiff, it stated in an August 14, 2025 letter to the Lieutenant Governor that "the basis for the demand was Title III of the CRA, the NVRA and HAVA, and the purpose was to 'assess Utah's compliance with the statewide VRL maintenance provisions of the National Voter Registration Act (NVRA).'" *Id.* Neither the basis nor the purpose offered is sufficient.

***Invalid Basis.*** Plaintiff argues that it satisfied the basis requirement "by stating that the basis was the CRA." Dkt. 36 at 11. In other words, Plaintiff defines the word "basis" to be synonymous with "'underlying legal authority.'" Dkt. 49 at 9

21

(quoting Dkt. 18 at 8). That effectively writes the word "basis" out of the CRA altogether. If "the basis [i]s the CRA," Dkt. 36 at 11, it follows that the basis requirement "requires only a citation to the statute itself"—meaning that every demand made under the CRA automatically complies. *Galvin*, 2026 WL 972129, at *5. "Congress could not have intended Title III to be interpreted in this redundant and circular manner." *Amore*, 2026 WL 1040637, at *5.

Plaintiff's later gloss—that "the basis for the demand was Title III of the CRA, the NVRA and HAVA" combined—fares no better. Dkt. 49 at 9. If "'basis' means merely identifying any federal statute . . . that Plaintiff believes may have been violated," the result would be a grant to the federal government of "virtually limitless access to records required to be maintained" under the CRA. *Oregon*, 2026 WL 318402, at *8. At best, it would subsume any "basis" into the broader "purpose" of the demand, making the former obsolete. *Amore*, 2026 WL 1040637, at *5.

The better interpretation of the basis requirement is that it means what it says: the United States must show that its demand is "'based upon information in the possession of the Attorney General tending to show that'" the targeted State has violated the CRA. *Oregon*, 2026 WL 318402, at *8 (quoting *Lynd*, 306 F.2d at 229 n.6). Several district courts have reached that conclusion, explaining that the required "basis is the reasoning provided by the DOJ regarding the evidence behind its investigation of a particular state and specific, articulable facts pointing to the violation of federal law," *Weber*, 816 F. Supp. 3d at 1184, and noting that a factual-basis requirement "comports with the construction given Title III by the Justice

22

Department and federal courts in the early months and years following the statute's enactment," *Galvin*, 2026 WL 972129, at *4 (collecting cases including *Lynd*); *see also Amore*, 2026 WL 1040637, at *5. Without such a basis, a CRA demand letter is nothing more than a "factually groundless 'fishing expedition[].'" *Amore*, 2026 WL 1040637, at *5.

Plaintiff lacks a sufficient basis for its CRA demand here. In its opposition brief, Plaintiff suggests that even "[i]f the United States were required to set forth a list of facts explaining why it needs to assess Utah's voter list maintenance compliance . . . [it] did so" in its letter dated July 15, 2025. Dkt. 49 at 11–12; *see also* Dkt. 36 at 14, Dkt. 36-2. Not so. In the July 15 letter, Plaintiff listed several perceived discrepancies with Utah's reports to the United States Election Assistance Commission (USEAC). Dkt. 49 at 11; Dkt. 36-2 at 2. But Plaintiff was making a separate request that the Lieutenant Governor "provide . . . information" unrelated to Plaintiff's later CRA demand. Dkt. 36-2 at 2. Before the CRA was ever mentioned by Plaintiff, the Lieutenant Governor responded to the July 15 request, explaining (among other things) that the purported discrepancies were "due to reporting limitations of [Utah's] 25 year old legacy system." Dkt. 36-5 at 5. Only later did Plaintiff invoke the CRA to demand Utah's voter registration list—and *not* the information it claimed Utah had failed to report to the USEAC. *See* Dkt. 36-3 (Aug. 14 letter making CRA demand); Dkt. 36-6 at 2–3 (Utah letter seeking clarification on this issue).

23

Thus, "the July [15] Letter contains no Title III demand, and the August 14 Letter's Title III demand does not identify the information in the July [15] Letter as its factual basis." *Oregon*, 2026 WL 318402, at *9. Plaintiff's "patchwork and post hoc effort to stitch together a legally sufficient 'statement of the basis'" from multiple letters cannot satisfy the CRA. *Id.*; *Galvin*, 2026 WL 972129, at *4. And nothing in any of Plaintiff's communications provides the sort of "specific, articulable facts pointing to the violation of federal law" that have historically supported CRA demands. *Weber*, 816 F. Supp. 3d at 1184.

