David P. Billings (11510)
**FABIAN VANCOTT**
95 South State Street, Suite 2300
Salt Lake City, UT 84111
Telephone: (801) 323-2205
dbillings@fabianvancott.com

David R. Fox*
Christopher D. Dodge*
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave NW, Suite 400
Washington, DC 20001
Telephone: (202) 968-4490
dfox@elias.law
cdodge@elias.law

Walker McKusick*
**ELIAS LAW GROUP LLP**
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
Telephone: (206) 656-0177
wmckusick@elias.law

*Counsel for NAACP Intervenors*

*\* Admitted Pro Hac Vice*

## UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DEIDRE M. HENDERSON, in HER official capacity as Lieutenant Governor and chief election officer for the State of Utah,<br><br>Defendant. | **NAACP INTERVENORS' COMBINED REPLY IN SUPPORT OF MOTION TO DISMISS AND OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL**<br><br>Case No. 2:26-cv-0166-DBB-DAO<br><br>District Judge David Barlow<br><br>Magistrate Judge Daphne A. Oberg |

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 2

I.    The Federal Rules of Civil Procedure apply to this case and require the adjudication of the motions to dismiss before the motion to compel. ........................................................2

II.   Under any procedure, the Court must conduct meaningful review of DOJ's demand. .......6

III.  DOJ failed to state "the basis" or a valid "purpose" for its demand. ................................10

    A.   DOJ did not provide any statement of "the basis" in its demand. ............................. 10

    B.   DOJ did not provide a legally sufficient "purpose" for its demand. ......................... 13

IV.  The CRA does not entitle DOJ to production of Utah's dynamic voter list in any event. 15

V.   Utah state law is not preempted and requires redaction of sensitive voter information. ...20

VI.  DOJ's demand is incompatible with the Privacy Act. ........................................................21

    A.   DOJ failed to comply with the Privacy Act's procedural mandates. ......................... 23

    B.   DOJ failed to satisfy the Privacy Act's substantive safeguards. .............................. 25

CONCLUSION ................................................................................................................... 26

**TABLE OF AUTHORITIES**

**Page(s)**

## CASES

*Alabama ex rel. Gallion v. Rogers*,
  187 F. Supp. 848 (M.D. Ala. 1960) ............................................................... 8

*Alexander v. Sandoval*,
  532 U.S. 275 (2001) .................................................................................... 14

*All. for Retired Ams. v. Bessent*,
  770 F. Supp. 3d 79 (D.D.C. 2025) ............................................................... 22

*Becker v. United States*,
  451 U.S. 1306 (1981) .................................................................................... 9

*Bird v. Wyoming*,
  No. 22-CV-152-NDF, 2022 WL 17545136 (D. Wyo. Dec. 8, 2022) ............... 14

*Califano v. Yamasaki*,
  442 U.S. 682 (1979) ...................................................................................... 3

*CFPB v. Accrediting Council for Indep. Colls. & Schs.*,
  854 F.3d 683 (D.C. Cir. 2017) ...................................................................... 7

*Citizens for Const. Integrity v. United States*,
  70 F.4th 1289 (10th Cir. 2023) ................................................................... 20

*Cleveland v. United States*,
  329 U.S. 14 (1946) ...................................................................................... 24

*Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*,
  601 U.S. 42 (2024) ...................................................................................... 20

*Doe v. Stephens*,
  851 F.2d 1457 (D.C. Cir. 1988) ................................................................... 22

*Donaldson v. United States*,
  400 U.S. 517 (1971) ...................................................................................... 9

*Epic Sys. Corp. v. Lewis*,
  584 U.S. 497 (2018) .................................................................................... 20

*EPIC v. Presidential Advisory Comm'n on Election Integrity*,
   878 F.3d 371 (D.C. Cir. 2017) ................................................................ 25

*Fifth Third Bancorp v. Dudenhoeffer*,
   573 U.S. 409 (2014) ............................................................................ 13

*Gahagan v. USCIS*,
   911 F.3d 298 (5th Cir. 2018) ................................................................... 4

*Gelbard v. United States*,
   408 U.S. 41 (1972) ............................................................................. 21

*Gonzalez v. Thaler*,
   623 F.3d 222 (5th Cir. 2010) ................................................................... 4

*Grand Canyon Univ. v. Cardona*,
   121 F.4th 717 (9th Cir. 2024) ................................................................ 17

*Henson v. Santander Consumer USA Inc.*,
   582 U.S. 79 (2017) ............................................................................. 17

*Honeycutt v. United States*,
   581 U.S. 443 (2017) ............................................................................ 16

*Huddleston v. United States*,
   415 U.S. 814 (1974) ............................................................................ 16

*In re Dep't of Just. Admin. Subpoena No. 25-1431-030*,
   No. 25-MC-00063-SKC-CYC, 2026 WL 33398 (D. Colo. Jan. 5, 2026) ........................... 15

*In re OPM Data Sec. Breach*,
   928 F.3d 42 (D.C. Cir. 2019) ............................................................. 25, 26

*In re Subpoena Duces Tecum*,
   228 F.3d 341 (4th Cir. 2000) .................................................................. 15

*Kelley v. City of Albuquerque*,
   542 F.3d 802 (10th Cir. 2008) ................................................................. 19

*Kennedy v. Lynd*,
   306 F.2d 222 (1962) ....................................................................... *passim*

*Knight v. Comm'r*,
   552 U.S. 181 (2008) ............................................................................ 19

*League of Women Voters v. DHS*,
   No. 25-cv-3501, 2025 WL 3198970 (D.D.C. Nov. 17, 2025) ...................................... 22

*Leocal v. Ashcroft*,
   543 U.S. 1 (2004) ............................................................................................. 16

*Londrigan v. FBI*,
   670 F.2d 1164 (D.C. Cir. 1981) ....................................................................... 22

*LULAC v. EOP*,
   818 F. Supp. 3d 34 (D.D.C. 2026)............................................................... 22, 25

*N.H. Fire Ins. Co. v. Scanlon*,
   362 U.S. 404 (1960) ........................................................................................... 3

*N.M. Elks Ass'n v. Grisham*,
   595 F. Supp. 3d 1018 (D.N.M. 2022) ............................................................... 23

*Niz-Chavez v. Garland*,
   593 U.S. 155 (2021) ......................................................................................... 12

*NLRB v. Eanet*,
   179 F.2d 15 (D.C. Cir. 1949)............................................................................... 7

*NLRB v. Kingston Cake Co.*,
   206 F.2d 604 (3d Cir. 1953)................................................................................ 7

*Northcross v. Bd. of Educ. of Memphis City Schs.*,
   412 U.S. 427 (1973) ........................................................................................... 3

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
   559 U.S. 393 (2010) ........................................................................................... 4

*Tal v. Hogan*,
   453 F.3d 1244 (10th Cir. 2006) ........................................................................ 23

*Ultradent Prods., Inc. v. Spectrum Sols. LLC*,
   No. 2:17-CV-890, 2018 WL 324868 (D. Utah Jan. 8, 2018)............................... 2

*United States v. Amore*,
   No. 25-cv-00639, 2026 WL 1040637 (D.R.I. Apr. 17, 2026)...................... *passim*

*United States v. Barnes*,
   No. 22-2147, 2025 WL 1367403 (10th Cir. May 12, 2025) .............................. 20

*United States v. Bellows*,
   No. 1:25-cv-00468, 2026 WL 1430481 (D. Me. May 21, 2026)................... *passim*

*United States v. Benson*,
   819 F. Supp. 3d 753 (W.D. Mich. 2026) .................................................... *passim*

*United States v. Fontes*,
  No. 2:26-cv-00066, 2026 WL 1177244 (D. Ariz. Apr. 28, 2026) ............................1, 3, 7, 15

*United States v. Galvin*,
  No. 1:25-cv-13816, 2026 WL 972129 (D. Mass. Apr. 9, 2026)....................................*passim*

*United States v. LKAV*,
  712 F.3d 436 (9th Cir. 2013) ..................................................................................... 18

*United States v. Lynd*,
  301 F.2d 818 (5th Cir. 1962) ..................................................................................... 8, 9

*United States v. Markwood*,
  48 F.3d 969 (6th Cir. 1995).......................................................................................... 8

*United States v. Mohrbacher*,
  182 F.3d 1041 (9th Cir. 1999) ................................................................................... 16

*United States v. Morton Salt Co.*,
  338 U.S. 632 (1950) ..................................................................................................... 7