*Invalid Purpose.* Plaintiff insists that "assess[ing] Utah's compliance with the statewide VRL [voter registration list] maintenance provisions of the National Voter Registration Act (NVRA)" is a "proper" purpose for its CRA demand. Dkt. 49 at 12. But as explained in the Lieutenant Governor's motion to dismiss, the CRA predates the NVRA by decades; it was never meant to facilitate NVRA compliance. "Instead, Congress included the CRA's record-inspection provision to enable *enforcement of the CRA*, not other federal statutes." Dkt. 18 at 19–20. Plaintiff does not acknowledge, much less rebut, this argument. *See* Dkt. 36 at 9–14; Dkt. 49 at 12–14.

Courts dismissing similar complaints have rejected Plaintiff's expansive view of what constitutes a valid purpose under the CRA. At least one has concluded that voter list maintenance cannot suffice as the "purpose" for a CRA demand because "[i]f the Department of Justice wants to enforce HAVA and the NVRA, it must use the pre-suit investigation and enforcement mechanisms that Congress provided in

24

those statutes" rather than attempt to "leverage[]" the CRA for that purpose. *Bellows*, 2026 WL 1430481, at \*7–8. That reasoning respects the differences between the CRA, the NVRA, and HAVA, and acknowledges that "the NVRA and HAVA are more recent, more precise statutes with their own objectives and mechanisms for enforcement." *Id.* at \*9; *see also* Dkt. 18 at 19–22.

But the Court need not even go as far as that. The majority view among courts deciding this question is that "'the "purpose" required in a demand for records under Title III must relate to a purpose of investigating violations of individuals' voting rights.'" *Amore*, 2026 WL 1040637, at \*6 (quoting *Oregon*, 2026 WL 318402, at \*10). This view is consistent with the past practice of the DOJ, which "routinely stated both a purpose and basis related to alleged civil rights violations" when seeking disclosures under the CRA. *Weber*, 816 F. Supp. 3d at 1182. More importantly, it is consistent with "Title III's text within its larger statutory and historical context." *Oregon*, 2026 WL 318402, at \*10. At minimum, a stated purpose cannot satisfy the CRA if it lacks "any reference or relation to" the CRA itself. *Id.*

As in similar cases, Plaintiff has "failed to satisfy [the] simple requirement imposed by Congress as one precondition to obtaining documents under the authority of the Civil Rights Act of 1960" that it offer a valid basis and purpose for its demand. *Galvin*, 2026 WL 972129, at \*6. Because that requirement is "a critical safeguard that ensures [Plaintiff's] request is legitimately related to the purpose of the statute," failure to fulfill it requires dismissal. *Weber*, 816 F. Supp. 3d at 1184.

25

## CONCLUSION

The CRA does not impose disclosure requirements on internal documentation that never came into the possession of the State. It does not require a State to disclose unredacted personal voter information in violation of its own laws. And it does not allow the federal government to make demands without first providing a factually relevant basis and legally relevant purpose. The Court should deny the motion to compel and dismiss the Complaint with prejudice.

DATED: June 3, 2026

Respectfully submitted,

*/s/ Mark C. Gillespie*
Mark C. Gillespie
Joshua B. Cutler
Assistant Utah Solicitors General

Lance Sorenson
David N. Wolf
Anikka Hoidal
Assistant Utah Attorneys General

*Counsel for Defendant Lieutenant Governor Deidre Henderson*

## CERTIFICATE OF SERVICE

I hereby certify that on June 3, 2026, I caused a true and correct copy of the foregoing **Defendant Lieutenant Governor Deidre M. Henderson's Combined (1) Opposition to Plaintiff's Motion to Compel and (2) Reply in Support of Motion to Dismiss** to be filed using the Court's electronic filing system, which effectuated service of such filing upon all counsel who have entered an appearance.

/s/ *Mark C. Gillespie*
Mark C. Gillespie
Assistant Solicitor General
*Counsel for Defendant*

28