*United States v. Oregon*,
  No. 6:25-cv-01666, 2026 WL 318402 (D. Or. Feb. 5, 2026) .....................................*passim*

*United States v. Powell*,
  379 U.S. 48 (1964) ............................................................................................ 1, 3, 6, 7

*United States v. Weber*,
  816 F. Supp. 3d 1168 (C.D. Cal. 2026) ..................................................................*passim*

*United States v. Wis. Elections Comm'n*,
  No. 25-cv-1036, 2026 WL 1430354 (W.D. Wis. May 21, 2026) ...........................1, 3, 15, 19

*Wis. Cent. Ltd v. United States*,
  585 U.S. 274 (2018) ................................................................................................... 17

## STATUTES

10 U.S.C. § 130c(d) ........................................................................................................ 19

29 U.S.C. § 161(2)............................................................................................................ 5

44 U.S.C. § 3554(a) ................................................................................................... 25, 26

44 U.S.C. § 3558............................................................................................................. 23

5 U.S.C. § 555(a) ............................................................................................................ 22

5 U.S.C. §552a ................................................................................................. 22, 26

52 U.S.C. § 20507(i)(1) ......................................................................................... 13

52 U.S.C. § 20701 .......................................................................................... *passim*

52 U.S.C. § 20702 ................................................................................................. 19

52 U.S.C. § 20703 ................................................................................... 1, 8, 10, 12

52 U.S.C. § 20705 ................................................................................................... 3

52 U.S.C. § 21083 ..................................................................................... 18, 19, 20

8 U.S.C. §1212(e)(1)(B) .......................................................................................... 4

Pub. L. No. 100-503, 102 Stat. 2507 (1988) ......................................................... 23

Pub. L. No. 107–347, 116 Stat. 2899 (2002) ......................................................... 23

Pub. L. No. 113-283, 128 Stat. 3073 (2014) ......................................................... 23

Pub. L. No. 93-579, 88 Stat. 1896 (1974) ............................................................. 22

Utah Code § 20A-2-104 ......................................................................................... 21

Utah Code § 20A-2-502 ......................................................................................... 19

Utah Code § 20A-2-601 ......................................................................................... 21

Utah Code § 20A-2-605 ......................................................................................... 21

Utah Code § 63G-2-302 ......................................................................................... 21

## RULES

Fed. R. Civ. P. 1 ...................................................................................................... 4

Fed. R. Civ. P. 12(b)(6) ....................................................................................... 2, 3

Fed. R. Civ. P. 81(a) ........................................................................................... 4, 5

## OTHER AUTHORITIES

AAG Harmeet Dhillon (@AAGDhillon), X (Dec. 18, 2025, at 9:24 AM ET),
   https://x.com/AAGDhillon/status/2001659823335616795 ................................. 6

Antonin Scalia & Bryan A. Garner,
   *Reading Law: The Interpretation of Legal Texts* (2012) .................................... 20

Compile, *Webster's New World Dictionary of the English Language* (1st ed. 1960)................ 16

Confidential Memorandum of Understanding, https://perma.cc/C9GH-NX9L........................ 23

Exec. Order No. 14399, *Ensuring Citizenship Verification and Integrity in Federal Elections*,
91 Fed. Reg. 17125 (Mar. 31, 2026) .................................................................... 5

Jane C. Timm, *Trump Says Republicans Should 'Nationalize' Elections*,
NBC News (Feb. 2, 2026), https://perma.cc/7HEL-KW5H .................................... 5

Louis L. Jaffe, *The Judicial Enforcement of Admin. Orders*, 76 Harv. L. Rev. 865 (1963) ..... 6, 7

Michelle Stoddart, Emily Chang, and Alexandra Hutzler, *Trump doubles down on suggesting
federal government 'get involved' in state elections*,
ABC News (Feb. 3, 2026), https://perma.cc/P4LY-A65C .................................... 5

Receive, *Black's Law Dictionary* (12th ed. 2024) .............................................. 16

Reid J. Epstein & Nick Corasaniti, *Trump, in an Escalation, Calls for Republicans
to Nationalize Elections*, N.Y. Times (Feb. 2, 2026)
https://www.nytimes.com/2026/02/02/us/politics/trump-nationalize-elections.html ............... 5

Sarah N. Lynch, *Justice Dept. close to finalizing deal to hand over states' voter roll data to
Homeland Security, sources say*,
CBS News (Mar. 26, 2026), https://perma.cc/T62F-J3ZF .................................... 6

**INTRODUCTION**

DOJ brought this case, and dozens of parallel cases against dozens of other States, to compel production of detailed statewide voter files under Title III of the Civil Rights Act ("CRA"). Yet here and across the country, DOJ failed to comply with the basic requirements of the CRA, and it demands records that fall well outside the CRA's scope. Unable to defend its demands on the merits, DOJ has resorted to arguing that federal courts have no substantive role in reviewing those demands, even while seeking judicial imprimatur to enforce them. On every point, the precedent and statutory text are contrary to DOJ's view. Eight federal courts have now dismissed DOJ's complaints in parallel cases against other States; not one has found DOJ to have stated a valid CRA claim.[1] This Court should follow suit, dismiss the case with prejudice, and deny DOJ's motion to compel.

Contrary to DOJ's argument, the Federal Rules of Civil Procedure apply to this case, like any other, because the CRA specifies no alternative procedure. *See United States v. Powell*, 379 U.S. 48, 58 n.18 (1964). The Court must therefore review the lawfulness of DOJ's demand, to ensure that it does "not permit its process to be abused," such as through a demand "issued for an improper purpose." *Id.* at 58.

When the Court does so, it can only conclude that DOJ's demand is not lawful. The CRA required DOJ to state "the basis and the purpose" for its request. 52 U.S.C. § 20703. But as in other

---

[1] *See United States v. Benson*, 819 F. Supp. 3d 753 (W.D. Mich. 2026), *argued*, No. 26-1225 (6th Cir. May 13, 2026); *United States v. Weber*, 816 F. Supp. 3d 1168 (C.D. Cal. 2026), *argued*, No. 26-1232 (9th Cir. May 19, 2026); *United States v. Oregon*, No. 6:25-cv-01666, 2026 WL 318402 (D. Or. Feb. 5, 2026), *argued*, No. 26-1231 (9th Cir. May 19, 2026); *United States v. Galvin*, No. 1:25-cv-13816, 2026 WL 972129 (D. Mass. Apr. 9, 2026); *United States v. Amore*, No. 25-cv-00639, 2026 WL 1040637 (D.R.I. Apr. 17, 2026); *United States v. Fontes*, No. 2:26-cv-00066, 2026 WL 1177244 (D. Ariz. Apr. 28, 2026); *United States v. Wis. Elections Comm'n*, No. 25-cv-1036, 2026 WL 1430354 (W.D. Wis. May 21, 2026); *United States v. Bellows*, No. 1:25-cv-00468, 2026 WL 1430481 (D. Me. May 21, 2026).

States, DOJ's demand of Utah "offered no basis—none—and the demand was therefore facially inadequate." *Galvin*, 2026 WL 972129, at *4. Nor did DOJ state a lawful purpose. It claims to want to investigate compliance with separate federal statutes, the National Voter Registration Act (NVRA) and the Help America Vote Act (HAVA). But DOJ's effort to do so improperly seeks to conduct a "line-by-line audit of each state's computerized" voter lists that the NVRA and HAVA laws do not authorize in their "comprehensive scheme for the creation and upkeep of states' computerized" voter lists. *Bellows*, 2026 WL 1430481, at *8. In fact, the computerized voter list DOJ seeks falls entirely outside the scope of the CRA, because it is created by election officials rather than "com[ing] into [their] possession" as the CRA requires. 52 U.S.C. § 20701. And DOJ did not comply with substantive and procedural requirements under the Privacy Act before issuing its wave of unprecedented demands.

For any or all of those reasons, the Court should dismiss this case with prejudice.

## ARGUMENT

**I.     The Federal Rules of Civil Procedure apply to this case and require the adjudication of the motions to dismiss before the motion to compel.**

DOJ's motion to compel seeks to short-circuit the ordinary litigation process and proceed straight to a judgment that gives DOJ everything it seeks on the merits. The Court should reject that effort and decide this case using ordinary mechanisms under the Federal Rules of Civil Procedure, starting by adjudicating the pending motions to dismiss. Motions to dismiss serve a crucial gatekeeping function: "Federal Rule of Civil Procedure 12(b)(6) permits defendants to test the legal sufficiency of a complaint prior to discovery." *Ultradent Prods., Inc. v. Spectrum Sols. LLC*, No. 2:17-CV-890, 2018 WL 324868, at *2 (D. Utah Jan. 8, 2018). That, no doubt, is why seven courts have granted motions to dismiss DOJ's parallel actions against other states for failure to state a claim in recent months. *See, e.g.*, *Weber*, 816 F. Supp. 3d at 1182; *Oregon*, 2026 WL

2

318402, at *8; *Fontes*, 2026 WL 1177244, at *1; *Amore*, 2026 WL 1040637, at *4; *Benson*, 819 F. Supp. 3d at 766, 770; *Bellows*, 2026 WL 1430481, at *10; *Wis. Elections Comm'n*, 2026 WL 1430354, at *5; *see also Galvin*, 2026 WL 972129, at *3 (denying motion to compel and dismissing case without reaching the Rule 12(b)(6) issue). DOJ is wrong to argue that *Benson* "followed [DOJ's proposed] approach" to the Federal Rules. Mot. to Compel at 6. *Benson* applied "the Rule 12(b)(6) standard to evaluate" and dismiss DOJ's CRA claim because DOJ had filed "a traditional civil complaint," just as DOJ did here. 819 F. Supp. 3d at 766.

Controlling law mandates the application of the Federal Rules to this case. The CRA provides federal courts with "jurisdiction *by appropriate process* to compel the production" of records DOJ seeks under that statute. 52 U.S.C. § 20705 (emphasis added). In *United States v. Powell*, the Supreme Court construed a tax summons statute with that same operative language— "jurisdiction by appropriate process"—and explained that, because it "contain[ed] no provision specifying the procedure to be followed in invoking the court's jurisdiction, the Federal Rules of Civil Procedure apply." 379 U.S. at 52 n.10, 58 n.18. *Powell* thus compels the same conclusion here with respect to an identically phrased jurisdictional provision. *See Northcross v. Bd. of Educ. of Memphis City Schs.*, 412 U.S. 427, 428 (1973) ("similarity of language . . . is, of course, a strong indication that the two statutes should be interpreted *pari passu*.").

Moreover, *Powell* is no outlier in holding that the Federal Rules apply, absent clear alternative procedures set out by Congress. The Supreme Court *always* demands a clear statutory exemption before finding that the Federal Rules do not govern judicial proceedings. *E.g.*, *N.H. Fire Ins. Co. v. Scanlon*, 362 U.S. 404, 407–08 (1960) ("In the absence of express statutory authorization . . . there is neither justification nor authority for carving out an exception to the uniform and regular civil procedure laid down by the Federal Rules[.]"); *Califano v. Yamasaki*,

442 U.S. 682, 700 (1979) (demanding "clear expression of congressional intent to exempt actions brought under [Social Security Act] from the operation of the Federal Rules of Civil Procedure"). Where Congress exempts application of the Federal Rules, it does so expressly. *E.g.*, *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 400 (2010) (citing 8 U.S.C. §1252(e)(1)(B)). The CRA—just like the statute in *Powell*—lacks such an exemption.[2]

In arguing otherwise, DOJ relies heavily on *Kennedy v. Lynd*, 306 F.2d 222, an out-of-circuit decision from 1962. Compl. ¶ 1; Mot. to Compel at 4–6. But *Lynd* was never binding in this Circuit and is irreconcilable with *Powell*, which was decided two years later. It is therefore not good law even in the Fifth Circuit. *See Gahagan v. USCIS*, 911 F.3d 298, 302 (5th Cir. 2018) (explaining "Fifth Circuit precedent is implicitly overruled" by a subsequent "inconsistent" Supreme Court opinion (quoting *Gonzalez v. Thaler*, 623 F.3d 222, 226 (5th Cir. 2010)). For that reason, courts across the country have declined to follow DOJ's proposed procedural course in parallel cases. *See, e.g.*, *Oregon*, 2026 WL 318402, at *8 ("The Supreme Court's holding in *Powell* squarely rejects [DOJ's] contention."); *Weber*, 816 F. Supp. 3d at 1182 & n.15 (similar).

Indeed, the applicability of the Federal Rules is clear from the Rules themselves. Rule 1 provides that the Rules "govern . . . in *all* civil actions and proceedings in the United States district courts, except as stated in Rule 81." Fed. R. Civ. P. 1 (emphasis added). This case is such an "action." While Rule 81 sets out a narrow set of cases that are exempt from the ordinary rules—such as certain admiralty or bankruptcy actions—*none* involve the CRA. *See* Fed. R. Civ. P. 81(a). And Rule 81(a)(5) states that "proceedings to compel testimony or the production of documents

---

[2] DOJ cannot keep its own story straight as to the applicability of the Federal Rules. In its pending appeal in *Weber*, DOJ conceded that the Federal Rules apply, while in its parallel appeal in *Oregon*, DOJ took the opposite view. *Compare* Br. of United States at 16, *Weber*, No. 26-1232 (9th Cir. Mar. 18, 2026), *with* Br. of United States at 15, *Oregon*, No. 26-1231 (9th Cir. Mar. 18, 2026).

through a subpoena issued by a United States officer or agency under a federal statute" are subject to the Federal Rules, "except as otherwise provided by statute, by local rule, or by court order in the proceedings." As a result, even if a CRA demand could be characterized as akin to a subpoena—a word that does not appear in the CRA—it would still be subject to the Federal Rules, as none of the sources listed in Rule 81(a)(5) provide an exception for document requests under the CRA. Congress knows how to prescribe streamlined proceedings under such circumstances, *see, e.g.*, 29 U.S.C. § 161(2), and it did not do so in the CRA.

If the Court denies the motions to dismiss in whole or in part, the next step would be to permit appropriate discovery—not to grant the motion to compel. There would be a need for discovery here, because even if DOJ's demand were facially valid, there is a genuine dispute of fact as to whether DOJ's stated purpose for its request is in fact "the purpose" for its request as the CRA requires. President Trump has repeatedly indicated that he believes the federal government should "take over" or "nationalize" elections from the states,[3] and he recently signed an Executive Order that, among other things, calls for the federal government to create state-specific lists of every American citizen over the age of 18 based on federal records. *See* Exec. Order No. 14399, *Ensuring Citizenship Verification and Integrity in Federal Elections*, § 2(a), 91 Fed. Reg. 17125, 17125–26 (Mar. 31, 2026).[4] Moreover, DOJ and the U.S. Department of Homeland Security are also "close to finalizing an agreement that will allow the federal government to use sensitive voter

---

[3] Reid J. Epstein & Nick Corasaniti, *Trump, in an Escalation, Calls for Republicans to Nationalize Elections*, N.Y. Times (Feb. 2, 2026), https://www.nytimes.com/2026/02/02/us/politics/trump-nationalize-elections.html; Jane C. Timm, *Trump Says Republicans Should 'Nationalize' Elections*, NBC News (Feb. 2, 2026), https://perma.cc/7HEL-KW5H; Michelle Stoddart, Emily Chang, and Alexandra Hutzler, *Trump doubles down on suggesting federal government 'get involved' in state elections*, ABC News (Feb. 3, 2026), https://perma.cc/P4LY-A65C.

[4] Available at https://perma.cc/6QG5-AWCV.

registration data for immigration and criminal investigations."[5] And as Assistant Attorney General Harmeet Dhillon has admitted, DOJ expects the sensitive data that it seeks here will help it to compel the removal of hundreds of thousands of voters from States' rolls.[6] Moreover, DOJ's Office of Legal Counsel has specifically opined at the Civil Rights Division's request that DOJ may use the records it demands for other purposes than the ones it gave when seeking them—tending to confirm that "the purpose" DOJ gave in seeking the records is not DOJ's true purpose for making these unprecedented demands. Opp. to Mot. to Dismiss, Ex. 21 at 1, 4.

Granting DOJ the final relief it seeks before any resisting parties have the opportunity to conduct discovery relevant to this and other factual disputes would be premature and contrary to the well-established practices that govern civil litigation. The Court should therefore deny the motion to compel whether or not it grants the motions to dismiss.

II.    **Under any procedure, the Court must conduct meaningful review of DOJ's demand.**

Whether the Federal Rules generally apply or not, DOJ is also wrong to argue that this is a mere "summary proceeding" that does not involve meaningful judicial review. *See* Mot. to Compel at 6–9. As *Powell* explained, a federal court's role when it is asked to enforce an administrative subpoena is substantive, not ministerial: "It is the court's process which is invoked to enforce the administrative summons and a court may not permit its process to be abused." *Powell*, 379 U.S. at 58 & n.20 (citing Louis L. Jaffe, The Judicial Enforcement of Admin. Orders, 76 Harv. L. Rev. 865 (1963)). As a result, to invoke the powers of a federal court to compel production, the

---

[5] *See* Sarah N. Lynch, *Justice Dept. close to finalizing deal to hand over states' voter roll data to Homeland Security, sources say*, CBS News (Mar. 26, 2026), https://perma.cc/T62F-J3ZF.

[6] *See* AAG Harmeet Dhillon (@AAGDhillon), X (Dec. 18, 2025, at 9:24 AM ET), https://x.com/AAGDhillon/status/2001659823335616795 (stating in video discussing these lawsuits: "You're going to see hundreds of thousands of people in some states being removed from the voter rolls.").

government must show, at minimum, that its investigation is for "a legitimate purpose" and "the inquiry may be relevant to the purpose." 379 U.S. at 57. After all, an "abuse" of the court's process itself "would take place if the summons had been issued for an improper purpose." *Id.* Contrary to DOJ's argument, this holding in *Powell* was grounded in foundational principles of administrative law, not merely the text or meaning of the particular statute at issue in that case. As Professor Jaffe explained in the article *Powell* cites, "*[t]he core of the judicial function where enforcement is in question is the determination of legality*," and "'[t]he interposition of the judiciary as the enforcing agency must have some meaning . . . Its exercise is not merely mechanical.'" Jaffe, 76 Harv. L. Rev. at 866, 869 (quoting *NLRB v. Eanet*, 179 F.2d 15, 20-21 (D.C. Cir. 1949) (Prettyman, J.); *accord*, *NLRB v. Kingston Cake Co.*, 206 F.2d 604, 611 (3d Cir. 1953) (Staley, J.)). Courts therefore "have the power to correct excessive administrative zeal," including through review "not only for errors of law but for any patent injustice." *Id.* at 870. Nothing about that reasoning is restricted to the precise IRS procedure at issue in *Powell*.

Following these basic principles of judicial review, federal courts have long repudiated suggestions that they may grant approval to a government document demand without meaningful inquiry. *See, e.g.*, *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950) (holding courts must quash demands that "exceed the investigatory power" of a federal agency); *CFPB v. Accrediting Council for Indep. Colls. & Schs.*, 854 F.3d 683, 689-90 (D.C. Cir. 2017) ("*ACICS*") (concluding federal agencies are "not afforded unfettered authority to cast about for potential wrongdoing"). And a Rule 12 motion is the initial and appropriate device available to initiate such inquiry. *Fontes*, 2026 WL 1177244, at *1 & n.1 (rejecting DOJ's effort to distinguish *Powell* and collecting cases). That includes *Benson*, which explained that even where more summary review applies to administrative subpoenas under the Sixth Circuit precedent that governed that case, "[t]he court

7

must 'decide whether the agency has met the statutory requirements pertaining to the issuance and enforcement of the subpoena,' and 'whether the agency has satisfied or complied with the judicially created standards for enforcement of the subpoena.'" 819 F. Supp. 3d at 766 (quoting *United States v. Markwood*, 48 F.3d 969, 976–77 (6th Cir. 1995)).

The context in which *Lynd* occurred, like the other civil rights era cases on which DOJ relies, readily distinguishes those cases. *See* Mot. to Compel at 3–5. *Lynd* involved demands for voter records from counties in Mississippi and parishes in Louisiana "based upon information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction." 306 F.2d at 229 n.6; *see also Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 855 (M.D. Ala. 1960) ("[T]he demand to the registrars made by the Attorney General . . . follows almost exactly the pertinent wording in Sections 301 and 303 of the [CRA]."), *aff'd sub nom. Dinkens v. Att'y Gen. of U.S.*, 285 F.2d 430 (5th Cir. 1961). That was a valid demand under 52 U.S.C. § 20703, as the CRA's "clearest purpose" is to permit investigations "concerning infringement or denial of . . . voting rights." *Lynd*, 306 F.2d at 228; *see also Gallion*, 187 F. Supp. at 853 ("The legislative history leaves no doubt but that [Title III of the CRA] is designed to secure a more effective protection of the right to vote."); *Weber*, 816 F. Supp. 3d at 1182 ("The purpose of Title III is to detect voting-related racial discrimination."); *Oregon*, 2026 WL 318402, at *10 ("[T]he 'purpose' required in a demand for records under Title III must relate to a purpose of investigating violations of individuals' voting rights."); NAACP Mot. to Dismiss at 13–15. And there could be no doubt that DOJ had a valid "basis" to suspect racial discrimination in localities where Black residents had overwhelmingly been excluded from the voter rolls. *See, e.g.*, *United States v. Lynd*, 301 F.2d 818, 821 (5th Cir. 1962) (explaining that "[n]o Negro had been registered in Forrest County during

8

defendant Lynd's term of office," while "none of the defendants nor their deputies were able to testify to any individual white person who had been rejected"). *Lynd* observed (and DOJ agrees) that if there were a "genuine dispute," the court would need to determine both "whether the written demand has been made" according to the CRA and "whether or not any specified particular paper or record" comes within the ambit of the statute's definition of those terms. 306 F.2d at 226; *see also* Mot. to Compel at 3, 6. As NAACP Intervenors' motion to dismiss makes clear, there are genuine disputes on both issues here. *See generally* NAACP Intervenors' Mot. to Dismiss.

*Lynd* also emphasized that it was "of great importance" that the records DOJ sought were "public records which ought ordinarily to be open to legitimate reasonable inspection," not "confidential, private papers." *Lynd*, 306 F.2d at 231. The opposite is true here—Utah already offered DOJ its public statewide voter registration list. *See* ECF No. 18 at 34–41. DOJ sued specifically over the Lieutenant Governor's refusal to turn over sensitive personal information protected by law—precisely the sort of "confidential, private" information not at issue in *Lynd*.

Neither *Donaldson v. United States*, 400 U.S. 517 (1971), nor *Becker v. United States*, 451 U.S. 1306 (1981), support DOJ's demand for watered down review. *Contra* Mot. to Compel at 6, 8–9. Those cases expressly *confirm* the "Civil Rules, of course . . . have an application to" suits to enforce governmental demands, *Donaldson*, 400 U.S. at 528, and they say nothing about whether and when a proceeding under a federal statute is rendered "summary" or exempt from the Rules. They note that even in such "summary enforcement proceeding[s] . . . the rights of the party summoned [must be] protected." *Id.*; *see Becker*, 451 U.S. at 1308 (same). Here, that principle only *reinforces* the need for careful judicial scrutiny: while *Donaldson* and *Becker* each implicated one taxpayer's returns, DOJ demands sensitive records of approximately two million registered voters in the state of Utah. Compl. at 8; Mot. to Compel at 6.

Ultimately, none of the authorities cited by DOJ stand for the untenable proposition that the CRA neuters this Court's review of DOJ's civil action seeking judicial enforcement of its CRA demand. This Court should reject DOJ's demand for a "summary proceeding" and toothless judicial review of its complaint, and instead follow *Powell,* the Federal Rules, and every court to have addressed the issue.

### III.    DOJ failed to state "the basis" or a valid "purpose" for its demand.

#### A.    DOJ did not provide any statement of "the basis" in its demand.

The CRA is clear as can be: a demand for records "shall contain a statement of the basis and the purpose therefor." 52 U.S.C. § 20703. DOJ's demand does not comply with this requirement because it contains no statement of "the basis" for DOJ's demand. The August 14 letter that constitutes the CRA demand contained no statement of basis at all. *See* ECF No. 18 at 42–44. Thus, as in *Galvin*, "the Attorney General offered no basis—none—and the demand was therefore facially inadequate." 2026 WL 972129, at *4. DOJ has no adequate explanation for how its CRA demand can be enforced when it failed to comply with that basic requirement.

DOJ first disputes that it was required to state a factual basis at all. Mot. to Compel at 10; Opp. to Mot. to Dismiss at 10. But DOJ offers no coherent account of what "the basis" could mean in the statute if not a factual basis. DOJ states that "the basis of the demand was the CRA," Compl. ¶ 23, and now seeks to add the NVRA and HAVA as bases, Opp. to Mot. Dismiss at 9. But, as another court has already explained, "this argument confuses the legal authority under which the Attorney General made the demand—the CRA—and the statute's requirement to state 'the basis'—the foundation in fact or evidence for the demand." *Galvin*, 2026 WL 972129, at *5. Even in DOJ's lodestar case, *Lynd*, the court presumed *some* factual material would be contained in the demand letter, otherwise its discussion of "factual foundation" would be meaningless. 306 F.2d at 226; *see also id.* at 229 n.6 (providing example statement of basis and purpose); *Amore*, 2026 WL

10

1040637, at *5 ("*Lynd* thus seems to contemplate a factual basis and a legal purpose under Title III."). For that and other reasons, multiple courts considering DOJ's deficient demands in parallel cases have found that the CRA "requires a statement of <u>why</u> the Attorney General demands production of the requested records—and, as conveyed by the statute's use of the definite article, the statement must be 'the' factual basis." *Galvin*, 2026 WL 972129, at *3 (citing contemporary dictionaries); *see also Amore*, 2026 WL 1040637, at *5 (similar); *Weber*, 816 F. Supp. 3d at 1184 (similar). DOJ has no answer to these cases.

DOJ then tries to argue that its factual basis was its statement that the "SVRL was needed to provide the means to 'assess [Utah's] compliance with the [SVRL] maintenance provisions of the [NVRA].'" Mot. to Compel at 10 (citing July 15 Letter). But that is a "purpose" and not a "basis." And the CRA's reference to "the basis and the purpose" shows that those requirements are "conceptually distinct." *Galvin*, 2026 WL 972129, at *4; *see also Amore*, 2026 WL 1040637, at *5 (similar). Asserting what DOJ intended to do with the SVRL does not explain why it was needed. And even in *Lynd*, DOJ's principal authority, the Attorney General provided such a statement, with his demand letter stating that it was "*based upon* information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction." 306 F.2d at 231 n.6 (emphasis added). DOJ identifies no similar statement here.

Finally, DOJ points to Utah's responses to an Election Assistance Commission survey (or "EAVS" data). Opp. to Mot. to Dismiss at 11. But these do not supply "the basis" the CRA requires either. For one, they were not included or referenced in the August 14 letter in which DOJ demanded records under the CRA. *See* Compl. ¶¶ 22–24 (characterizing the August 14 Letter as "demanding" the SVRL, "stated the basis of the demand," and "stated the purpose of the demand").

11

The CRA explicitly mandates that when the DOJ demands records, "*[t]his demand* shall contain a statement of the basis and the purpose therefor." 52 U.S.C. § 20703 (emphasis added). The statute does not allow election officials to piece together an opaque basis from separate communications that together purportedly provide "notice" to state election officials. *Accord Galvin*, 2026 WL 972129, at \*4; *Oregon*, 2026 WL 318402, at \*9 ("Plaintiff's patchwork and post hoc effort to stitch together a legally sufficient 'statement of the basis' fails."); *see also Niz-Chavez v. Garland*, 593 U.S. 155, 161 (2021) (holding that statutory instructions similar to those in CRA require government to provide a "single document containing the required information, not a mishmash of pieces with some assembly required").

Moreover, DOJ fails to explain how the specific EAVS data it now cites constitute a valid basis for its request in any event. *See* NAACP Intervenor' Mot. Dismiss at 18. DOJ merely repeats the EAVS figures in its brief, without any cogent explanation of how they supply a reason for believing Utah is falling short of its procedural obligations under the NVRA or HAVA. *See* Opp. to Mot to Dismiss at 11. And DOJ's reliance on cherrypicked data is belied by its citations to EAVS data in other states. Whereas here in Utah, DOJ complains about *too few* removals, Mot. to Compel at 2; Opp. to Mot. to Dismiss at 11, in its parallel lawsuit seeking to compel Maine's unredacted voter file, it argued that Maine had *too many* removals, *see Bellows*, 2026 WL 1430481, at \*2. Both *too few* and *too many* cannot simultaneously explain DOJ's parallel demands for the detailed, unredacted voter lists from 49 of the 50 states.

In short, because DOJ's demand letter to Utah includes no sufficient statement of "the basis" for the demand, it is facially inadequate, and the Complaint must be dismissed.

**B.      DOJ did not provide a legally sufficient "purpose" for its demand.**

DOJ's complaint also must be dismissed because its stated purpose for its demand—"to assess [Utah's] compliance with the statewide [Voter Registration List] maintenance provisions of the National Voter Registration Act," Compl. ¶ 24 (quotation marks omitted) (quoting August 14 Letter)—is not a permissible purpose under the Civil Rights Act. *See* NAACP Intervenors' Mot. to Dismiss at 13–16; *see also Bellows*, 2026 WL 1430481, at *7–9 ("whatever investigatory purposes may support a Title III records demand, voter list maintenance is not among them"). The NVRA and HAVA impose their own comprehensive regulations and enforcement regimes, but they do not authorize demands like DOJ's here, and nothing in their text or the text of the CRA supports DOJ's position that it can circumvent the limitations of the NVRA and HAVA's enforcement regimes by resorting to the CRA. *See id.*

If Congress wanted to grant DOJ broad access to voter files to investigate potential violations of the NVRA and HAVA, it would have done so in those statutes. But HAVA has no disclosure requirements at all, *see* NAACP Intervenors' Mot. Dismiss at 21, and DOJ does not argue that it is entitled to the records it seeks under the NVRA's very different disclosure provision, *see* 52 U.S.C. § 20507(i)(1). Congress granted DOJ authority to sue under the NVRA and HAVA and therefore empowered DOJ to obtain the fruits of civil discovery—but only so long as it can first state a valid legal claim, which DOJ has not sought to do here. *Cf. Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014). And DOJ cites nothing in the text or history of either statute to support its bare assertion that Congress intended the CRA to supplement the detailed enforcement provisions enacted in the NVRA and HAVA.

DOJ cannot substitute the list maintenance tools Congress supplied in the NVRA and HAVA with the ones DOJ wishes it had. If DOJ "wants to enforce" the NVRA and HAVA, "it

13

must use the pre-suit investigation and enforcement mechanisms that Congress provided in" those statutes, because the CRA does not authorize the compelled production of an unredacted VRL "so that [DOJ] might loom over the shoulder[s]" of states to point out purported inaccuracies in their lists. *Bellows*, 2026 WL 1430481, at \*8. Congress's "express provision of one method of enforcing" these statutes "suggests that Congress intended to preclude others." *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001).

DOJ's reliance on past consent decrees and settlement agreements in which states have agreed to produce voter file data does nothing to change this. Opp. to Mot. Dismiss at 17–19. None of DOJ's examples involved a contested demand for voter file data under the CRA. *See generally id.* The fact that several States chose to voluntarily turn over certain records without litigation says nothing about the meaning of the CRA—"[p]arties can choose to settle non-meritorious claims for any number of reasons, including to have peace and avoid the costs of further litigation." *Bird v. Wyoming*, No. 22-CV-152-NDF, 2022 WL 17545136, at \*2 (D. Wyo. Dec. 8, 2022). Moreover, nearly every example involved substantive allegations that the State was violating a federal law that DOJ was charged with enforcing, meaning the agency likely could have obtained the materials at issue through civil discovery. *See, e.g.*, Opp. to Mot. Dismiss, Ex. 12 at 1 (describing complaint against Maine involving HAVA and NVRA claims); *id.*, Ex. 13 at 1 (similar as to New Jersey); *id.*, Ex. 14 at 2 (consent decree noting the underlying action against Indiana was filed "pursuant to Section 8 of the National Voter Registration Act"); *id.*, Ex. 17 ¶ 1 (complaint against Alabama alleging violations of the Uniformed and Overseas Citizens Absentee Voting Act); *id.*, Ex. 18 (similar as to Shelby County, Alabama); *id.*, Ex. 19 at 1 (complaint alleging violations of UOCAVA by Vermont). These examples therefore stand for nothing more than the commonsense proposition that States and localities have historically cooperated with DOJ's document demands

14

when they were rooted in specific allegations of noncompliance with federal law. None stands for the proposition that the CRA is commonly used, on its own, to demand a State's full voter file at DOJ's caprice, as part of an unprecedented nationwide dragnet.

In short, DOJ's stated purpose "lack[s] any reference or relation to the purposes for which Title III was enacted," *Oregon*, 2026 WL 318402, at *10; *see also Amore*, 2026 WL 1040637, at *6 (same), and it is, in fact, antithetical to the CRA's purpose, *see Weber*, 816 F. Supp. 3d at 1182–84. Holding DOJ to the statue's limits does not "undermine the statute's purpose," Opp. to Mot. to Dismiss at 7, it enforces what Congress intended. The Court should reject DOJ's efforts to justify its demands with a purpose so disconnected from the provision that DOJ claims purportedly authorizes it. *See In re Dep't of Just. Admin. Subpoena No. 25-1431-030*, No. 25-MC-00063-SKC-CYC, 2026 WL 33398, at *8 (D. Colo. Jan. 5, 2026) ("'[t]he requirement that subpoenas be used only for a legitimate and authorized governmental purpose prohibits the government from engag[ing] in arbitrary fishing expeditions'" (quoting *In re Subpoena Duces Tecum*, 228 F.3d 341, 349 (4th Cir. 2000))).

**IV.    The CRA does not entitle DOJ to production of Utah's dynamic voter list in any event.**

In addition to the deficiencies with DOJ's demand, DOJ's claim must fail because—as multiple courts have now held—Utah's statewide voter registration list falls outside the textual scope of the CRA. *See Benson*, 819 F. Supp. 3d at 768–70; *Fontes*, 2026 WL 1177244, at *3–7; *Bellows*, 2026 WL 1430481, at *7; *Wis. Elections Comm'n*, 2026 WL 1430354, at *3–5; *contra* Opp. to Mot. to Dismiss at 4–8.

To start, the voter list is a record that that Utah election officials themselves generate, but the CRA applies only to records that "come into [the] possession" of election officials from some other source relating to a voter's "application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. DOJ focuses on the term "relating to,"

15

but in so doing fails to give meaning to the phrase "come into . . . possession." Opp. to Mot. to Dismiss at 5. "The phrase 'come into . . . possession' naturally refers to a process by which someone *acquires* an item from an external source." *Benson*, 819 F. Supp. 3d at 768; *see also Bellows*, 2026 WL 1430481, at *6 (similar and citing *Benson*). Since Utah's voter list is a record created and maintained by election officials, not a record that came into their possession from an external source, the CRA does not reach that list.[7]

This follows from the "natural" and "ordinary" meaning of the statutory text. *Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004). Dictionaries link the phrase "come into possession" to receiving, obtaining, or acquiring something from an outside source. *See Receive*, Black's Law Dictionary (12th ed. 2024) (defining "receive" as "to come into possession of or get from some outside source"). And federal courts interpreting other statutes—many relying on dictionaries published contemporaneously to the CRA—have equated "com[ing] into possession" of something with receiving, acquiring, or obtaining that thing. *See, e.g.*, *Honeycutt v. United States*, 581 U.S. 443, 449 (2017) (defining "obtain" as "to come into possession of" (quoting Random House Dictionary of the English Language 995 (1966))); *Huddleston v. United States*, 415 U.S. 814, 820 (1974) ("The word 'acquire' is defined to mean simply 'to come into possession, control, or power of disposal of.'" (quoting Webster's New International Dictionary (3d ed., 1966, unabridged))); *United States v. Mohrbacher*, 182 F.3d 1041, 1048 & n.5 (9th Cir. 1999) (defining "receive" as "to come into possession of" or to take "into one's possession (something held out or offered by

---

[7] A district court order at issue in *Lynd* is not to the contrary. *Contra* Opp. to Mot. to Dismiss at 8 (citing *Lynd*, 306 F.2d at 229). This order required production of records and papers "prepared or compiled" as of a date certain. Ex. 23 to Second Decl. of Eric Neff. DOJ grafts a subject onto these verbs that is not there. The relevant voter registration application records were likely "prepared" by voters, not the local election official. And "compile" does not mean the documents were *created* by an election official, either. *See Compile*, Webster's New World Dictionary of the English Language (1st ed. 1960) ("to gather and put together").

another)"). Indeed, DOJ's own Office of Legal Counsel agrees that "comes into possession" is equivalent to "receives." Opp. to Mot. to Dismiss, Ex. 21 at 7. That also aligns with common usage: a person "comes into possession" of an antique chair bequeathed by a family member, but not a chair they build themselves in their basement.

Comparing the CRA to the NVRA's inspection provision bolsters this understanding of the CRA's reach. The CRA requires preservation (and disclosure) of records that are "requisite to voting in [an] election," meaning voter registration materials like "application[s], registration[s], and payment[s] of poll tax." 52 U.S.C. § 20701. The NVRA, by contrast, is intended to preserve and make transparent internal records relating to programmatic list maintenance policies. That is why the NVRA requires States to "make available for public inspection . . . all records concerning the *implementation* of programs and activities conducted for the purpose" of ensuring accurate voter lists. 52 U.S.C. § 20507(i) (emphasis added). When discussing such records in the NVRA, Congress conspicuously omitted the "come into possession" construction present in the CRA and instead employed language inclusive of internal records. "Omitting a phrase from one statute that Congress has used in another statute with a similar purpose virtually commands the inference that the two have different meanings." *Grand Canyon Univ. v. Cardona*, 121 F.4th 717, 725 (9th Cir. 2024) (citation modified). The NVRA's inspection provision makes clear that Congress knows how to draft disclosure obligations that extend to internal documents created by election officials— but when it does so, the language it employs differs markedly from that in the CRA. *See Wis. Cent. Ltd v. United States*, 585 U.S. 274, 279 (2018) ("We usually 'presume differences in language like this convey differences in meaning.'" (quoting *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 86 (2017))).

17

Other provisions within the CRA confirm that it does not reach internally generated records that never "come into the possession" of officials. For example, the CRA requires retention only "for a period of twenty-two months" from the date of a covered election for those documents received "relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. §§ 20701, 20702. That temporal limitation makes sense when applied to static records related to a specific election, but it does not make sense to place those requirements on a dynamic voter list, which compiles voter information across many elections and is intended to be perpetually maintained and updated.[8] And within the very same section of the CRA, Congress used a different word—"delivered"—to describe the transmittal and acquisition of internal election records. 52 U.S.C. § 20701 ("such records and papers may be delivered to another officer of election"). Utah's voter registration list, by contrast, is accessible to and maintained by all state and local election officials. *See id.* § 21083(a)(1)(A)(v); *id.* § 21083(a)(1)(A)(vi)–(vi). It is never "delivered" to the Lieutenant Governor and the SVRL never "comes into" her possession—it is permanently in her possession as a matter of law. Whereas static documents that follow a chain-of-custody from one official to another may need to be preserved under the CRA's terms, Utah's interactive voter list falls outside that scope.

DOJ argues that the Lieutenant Governor receives the SVRL from the county clerks and thus comes into possession of it even on this account. *See* Opp. to Mot. Dismiss at 7–8. But that argument fails to recognize that the CRA applies to particular "records and papers," 52 U.S.C. § 20701, not to the *information* within them. The SVRL is a continuously updated "system" to which

---

[8] Otherwise, the CRA would absurdly require State officials to retain *every* single iteration of the dataset during the retention period or else commit a criminal violation each time they conduct the very list maintenance that DOJ is concerned with here. *See United States v. LKAV*, 712 F.3d 436, 440 (9th Cir. 2013) ("Statutory interpretations which would produce absurd results are to be avoided." (citation modified)).

the Lieutenant Governor has ongoing access, not something that she gains possession of from an outside source. Utah Code § 20A-2-502(1)(a). DOJ's argument that the Lieutenant Governor "come[s] into possession *of the information* in Utah's SVRL" from the county clerks therefore misses the point. Opp. to Mot. Dismiss at 8. Congress could have drafted the CRA to reach "information" that comes into the possession of certain officials—as it has in other statutes, *see, e.g.*, 10 U.S.C. § 130c(d) (governing disclosure of "sensitive *information* of a foreign government . . . that came into the possession . . . of the United States Government")—but instead it targeted only specific papers and records instead. Simply put, "[i]f Congress had intended [DOJ's] reading, it easily could have replaced ['papers and records'] in the statute with ['information']." *Knight v. Comm'r*, 552 U.S. 181, 188 (2008). "The fact that it did not adopt this readily available and apparent alternative strongly supports rejecting [DOJ's] reading." *Id.*; *see also Kelley v. City of Albuquerque*, 542 F.3d 802, 814 n.10 (10th Cir. 2008) (similar).

DOJ's reading would also render the CRA inconsistent with HAVA, because it would mean the CRA requires states to preserve and not modify a voter list that HAVA requires to be constantly updated. *See Wis. Elections Comm'n*, 2026 WL 1430354, at \*5 (DOJ could not explain "what it means to 'retain' or 'preserve' a document like a voter registration list that is updated on a near-constant basis."); *see also* Utah Code § 20A-2-502. The CRA requires all records under its purview to be "retain[ed] and preserve[d]" for twenty-two months, 52 U.S.C. § 20701, and it prohibits any willful "alter[ing]" of records subject to that "retain and preserve" requirement, *id.* § 20702. Any person who willfully violates these requirements risks imprisonment. *Id.* §§ 20701, 20702. HAVA, on the other hand, requires Utah officials to continually alter its voter list: It commands that "[a]ll voter registration information obtained by any local election official in the State shall be electronically entered into the computerized list on an expedited basis," *id.*

19

§ 21083(a)(1)(A)(vi); that election officials must "perform list maintenance with respect to the computerized list on a regular basis," *id.* § 21083(a)(2)(A); and that officials must "ensure that voter registration records in the State are accurate and are updated regularly," *id*. § 21083(a)(4). Extending the CRA to statewide voter lists would, accordingly, place HAVA and the CRA into direct conflict and subject Utah officials to irreconcilable obligations: Under HAVA, they would be required to regularly alter Utah's voter list, but under the CRA, it would be a crime to do so.

This legal discord forecloses DOJ's reading of the CRA. Courts must "interpret Congress's statutes as a harmonious whole rather than at war with one another," *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 502 (2018), and courts therefore "approach federal statutes touching on the same topic with a 'strong presumption' they can coexist harmoniously," *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 63 (2024); *see also United States v. Barnes*, No. 22-2147, 2025 WL 1367403, at *7 (10th Cir. May 12, 2025) ("interpretations of a statute which would produce absurd results are to be avoided") (quotation omitted)); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 252 (2012) ("The body of the law should make sense," and "it is the responsibility of the courts, within the permissible meanings of the text, to make it so."). Here, only the reading offered by Intervenors and the Lieutenant Governor offer such harmony.

**V.      Utah state law is not preempted and requires redaction of sensitive voter information.**

The CRA does not preempt state privacy laws as to sensitive voter information. *See* NAACP Intervenors' Mot. to Dismiss at 18–19 (citing *Lynd*, 306 F.2d at 231). As NAACP Intervenors have explained, the NVRA contains its own similarly-drafted disclosure provision, yet the NVRA has not been interpreted to preempt such state law privacy protections. *Id.* at 20 (collecting cases); *see also Citizens for Const. Integrity v. United States*, 70 F.4th 1289, 1308 (10th Cir. 2023) ("similar language in similar statutes should be interpreted similarly." (quotation

20

omitted)). Similarly, Utah state law mandates that voters' dates of birth, driver's license, and social security numbers are private records. Utah Code § 63G-2-302(1)(j)(i)–(ii), (iv); *see also id.* § 20A-2-104 (eff. May 7, 2025) (protecting private records in voter registration); Henderson's Mot. to Dismiss at 6.

DOJ's response is that it is a "government official" and, as such, is entitled to access private records subject to protection by state law. Opp. to Mot. to Dismiss at 22 (citing Utah Code § 20A-2-104(4) (effective May 7, 2025)). But while certain government officials could meet the definition of a "qualified person" under Utah Code § 20A-2-104(4)(a)(i), doing so would allow them only to obtain voters' "years of birth" from the voter list, *id.* § 20A-2-104(4)(b). The other protections for private records still apply: driver's license and social security numbers remain private (as do specific dates of birth), even as to qualified persons. *Id.* § 63G-2-302(1)(j)(i)–(ii), (iv). Once again, DOJ misreads a statute—this one squarely within the Lieutenant Governor's purview—in its overreach for state voter records.[9]

## VI.  DOJ's demand is incompatible with the Privacy Act.

Finally, DOJ's noncompliance with the Privacy Act of 1974 provides further reason its claim should be dismissed. *See* NAACP Intervenors' Mot. to Dismiss at 21–25l; *see also Weber*, 816 F. Supp. 3d at 1193 (dismissing on this basis, among others); *see also, e.g.*, *Gelbard v. United States*, 408 U.S. 41, 52 & 60–61 (1972) (holding statutory prohibition on use of certain

---

[9] While Utah's Government Records Access and Management Act (GRAMA) remains unchanged, *see* Utah Code § 63G-2-302(1)(j), new and relevant provisions of Utah's Election Code went into effect during the pendency of this litigation, *see* Opp. to Mot. Dismiss at 22. DOJ does not dispute that the prior provisions were in effect when it made its demand here. *See id.* And the new provisions still exclude dates of birth, driver's license, and social security numbers from the "standard voter data" that may be disclosed, *see* Utah Code § 20A-2-601(14) (eff. Mar. 18, 2026), and only permit disclosure to certain government officials if the "information" is "necessary to permit the government official to fulfill an official duty imposed by law," *id.* § 20A-2-605(1)(a) (eff. Apr. 6, 2026).

communications was properly invoked as a "defense" in action brought by DOJ to compel compliance with subpoena).

Congress enacted the Privacy Act in response to "growing awareness that governmental agencies were accumulating an ever-expanding stockpile of information about private individuals that was readily susceptible to both misuse and the perpetuation of inaccuracies." *Londrigan v. FBI*, 670 F.2d 1164, 1169 (D.C. Cir. 1981); *see also Weber*, 816 F. Supp. 3d at 1192 (similar); Pub. L. No. 93-579, 88 Stat. 1896, codified at 5 U.S.C. §552a note. The Act accordingly "offers substantial protections regarding governmental use and retention of identifiable personal information" by "impos[ing] burdens on federal agencies and creat[ing] rights for individuals when agencies collect, maintain, use, and disseminate 'records.'" *All. for Retired Ams. v. Bessent*, 770 F. Supp. 3d 79, 87 (D.D.C. 2025) (quoting 5 U.S.C. § 552a(a)(4)); *see also League of Women Voters v. DHS*, No. 25-cv-3501, 2025 WL 3198970, at *1 (D.D.C. Nov. 17, 2025) (similar).

These restrictions include both procedural and substantive restrictions, and courts have consistently held that federal agencies cannot maintain or use records absent strict adherence to these requirements. *See Weber*, 816 F. Supp. 3d at 1192; *see also Doe v. Stephens*, 851 F.2d 1457, 1466 (D.C. Cir. 1988) (describing the matter as "settled"); *LULAC v. EOP*, 818 F. Supp. 3d 34, 110–17 (D.D.C. 2026). Notably, in a section of the Code that specifically "applies" to the Privacy Act's prohibitions, 5 U.S.C. § 555(a), Congress provided that an "investigative act or demand may not be issued, made, or enforced except as authorized by law," *id*. § 555(c) (emphasis added). Courts have with increasing urgency emphasized that the concerns animating the Privacy Act are as present today as when first enacted in the wake of Watergate. *See Weber*, 816 F. Supp. 3d at 1192; *see also LULAC*, 818 F. Supp. 3d at 114 & n.54 (declaring DHS's ignorance of certain "procedural protections" in carrying out recent expansion of SAVE database "flatly inconsistent"

with the Act, expressing "grave concern" about recent disclosures of data among federal agencies). Indeed, Congress has amended the Privacy Act several times to strengthen its protections.[10]

DOJ demands Utah's unredacted SVRL without having complied with several of the Privacy Act's core mandates. DOJ broadly promises adherence to that Act in its demand letter, and then later referenced a "memorandum of understanding" that would assuage all privacy concerns. Compl. ¶¶ 25, 27.[11] Yet the complaint, together with these incorporated materials, demonstrate that the demand—and the relief DOJ requests from this Court—facially violate the Privacy Act because DOJ (1) failed to complete mandatory notice-and-comment requirements, and (2) failed to satisfy mandatory privacy and security prerequisites. The relief DOJ seeks is therefore foreclosed under federal law. *See Weber*, 816 F. Supp. 3d at 1192.

### A.     DOJ failed to comply with the Privacy Act's procedural mandates.

DOJ does not dispute that the Privacy Act applies to its attempt to collect and maintain Utah's voter registration list, *see* Compl. ¶ 25, nor that that a statutorily compliant statement of record notice ("SORN") is required, *see* Opp. to Mot. Dismiss at 27. *See also* NAACP Intervenors' Mot. to Dismiss at 23 (explaining SORN requirements). Instead, DOJ now lists three SORNs it claims provide the "full list of routine uses for this collection." Opp. to Mot. to Dismiss at 27–28

---

[10] *See* Computer Matching and Privacy Protection Act of 1988 ("CMPPA"), Pub. L. No. 100-503, 102 Stat. 2507 (1988); E-Government Act of 2002, Pub. L. No. 107–347, 116 Stat. 2899, 2921–22 (2002); Federal Information Security Modernization Act of 2014 ("FISMA"), Pub. L. No. 113-283, 128 Stat. 3073 (2014). Notably, Congress in FISMA specified that complying with FISMA did not replace any "protection[s] of personal privacy under [the Privacy Act]" itself, and expressly affirmed that meeting all of its requirements is prerequisite to any "disclosure" being "authorized." 44 U.S.C. § 3558.

[11] The template of the memorandum proposed by DOJ has been made public, *see* Confidential Memorandum of Understanding, https://perma.cc/C9GH-NX9L ("MOU"), and is thus subject to judicial notice given that DOJ cannot question its authenticity, *N.M. Elks Ass'n v. Grisham*, 595 F. Supp. 3d 1018, 1024 n.3 (D.N.M. 2022) (citing *Tal v. Hogan*, 453 F.3d 1244, 1265 n.24 (10th Cir. 2006)).

(citing 68 Fed. Reg. 47610-01, 611 (Aug. 11, 2003); 70 Fed. Reg. 43904-01 (July 29, 2005); and 82 Fed. Reg. 24147-01 (May 25, 2017)). None come even close to satisfying subsection (e), as the district court in *Weber* properly held. 816 F. Supp. 3d at 1193 ("If millions of Americans' private information is to be collected by the federal government, they deserve the ability to comment and voice their concerns before this collection occurs.").

The first SORN—68 Fed. Reg. 47610-01—merely notifies the public that the categories of individuals covered by the Civil Rights Department's general information system may include "[s]ubjects of investigations, victims, [and] potential witnesses," in addition to other irrelevant categories. Applied here, DOJ's reliance on this SORN would implausibly mean every registered voter in Utah (or, given DOJ's near-nationwide demands, every registered voter in the country) is a subject under investigation, a victim, or a witness in some unnamed matter. *See id.* Courts do not read such specifically enumerated categories to be all-encompassing, as DOJ urges. *Cf. Cleveland v. United States*, 329 U.S. 14, 15 (1946). That SORN similarly describes the categories of records in this system to "consist of case files, matters, memoranda, correspondence, studies, and reports relating to enforcement of civil rights laws and other various duties of the Civil Rights Division." 68 Fed. Reg. 47610-01, 47611. This language might cover run-of-the-mill files maintained for specific investigations and litigation matters, but it would be an extraordinary and startling construction of its terms to find they extend to a statewide (or nationwide) voter registration list, the likes of which have never before been compiled by the federal government. *Weber*, 816 F. Supp. 3d at 1193. "This SORN does nothing to put a member of the American public on notice that specifically, their voter registration data is going to be collected on an unprecedented level and used for a plethora of government activity." *Id.* at 1193–94.

The second and third SORNs cited by DOJ also plainly do not cover DOJ's maintenance or use of Utah's voter registration list. *See* NAACP Intervenors' Mot. to Dismiss at 24 n.9. And even if DOJ could somehow shoehorn its collection of Utah's voter registration list into a past SORN, the agency would *still* have an obligation to comply with the mandatory prerequisites described above to specify the *new* categories of information being maintained and all *uses* of that specific data. *LULAC*, 818 F. Supp. 3d at 111, 115; *see also Weber*, 816 F. Supp. 3d at 1192. Until DOJ does so, it may not lawfully collect and maintain the data it demands from Utah.

**B.      DOJ failed to satisfy the Privacy Act's substantive safeguards.**

DOJ's demand for Utah's unredacted voter file also flouts critical prerequisites on federal agencies' maintenance and use of records. The Privacy Act provides that an agency must "establish appropriate . . . safeguards" to protect the privacy and security of personal data. 5 U.S.C. § 552a(e)(10). Congress has also enacted some specific, minimum requirements. In 2002, Congress enacted the E-Government Act, which requires agencies to conduct a "privacy impact assessment" ("PIA") addressing various issues regarding the suitability of the data before initiating a new collection of records. 116 Stat. 2899, 2921–22 (Dec. 17, 2002); *see EPIC v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 378 (D.C. Cir. 2017) (describing E-Government Act). Congress also enacted FISMA in 2014 to mandate data-security protections for any personal information agencies collect, with personal identifiers like social security and driver's license numbers afforded the highest protection. *See* 44 U.S.C. § 3554(a); *see also In re OPM Data Sec. Breach*, 928 F.3d 42, 54-60 (D.C. Cir. 2019) (describing FISMA).

Nothing in DOJ's Complaint or its correspondence with the Lieutenant Governor suggests that DOJ complied with these requirements with respect to Utah's sensitive voter information, and DOJ has conceded in judicially noticeable briefs that it has not conducted a PIA as to state voter rolls. *See, e.g.*, Reply Br. at 31, *Weber*, No. 26-1232 (9th Cir. Apr. 24, 2026), Doc. 91. Any

25

suggestion that the privacy provisions of the E-Government Act do not apply to DOJ's collection of Utah's voter registration list would defy statutory text, which refers to any federal agency's *collection* of new personal information. *Weber*, 816 F. Supp. 3d at 1195 ("The information the DOJ seeks to collect . . . is personal information protected by the E-Government Act," and "the request made by the DOJ to [Utah] is a new one, thus initiating a new collection of data").

DOJ's pleadings similarly show that its demand would violate the Privacy Act's requirements for "administrative, technical, and physical safeguards to insure the security and confidentiality of records" and to "protect against any anticipated threats or hazards to their security or integrity." 5 U.S.C. § 552a(e)(10); *see also* 44 U.S.C. § 3554(a); *In re OPM Data Sec. Breach*, 928 F.3d at 54–60 (looking to the requirements of FISMA when assessing agency's compliance with the Act's security requirements). While DOJ states that any records will be maintained according to federal law, Compl. ¶ 25, the Privacy Act and FISMA restrict maintenance of data in ways that the MOU DOJ has proposed with Utah would violate, *see* 44 U.S.C. § 3554(a). That proposed agreement represents DOJ's own proposal to govern the collection and use of the voter list, yet its bare provisions make clear that the mandates of § 3554 have not been satisfied as to Utah's voter list. *Compare* MOU at 2–8 (lacking specific security protocols required by the Privacy Act and FISMA), *with In re OPM Data Security Breach*, 928 F.3d at 54–56 (summarizing the requirements of FISMA). This is yet another basis to conclude that DOJ has failed to satisfy prerequisites the Privacy Act imposes on its attempted collection of Utah's voter registration data.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the complaint with prejudice under Rule 12(b)(6) for failure to state a claim and deny Plaintiff's motion to compel.

Dated: June 3, 2026

Respectfully submitted,
*/s/ David P. Billings*
David P. Billings
**FABIAN VANCOTT**

David R. Fox*
Christopher D. Dodge*
Walker McKusick*
**ELIAS LAW GROUP LLP**
*\* Admitted Pro Hac Vice*
*Counsel for NAACP Intervenors*

27

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of June 2026, the foregoing document has been filed electronically through the District of Utah ECF system, is available for viewing and downloading, and will be sent electronically to the counsel who are registered participants identified on the Notice of Electronic Filing and was sent to the following:

- **Brittany E. Bennett** brittany.bennett@usdoj.gov; german.bonilla@usdoj.gov
- **Christopher J Gardner**  christopher.gardner@usdoj.gov; german.bonilla@usdoj.gov

I hereby further certify that on this 3rd day of June 2026, I caused a true and correct copy of the foregoing to be sent via email to the following:

- **Anikka Hoidal** ahoidal@agutah.gov; asiareid@agutah.gov,mchristesen@agutah.gov
- **Lance F. Sorenson** lancesorenson@agutah.gov; asiareid@agutah.gov,cdsl@agutah.gov; mchristesen@agutah.gov
- **David N. Wolf** dnwolf@agutah.gov; asiareid@agutah.gov; cdsl@agutah.gov; mchristesen@agutah.gov

*Counsel to Lt. Governor Deidre M. Henderson*