Jason M. Groth (16683)
Masami T. Kanegae (20270)
American Civil Liberties Union of Utah Foundation
311 South State Street, Suite 310
Salt Lake City, Utah 84111
(801) 521-9862
jgroth@acluutah.org
mkanegae@acluutah.org

William Hughes*
Theresa J. Lee*
Sophia Lin Lakin*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
whughes@aclu.org
tlee@aclu.org
slakin@aclu.org

*admitted pro hac vice*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>Plaintiff,<br>v.<br><br>DEIDRE M. HENDERSON, in her official capacity as Lieutenant Governor and chief election officer for the State of Utah,<br><br>Defendant. | **LEAGUE OF WOMEN VOTERS OF UTAH'S OPPOSITION TO THE UNITED STATES'S MOTION TO COMPEL AND REPLY IN SUPPORT OF ITS MOTION TO DISMISS**<br><br>Case No. 2:26-cv-166<br><br>District Judge David Barlow<br><br>Magistrate Judge Daphne A. Oberg |

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ..................................................................................................................... 3

    I.    The United States Is Not Entitled to Summary Disposition of Its Title III Claim. ............. 3

        A.    Core Protections of the Federal Rules of Civil Procedure, Including Scrutiny of the Pleadings Under Rule 12, Apply. ................................................................................. 3

        B.    *Lynd* and DOJ's Other Authorities Do Not Displace the Federal Rules. ....................... 8

    II.    Title III Does Not Cover the Requested Records Because They Do Not Come Into Elections Officials' Possession. ........................................................................................ 11

    III.    The United States Offers Neither a Sufficient Basis nor a Sufficient Purpose. ................ 14

        A.    DOJ Fails to Offer the Statutorily-Required Factual Basis. ........................................... 14

        B.    DOJ Also Fails to Offer a Plausible and Non-Pretextual Purpose Behind Its Demand. 18

    IV.    Even If Production Were Appropriate, Title III Permits Redactions. .............................. 22

CONCLUSION .................................................................................................................. 25

## TABLE OF AUTHORITIES

**Cases**

*Alabama ex rel. Gallion v. Rogers*,
    187 F. Supp. 848 (M.D. Ala. 1960)........................................................................ 13

*Christensen v. Harris Cnty.*,
    529 U.S. 576 (2000)............................................................................................. 24

*Coleman v. Kennedy*,
    313 F.2d 867 (5th Cir. 1963) ............................................................................... 11

*Corley v. United States*,
    556 U.S. 303 (2009)............................................................................................. 12

*Dinkens v. Att'y Gen. of U.S.*,
    285 F.2d 430 (5th Cir. 1961) ............................................................................... 13

*Donaldson v. United States*,
    400 U.S. 517 (1971)............................................................................................... 6

*In re Coleman*,
    208 F. Supp. 199 (S.D. Miss. 1962)..................................................................... 10

*Jud. Watch v. Lamone*,
    399 F. Supp. 3d 425 (D. Md. 2019) ..................................................................... 12

*Kennedy v. Lynd*,
    306 F.2d 222 (5th Cir. 1962) ........................................................................ passim

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024)............................................................................................. 24

*N.H. Fire Ins. Co. v. Scanlon*,
    362 U.S. 404 (1960)............................................................................................... 5

*Navajo Nation v. Dalley*,
    896 F.3d 1196 (10th Cir. 2018) ............................................................................. 4

*Pub. Int. Legal Found. v. Benson*,
    136 F.4th 613 (6th Cir. 2025)............................................................................... 17

*Speidell v. IRS*,
    978 F.3d 731 (10th Cir. 2020)................................................................................ 6

*Standing Akimbo, LLC v. IRS*,
 955 F.3d 1146 (10th Cir. 2020) ....................................................................... 6

*Sw. Airlines Co. v. Saxon*,
 596 U.S. 450 (2022) ....................................................................................... 13

*United States v. Amore*,
 No. 25-cv-639-MSM-PAS, 2026 WL 1040637 (D.R.I. Apr. 17, 2026) ......................... passim

*United States v. Bellows*,
 No. 1:25-cv-468-LEW, 2026 WL 1430481 (D. Me. May 21, 2026) .............................. passim

*United States v. Benson*,
 819 F. Supp. 3d 753 (W.D. Mich. 2026) ........................................ 1, 11, 12, 13, 24

*United States v. Caldwell*,
 No. 3:26-cv-2025 (D.N.J. Feb. 26, 2026) ................................................................ 23

*United States v. Fontes*,
 No. 26-cv-66-PHX-SMB, 2026 WL 1177244 (D. Ariz. Apr. 28, 2026) .......... 1, 11, 12, 13, 14

*United States v. Galvin*,
 No. 25-cv-13816-LTS, 2026 WL 972129 (D. Mass. Apr. 9, 2026) ............................... passim

*United States v. Garcia-Limon*,
 146 F.4th 885 (10th Cir. 2025) ............................................................................... 3

*United States v. Morton Salt Co.*,
 338 U.S. 632 (1950) ......................................................................................... 7

*United States v. Oregon*,
 No. 6:25-cv-1666-MTK, 2026 WL 318402 (D. Ore. Feb. 5, 2026) ............................... passim

*United States v. Powell*,
 379 U.S. 48 (1964) .............................................................................. 4, 5, 6, 8, 15

*United States v. Raffensperger*,
 No. 1:26-cv-485-ELR (N.D. Ga. Feb. 5, 2026) ...................................................... 23

*United States v. Weber*,
 816 F. Supp. 3d 1168 (C.D. Cal. 2026) .................................................... 2, 4, 5, 11

*United States v. Wis. Elections Comm'n*,
 No. 25-cv-1036-JDP, 2026 WL 1430354 (W.D. Wis. May 21, 2026) ................... 1, 11, 12, 13

*Van Buren v. United States*,
   593 U.S. 374 (2021).............................................................................................. 3

*Voter Reference Found. v. Torrez*,
   160 F.4th 1068 (10th Cir. 2025)......................................................................... 22


**Statutes**

15 U.S.C. § 57................................................................................................................ 7

18 U.S.C. § 2721......................................................................................................... 10

26 U.S.C. § 7604........................................................................................................... 5

44 U.S.C. § 3351......................................................................................................... 10

52 U.S.C. § 10101......................................................................................................... 8

52 U.S.C. § 10308....................................................................................................... 24

52 U.S.C. § 20307....................................................................................................... 24

52 U.S.C. § 20507....................................................................................................... 19

52 U.S.C. § 20701................................................................................................ 7, 11, 12

52 U.S.C. § 20703.................................................................................................. passim

52 U.S.C. § 20705.................................................................................................. 3, 4, 5

52 U.S.C. § 21083....................................................................................................... 19

Pub. L. No. 103-322, 108 Stat. 1796 (1994)............................................................. 10

Pub. L. No. 107-347, 116 Stat. 2899 (2002)............................................................. 10

Pub. L. No. 93-579, 88 Stat. 1896 (1974).................................................................. 10


**Other Authorities**

*CREW Sues DOJ for Failing to Produce Records on Voter Data Collection*,
   Citizens for Resp. & Ethics in Wash. (Dec. 19, 2025)......................................... 21

*CREW Sues DOJ for Failing to Produce Records on Voter Data Collection*,
   Citizens for Resp. & Ethics in Wash., Apr. 14, 2026, Records, Part 1 .................................. 21

*CREW Sues DOJ for Failing to Produce Records on Voter Data Collection*,
   Citizens for Resp. & Ethics in Wash., Apr. 14, 2026, Records, Part 2 ............................ 21, 22

Elec. Registration Info. Ctr., *Technology & Security Overview* (Sept. 29, 2025) ........................ 24

Exec. Order No. 14,399, 91 Fed. Reg. 17125 (Apr. 3, 2026) ........................................................ 20

**Rules**

Fed. R. Civ. P. 1................................................................................................................ 4

Fed. R. Civ. P. 12.................................................................................................. 3, 6, 7, 11

Fed. R. Civ. P. 81................................................................................................................ 4

Intervenor-Defendant League of Women Voters of Utah ("LWV-UT") respectfully submits this brief in opposition to the United States' motion to compel and in support of its motion to dismiss the Complaint. *See* Dkt. No. 44.

## INTRODUCTION

The United States Department of Justice ("DOJ") is now zero for eight in its quest for states' voter data. Courts across the country have rejected its attempts to compel production of statewide voter registration lists, along with all the sensitive information they contain. These courts have seen through DOJ's attempts to contort civil rights law, including Title III of the Civil Rights Act ("Title III" or "CRA"), the National Voter Registration Act ("NVRA"), and the Help America Vote Act ("HAVA") to do so.

Illustrating the multiple, independent flaws in DOJ's requests, these courts have relied on different grounds in dismissing its cookie-cutter complaints, which were materially identical to the Complaint here. Some have found that DOJ seeks records outside the scope of Title III, because state voter files are not records that "come into . . . [the] possession" of elections officials. *See United States v. Wis. Elections Comm'n*, No. 25-cv-1036-JDP, 2026 WL 1430354 (W.D. Wis. May 21, 2026) ("*WEC*"); *United States v. Bellows*, No. 1:25-cv-468-LEW, 2026 WL 1430481 (D. Me. May 21, 2026); *United States v. Fontes*, No. 26-cv-66-PHX-SMB, 2026 WL 1177244 (D. Ariz. Apr. 28, 2026); *United States v. Benson*, 819 F. Supp. 3d 753 (W.D. Mich. 2026), *appeal argued*, No. 26-1225 (6th Cir. May 13, 2026). Others have found that DOJ has not provided a sufficient statement of the basis for its request, as required by the CRA. *See United States v. Amore*, No. 25-cv-639-MSM-PAS, 2026 WL 1040637 (D.R.I. Apr. 17, 2026); *United States v. Galvin*, No. 25-cv-13816-LTS, 2026 WL 972129 (D. Mass. Apr. 9, 2026). Still others have held that DOJ has not provided a sufficient statement of the purpose of its request, also required by the CRA. *See*

1

*United States v. Oregon*, No. 6:25-cv-1666-MTK, 2026 WL 318402 (D. Ore. Feb. 5, 2026), *appeal argued*, No. 26-1231 (9th Cir. May 19, 2026); *United States v. Weber*, 816 F. Supp. 3d 1168 (C.D. Cal. 2026), *appeal argued*, No. 26-1232 (9th Cir. May 19, 2026); *Bellows*, 2026 WL 1430481, at *7; *Amore*, 2026 WL 1040637, at *5. And some have noted that even if DOJ sought records covered by the CRA and sufficiently complied with the statute's requirements—neither of which is true, in Utah or in other states—nothing entitles DOJ to unredacted versions. *See Oregon*, 2026 WL 318402, at *12; *Bellows*, 2026 WL 1430481, at *5 n.7, *9. As described in more detail below, each of these holdings provides an independent basis to reject DOJ's request for production of sensitive voter information.

Neither DOJ's motion to compel production, *see* United States' Mot. to Compel Federal Election Records, Dkt. No. 36 ("Mot. to Compel"), nor DOJ's opposition to the motions to dismiss, *see* United States' Combined Resp. in Opp'n to Mots. to Dismiss, Dkt. No. 49 ("Opp."), seriously grapples with these authorities or their reasoning. Instead, DOJ offers scattershot arguments that do not change the fundamental nature of this case: the United States seeks Utah's complete, unredacted voter file, with all of the highly-sensitive personal data it contains, just as it seeks the voter files of almost every state in the country, in an unprecedented effort to compile information on voters nationwide. DOJ attempts to use the CRA as an instrument to do so, even though that law does not cover the records sought here and imposes express requirements with which the DOJ has not complied.

A chorus of district courts across the country have rejected these efforts. This Court should do the same.

**ARGUMENT**

**I.      The United States Is Not Entitled to Summary Disposition of Its Title III Claim.**

DOJ's motion to compel production of the sensitive voter information it seeks in this litigation—in other words, the ultimate issue in this case—without discovery, motion practice, or fact-finding is contrary to law and must be denied. The text of the CRA and the Federal Rules of Civil Procedure, as well as binding case law, all require that result. DOJ attempts to get out from under the weight of this authority by relying extensively on out-of-Circuit cases decided in the Jim Crow South in the early 1960s, particularly *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962). But these cases are inapposite to the questions presented in this case, particularly when properly understood in the context of the time in which they were decided.

**A.      Core Protections of the Federal Rules of Civil Procedure, Including Scrutiny of the Pleadings Under Rule 12, Apply.**

DOJ claims that its pleadings need not "satisfy usual notions under the Federal Rules of Civil Procedure." Mot. to Compel at 5 (quoting *Lynd*, 306 F.2d at 225–26). This is flatly contradicted by the text, structure, and binding caselaw interpreting the CRA and the Federal Rules.

"[S]tart where we always do: with the text of the statute." *United States v. Garcia-Limon*, 146 F.4th 885, 896 (10th Cir. 2025) (quoting *Van Buren v. United States*, 593 U.S. 374, 381 (2021)). Title III provides that the Attorney General may make a "demand in writing" for certain voting-related records or papers, which "shall contain a statement of the basis and the purpose therefor." 52 U.S.C. § 20703. It then provides that "[t]he United States district court for the district in which a demand is made pursuant to section 20703 of this title . . . shall have jurisdiction *by appropriate process* to compel the production of such record or paper." *Id.* § 20705 (emphasis added). In other words, if there is a dispute over a Title III demand, the Attorney General may go to a federal court

3

to seek relief. The statute specifies no special procedures. It does not state that courts must rule summarily or act in a merely ministerial role. It does not say that the ordinary rules for invoking and deploying judicial power have been superseded. *Weber*, 816 F. Supp. 3d at 1182 ("Nothing in the text of Title III requires a special statutory proceeding or any abbreviated procedures."); *Bellows*, 2026 WL 1430481, at *5 ("[T]his case presents something other than a perfunctory matter of compelling compliance with a clear statutory directive.").

To the contrary, Title III provides for judicial enforcement of records requests under the statute "by appropriate process." 52 U.S.C. § 20705. And the appropriate process is set forth in the Federal Rules of Civil Procedure, which "govern the procedure in *all* civil actions and proceedings in the United States district courts," Fed. R. Civ. P. 1 (emphasis added), with only a narrow set of express exceptions, of which the CRA is not one, Fed. R. Civ. P. 81. *See also* Fed. R. Civ. P. 81(a)(5) ("These rules apply to proceedings to compel testimony or the production of documents through a subpoena issued by a United States officer or agency under a federal statute").

The drafters of the Federal Rules knew how to carve out certain types of proceedings from the otherwise unequivocal mandate that the Rules apply to *all* civil actions and proceedings, *see* Fed. R. Civ. P. 81, yet they did not do so for Title III. "[T]he enumeration of certain things . . . suggests that the [drafter] had no intent of including things not listed or embraced." *Navajo Nation v. Dalley*, 896 F.3d 1196, 1213 (10th Cir. 2018) (quotation marks omitted). The Federal Rules—including the protections and processes they supply for testing the sufficiency of pleadings and for taking discovery—apply in this civil action.

Binding precedent is in accord, because *United States v. Powell*, 379 U.S. 48 (1964), controls. That case involved an attempt to enforce a statute providing the United States with the power to request certain books and records relating to taxes and to compel their production "by

appropriate process." 379 U.S. at 52 & n.10, 57–58, 58 n.18 (citing 26 U.S.C. § 7604(a)). There, the Supreme Court squarely held that the tax records statute being enforced did *not* authorize any special or summary proceeding that might supplant the Federal Rules. *Id.* Critically, the IRS statute at issue in *Powell* is identical to Title III in relevant part. The relevant provision of the IRS statute reads: "[T]he United States district court for the district in which such person resides or is found *shall have jurisdiction by appropriate process to compel* such attendance, testimony, or production of books, papers, records, or other data." 26 U.S.C. § 7604(a) (emphasis added). Title III reads: "The United States district court for the district in which a demand is made . . . or in which a record or paper so demanded is located, *shall have jurisdiction by appropriate process to compel* the production of such record or paper." 52 U.S.C. § 20705 (emphasis added). Because the operative language is materially identical, *Powell*'s holding directly applies. *See Oregon*, 2026 WL 318402, at *8; *Weber*, 816 F. Supp. 3d at 1182 n.15.

*Powell* could not have been any clearer: Because the statute there provided that records requests would be judicially enforced "by appropriate process," and because no alternative process was specified, "the Federal Rules of Civil Procedure apply." *Powell*, 379 U.S. at 52, 57–58, 58 n.18; *accord N.H. Fire Ins. Co. v. Scanlon*, 362 U.S. 404, 407 (1960) ("[Absent] express statutory authorization, courts have been extremely reluctant to allow proceedings more summary than the full court trial at common law."). And where the federal government demands the production of documents, the demand may be contested on "any appropriate ground." *Powell*, 379 U.S. at 58. In the years since *Powell*, the Supreme Court and the Tenth Circuit have reaffirmed that it is a court's responsibility to independently determine—prior to compelling disclosure—whether a government agency has followed procedural requirements and whether the evidence sought is relevant and material to its investigation. *See, e.g.*, *Donaldson v. United States*, 400 U.S. 517, 528

(1971); *Speidell v. IRS*, 978 F.3d 731, 738 (10th Cir. 2020); *Standing Akimbo, LLC v. IRS*, 955 F.3d 1146, 1154–55 (10th Cir. 2020).

DOJ notes that *Donaldson* states that "*Powell* was not intended to impair a summary enforcement proceeding so long as the rights of the party summoned are protected and an adversary hearing, if requested, is made available." Mot. to Compel at 6 (quoting 400 U.S. at 529). DOJ does not, however, that *Donaldson* also states that "[t]he [Federal] Civil Rules, of course, do have an application to a summons proceeding," 400 U.S. at 528, which is contrary to what DOJ argues, *see* Mot. to Compel at 5. *Donaldson* indicates that—as with any other case governed by the Federal Rules—district courts retain the ability to tailor and streamline the procedural path a case takes, including by limiting the scope of any necessary discovery, provided that core protections, such as scrutiny under Rule 12, are observed. *See* 400 U.S. at 528–29. Here, DOJ demands summary disposition and the transfer of voters' sensitive data, without any substantive review of its pleadings, let alone discovery; this would not allow for the "rights of the party summoned" to be "protected," or for any kind of "adversary hearing." *Id.* at 529.

DOJ also attempts to get out from under *Powell* by arguing that the Internal Revenue Code contains a provision protecting taxpayers from summonses "issued for an improper purpose," including "any . . . purpose reflecting on the good faith of the particular investigation." Mot. to Compel at 7–8 (quoting *Powell*, 379 U.S. at 58). This misreads *Powell*: the Supreme Court held that "the Federal Rules of Civil Procedure apply" not because of substantive language in other provisions of the Internal Revenue Code, but "[b]ecause [the statute] contains no provision specifying the procedure to be followed in invoking the court's jurisdiction" other than its reference to "appropriate process." 379 U.S. at 52, 58 n.18. Moreover, the CRA does include language limiting the parameters of the Attorney General's authority under Title III, including,

6

notably, the language limiting the scope of Title III to records that "come into [election officials'] possession," and the requirement for a written "statement of the basis and the purpose therefor." 52 U.S.C. §§ 20701, 20703.[1]

Finally, it bears noting that DOJ chose to initiate this action by availing itself of standard procedural pathways, including filing the Complaint. As other courts hearing these cases have noted, even if more summary procedures could otherwise apply, "Plaintiff made an affirmative choice to file a complaint and proceed through ordinary litigation," thereby subjecting its complaint to ordinary scrutiny under Rule 12. *Oregon*, 2026 WL 318402, at *8 n.1; *accord Amore*, 2026 WL 1040637, at *4 n.1.

The safeguards and procedures built into the Federal Rules of Civil Procedure, including scrutiny of the pleadings, appropriate discovery into all the relevant facts, and the proper presentation of summary judgment motions on the record or trial, are especially important here. The United States seeks to obtain Utah voters' sensitive personal data—records outside the scope of the statute it invokes—without properly setting forth "the basis and the purpose" for its request as the CRA requires, 52 U.S.C. § 20703, all while failing to disclose its actual purpose, which is the unlawful construction of a tool to disenfranchise voters. But the United States cannot simply

---

[1] Reliance on *United States v. Morton Salt Co.*, 338 U.S. 632 (1950), is also misplaced. Mot. to Compel at 5 n.4, 8, 11. *Morton Salt* addressed Federal Trade Commission (FTC) investigative authority, when the agency acted under a broad statutory mandate and congressionally-conferred subpoena power. 338 U.S. at 647–49. Even with that broad power, the FTC must identify the conduct under investigation and the applicable law in each civil investigative demand it issues. 15 U.S.C. § 57b-1(c)(2). But the FTC does so under an express congressional grant authorizing investigation of any person with relevant information. Title III confers no such power; it permits inspection only of "records and papers" upon a written demand stating "the basis" and "the purpose." 52 U.S.C. §§ 20701, 20703. In any event, unlike the FTC in *Morton Salt*, the United States here has not identified concrete facts suggesting a violation of federal law, nor has it sought information through a tailored demand tied to a specific investigation. *See Galvin*, 2026 WL 972129, at *3–5; *Amore*, 2026 WL 1040637, at *5.

end-run the Federal Rules and the CRA's requirements. Because the motion to compel would improperly circumvent the Federal Rules and impermissibly award the United States all of the relief it seeks in this lawsuit before it has proven entitlement to judgment on its claim, the motion should be denied.

###### B. *Lynd* and DOJ's Other Authorities Do Not Displace the Federal Rules.

DOJ rests its argument that Title III creates some sort of special summary proceeding almost entirely on a set of Fifth Circuit cases from the early 1960s, chief among them *Lynd*. Notably, those cases pre-date the binding Supreme Court precedent in *Powell*. Those non-binding cases are also inapposite, as they arose in a completely different context, and they did not involve the disclosure of sensitive personally identifying information and substantial data privacy risks. This Court should not adopt the United States' proposal to bypass the Federal Rules based on out-of-context excerpts from those cases.

First and foremost, *Lynd* and DOJ's other preferred authority have been superseded by *Powell*. *See, e.g.*, *Oregon*, 2026 WL 318402, at *8 ("The Supreme Court's holding in *Powell* squarely rejects Plaintiff's contention and reliance on *Lynd*."); *Bellows*, 2026 WL 1430481, at *5 (same); *Amore*, 2026 WL 1040637, at *4 (same). This is, in and of itself, sufficient grounds to reject DOJ's arguments based on *Lynd*.

In any event, decisions like *Lynd* must be understood in context*,* as a pragmatic response to the situation that prevailed in the Jim Crow South in the early 1960s. Title III's purpose was to protect the right to vote by facilitating discrimination suits against recalcitrant Jim Crow counties that refused to process the voter registrations of Black voters and that stymied every effort to enforce federal law, sometimes with help from friendly judges. *Lynd*, 306 F.2d at 228 (Title III's "purpose is to enable the Attorney General to determine whether [52 U.S.C. § 10101 pattern-or-practice] suits or similar actions should be instituted. And it is to enable him to obtain such

evidence for use in such cases if and when filed."). The Fifth Circuit painted a clear picture of the situation: By the time *Lynd* was decided, the county registrar defendants in that case had already spent 18 months filing "a series of motions, motions to dismiss, opposing substitution motions for more definite statement and briefs and repeated extended oral arguments thereon," all "with no clear-cut ruling, no indication that this interminable proceeding would ever come to an end, and certainly never an order for production." *Id.* at 227. This was all despite the fact that "the factual foundation for" the basis and purpose of the Attorney General's Title III requests was utterly self-evident at that time—massive racial disparities with respect to registration and voting in the counties at issue were clear and the Jim Crow regimes were using every possible means to block Black Americans from registering to vote. *See id.*

It was in this context that the Fifth Circuit recognized a need for summary resolution of the Title III requests being deployed against the Jim Crow registrars. Following 18 months of litigation, these courts recognized that plenary "judicial review or ascertainment" of further facts was not warranted to further the aims of Title III; to the contrary, at that point, and in that context, the statutory goal of protecting the franchise could only be met with summary resolution. *See id.* at 226–28. The 1960s Fifth Circuit cases analyzing the CRA cannot be divorced from this historically and procedurally specific context and should not be taken to stand for the general availability of summary proceedings whenever the CRA is invoked.

Here, the context of this records request could not be more different. The United States has invoked the CRA for novel purposes far removed from Congress's aims in 1960, to make sweeping demands for extensive voter data including sensitive, non-public personal identifying information with no showing or claim of legal deficiencies or violations of rights. Even more alarming, there is extensive reporting that the purported basis and purpose of DOJ's request are likely pretextual,

9

and that the data at issue is in fact being sought for unlawful ends that are directly contrary to Title III's purpose to expand the franchise and totally unrelated to assessing states' compliance with the NVRA or HAVA. *See* Mot. to Dismiss of League of Women Voters of Utah at 3–9, Dkt. No. 46 ("MTD Br."); *see also infra* Section III.B. Such improper purposes can never justify judicial enforcement of a government records request, summarily or otherwise.

The 1960s Fifth Circuit cases do not support proceeding summarily here for another reason as well: They were decided before sensitive personal identifying information such as Social Security Numbers or driver's license numbers was widely collected as part of a person's voter registration record, and before any federal laws had been passed to protect and constrain access to such personal information.[2] The premise of those early Fifth Circuit cases was that they involved *public* records; as the court explained in *Lynd*: "we are not discussing confidential, private papers and effects. We are, rather dealing with public records which ought ordinarily to be open to legitimate reasonable inspection." 306 F.2d at 231. Indeed, the court even acknowledged that courts in Title III cases might "issue protective orders" even where the statute's requirements were satisfied. *Id.* at 230. Those courts plainly did not intend their decisions to lay down a rule of law that would justify the summary disposition of a request like the one here, involving the disclosure of highly sensitive, protected personal information, *see id.* at 230–31, and particularly in the context of an unprecedented fishing expedition seeking confidential information from dozens of states, *see In re Coleman*, 208 F. Supp. 199, 201 (S.D. Miss. 1962) (acknowledging in the context of Title III of the CRA that while "[t]he right of free examination of official records is the rule,"

---

[2] *E.g.*, Privacy Act of 1974, Pub. L. No. 93-579, 88 Stat. 1896 (1974); Driver's Privacy Protection Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796 (1994), codified at 18 U.S.C. § 2721 *et seq.*; E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899 (2002); Federal Information Security Modernization Act of 2014, Pub. L. No. 113-283, 128 Stat. 3073 (2014), codified at 44 U.S.C. §§ 3351 *et seq.* (2014).

there could be "exception[s]" where "the purpose is speculative, or from idle curiosity"), *aff'd sub nom.*, *Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963). Such considerations, absent in the 1960s Fifth Circuit cases, further emphasize why the protections and procedures of the Federal Rules must apply here.

\*    \*    \*

Unsurprisingly, "no district court has adopted the United States' view of *Lynd*'s 'special statutory proceeding.'" *Bellows*, 2026 WL 1430481, at \*5 n.8. Instead, six of the eight courts to adjudicate DOJ's requests for statewide voter registration lists have applied the traditional analysis under Rule 12—and the other two declined to decide the issue, because they found the requests failed even under the summary standard articulated in *Lynd*. *See id.* at \*3; *Fontes*, 2026 WL 1177244, at \*1; *Amore*, 2026 WL 1040637, at \*4; *Benson*, 819 F. Supp. 3d at 766; *Oregon*, 2026 WL 318402, at \*8; *Weber*, 816 F. Supp. 3d at 1180–81; *see also WEC*, 2026 WL 1430354, at \*2; *Galvin*, 2026 WL 972129, at \*2 n.3, \*4 n.8.[3]

## II.    Title III Does Not Cover the Requested Records Because They Do Not Come Into Elections Officials' Possession.

Because the Federal Rules apply, the Complaint must survive scrutiny under Rule 12. It does not, because it seeks records outside the scope of Title III.

Title III only obligates elections officials to preserve those "all records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting." 52 U.S.C. § 20701. It also grants the Attorney General the power only to demand "[a]ny record or paper required by [Section 301] to be retained and preserved." *Id.*

---

[3] Indeed, even under DOJ's own standard derived from the 1960s Fifth Circuit cases, the United States is still not entitled to summary disposition of its Title III claim. *See* Mot. to Compel at 3–4. For one, it has sought records outside the scope of the statute, and for another, it has not provided the requisite statement of its basis and purpose. *See infra* Section III.

11

§ 20703. This plain text straightforwardly forecloses DOJ's request: Utah's statewide voter registration file is not a record which "c[a]me into [the] possession" of Lieutenant Governor Henderson or other elections officials, because it is one they created. *See Bellows*, 2026 WL 1430481, at *6 (holding a statewide voter registration list is not "a record or paper that 'comes into [the] possession' of [state] election officers, as that phrase is most naturally construed" (quoting 52 U.S.C. § 20701)); *WEC*, 2026 WL 1430354, at *4 (same); *Fontes*, 2026 WL 1177244, at *3 (same); *Benson*, 819 F. Supp. 3d at 768 (same).

DOJ's counterarguments do not change this result. For one, it places great weight on the statute's use of "all records" to refer to the covered documents. *See* Opp. at 6; *see also* Mot. to Compel at 15 (citing *Jud. Watch v. Lamone*, 399 F. Supp. 3d 425 (D. Md. 2019), for the idea that a voter registration list is one such "record"). But this broad language is directly limited by the words immediately following: Title III applies to "all records and papers which come into [elections officials'] possession." 52 U.S.C. § 20701; *see also Corley v. United States*, 556 U.S. 303, 314 (2009) ("A statute should be construed so that effect is given to all its provisions." (quotation marks omitted)). This means that all those records and papers that elections officials receive, but do not create—and only those records—are covered. *See* MTD Br. at 10–11. "Coming into possession of something most naturally implies receipt from an external source." *Bellows*, 2026 WL 1430481, at *6 n.10.

Title III's structure reinforces that conclusion. As *Benson* explained, Congress enacted Section 301 against a backdrop of concern that officials were destroying or withholding original records—particularly voter registration applications—needed to investigate discrimination. 2026 WL 362789, at *9–10. Those concerns map naturally onto documents voters have submitted, which can reveal whether applications were improperly rejected or mishandled. A finalized voter

list, however, cannot serve that function: it reflects only who successfully registered, not whether unlawful practices affected those who did not. *Id.* The United States' insistence that it must review the statewide voter registration list to assess list maintenance thus misapprehends the statute's focus and confirms that its request reaches beyond the materials Congress intended to preserve and produce.

DOJ relies on *Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848 (M.D. Ala. 1960), *aff'd sub nom. Dinkens v. Att'y Gen. of U.S.*, 285 F.2d 430 (5th Cir. 1961), and *Lynd* to argue that records created by elections officials "come into [their] possession." *See* Opp. at 5–6, 8–9. But, as with DOJ's procedural arguments, these cases cannot bear the weight DOJ attempts to place on them. The portion of *Gallion* that DOJ quotes rejected the state's argument "that the Attorney General's request is vague and the statute is uncertain," finding instead that the scope of the statute and request were "clear and unambiguous." 187 F. Supp. at 855. And *Lynd* held that the order under review erred "in refusing to require the Registrars to produce those records prepared or compiled prior to the incumbency of the present Registrar," because elections officials must turn over all covered records in their possession, not those "which are compiled subsequent to [their] taking office." 306 F.2d at 230. Neither of these opinions addressed the argument presented here and credited in *Benson*, *Fontes*, *Bellows*, and *WEC*. *See also Fontes*, 2026 WL 1177244, at *5 ("[T]he issue of what documents are covered by § 20701 has not been a heavily litigated issue.").

DOJ also argues that construing Title III's "comes into . . . possession" language to exclude those records created by elections officials would defeat the purpose of the CRA. *See* Mot. to Compel at 7. But the scope of the Attorney General's investigative authority does not depend on what tools DOJ would like to have; it depends on the balance struck by Congress. *See Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 463 (2022) ("[Courts] have no warrant to elevate vague invocations

13

of statutory purpose over the words Congress chose"); *Fontes*, 2026 WL 1177244, at *6 ("[T]he Court will not superimpose an expansive definition where Title III, by its plain text, does not tolerate such a definition.").

Finally, DOJ claims that even if the statute limits covered records to those that elections officials receive, Utah's statewide voter file is still included, because counties compile voter registration lists and transmit them to Lieutenant Governor Henderson. *See* Mot. to Compel at 14–16. This ignores a key step in the process: because each county compiles information only on its own voters, Lieutenant Governor Henderson must then aggregate them into the *statewide* voter file—precisely what DOJ seeks.

### III.    The United States Offers Neither a Sufficient Basis nor a Sufficient Purpose.

Even if Title III covered the records sought, the Complaint and the documents incorporated by reference therein make clear that DOJ has not provided the statutorily-required "statement of the basis and the purpose" behind its request, meaning its claim fails as a matter of law. 52 U.S.C. § 20703. DOJ attempts to rewrite the statute, construing it to require a statement of only a legal—not a factual—basis, and of any conceivable purpose, rather than the actual purpose behind its request. None of this is the law.

#### A.  DOJ Fails to Offer the Statutorily-Required Factual Basis.

DOJ resists the requirement of the CRA to show a factual basis for its request. It takes two different tacks, first arguing that the statute requires no statement of a factual basis for the request. *See* Mot. to Compel at 11 (stating DOJ complied with the requirement "by stating that the basis was the CRA"), Opp. at 10 (rejecting the premise "that the Attorney General must state a factual basis for the demand"). In the alternative, it argues that it has sufficiently done so beyond its demand letter, in communications with Utah officials and its legal briefing here. *See* Opp. at 11. Neither is availing.

14

First, the basis requirement refers to a factual basis, rather than merely the legal basis, as DOJ claims. DOJ's argument "confuses the legal authority under which the Attorney General made the demand—the CRA—and the statute's requirement to state 'the basis'—the foundation in fact or evidence for the demand." *Galvin*, 2026 WL 972129, at *5; *accord Amore*, 2026 WL 1040637, at *5 ("[T]he 'basis' contemplated by Title III is a factual, not legal basis."). Indeed, the United States' position would render the statutory requirement circular and meaningless: the legal basis of every Title III request is Title III by definition, so treating a simple invocation of the CRA as a sufficient basis would write away a portion of the statute. *See* MTD Br. at 13; *Amore*, 2026 WL 1040637, at *5 ("Congress could not have intended Title III to be interpreted in this redundant and circular manner.").

Instead, the basis requirement requires an actual statement of the factual circumstances prompting the DOJ's request. "To invoke all (or virtually all) investigatory tools and compulsory process, the law requires some showing" even if that showing is "typically less than the showing required to prevail on the related claim." *Galvin*, 2026 WL 972129, at *6. DOJ attacks a strawman, saying that it cannot be expected to prove HAVA and NVRA violations prior to obtaining records that may tend to show such a violation. *See* Mot. to Compel at 5, 8 (arguing DOJ may collect evidence "merely on suspicion that the law is being violated, or even just because it wants assurance that it is not" (quoting *Powell*, 379 U.S. at 57)). But Title III does not require DOJ to completely prove a violation—but it does require *something*, some statement of the specific factual basis for its demand, or else it would "essentially authorize[] factually groundless fishing expeditions." *Amore*, 2026 WL 1040637, at *5; *see also Bellows*, 2026 WL 1430481, at *9 ("[T]he

15

United States has filed a HAVA action in search of a HAVA violation, which is not the preferred order of things in the course of civil litigation.").[4]

DOJ provides in its Complaint only that "[t]he August 14 Letter stated the basis of the demand was the CRA." Compl. ¶ 23, Dkt. 1; *see also* Letter of Harmeet K. Dhillon to Deidre Henderson (Aug. 14, 2025), Dkt. 36-3 ("August 14 Letter"). The August 14 Letter to Lieutenant Governor Henderson states that "[t]he purpose of the request is to ascertain Utah's compliance with the list maintenance requirements of the NVRA and HAVA," but identifies nothing that would indicate the state's noncompliance or even raise a suspicion of it. August 14 Letter at 2. This is plainly insufficient as a factual basis—and therefore sufficient grounds to dismiss the Complaint for failing to comply with Title III. *See Amore*, 2026 WL 1040637, at *5; *Galvin*, 2026 WL 972129, at *4 (noting the demand letter "identifies no requirements of federal law with which Massachusetts had, or was suspected to have, failed to comply").

Conceding that a factual basis is necessary, DOJ claims that it "has done so here," i.e., in its opposition brief. Opp. at 11. There, it collects data pulled from Utah's responses to the Election Assistance Commission's Election Administration and Voting Survey ("EAVS"), discussed in previous communications with Lieutenant Governor Henderson. *See* Letter of Michael E. Gates to Deidre Henderson (July 15, 2025), Dkt. 36-2 ("July 15 Letter"). As a threshold matter, this Court must look to "the Attorney General's written demand—rather than the United States' subsequent court filings—to determine whether that demand contained a statement of the basis." *Galvin*, 2026 WL 972129, at *3. The Complaint treats the August 14 Letter—not the July 15 Letter—as the written demand under the CRA. *See* Compl. ¶ 32. That letter, rather than any prior correspondence

---

[4] In response, DOJ again falls back to *Lynd*. *See* Opp. at 10. However, the document demand in *Lynd* in fact contained information indicating the factual basis underlying the Attorney General's request. *See* 306 F.2d at 229 n.6.

16

or post hoc rationalizations, must satisfy Title III. Because it contains no factual allegations of any impropriety or irregularities in Utah's election administration program, it does not.

Even if it were permissible to look at Utah's EAVS data, it still does not provide a sufficient basis for the request. DOJ alleges that "Utah has the lowest rate in the nation for voter registration records removed from voter registration rolls" and lists five categories of information which DOJ lacks county-level data, including reasons for removals from voter rolls, duplicate registrations, and the outcome of mailed confirmation notices. Opp. at 11. Given that DOJ has requested these records from nearly every state in the country, it strains credulity to say that these issues are the *actual* factual basis for the request. But even if they were, aggregate national survey data reflecting normal variation in state practices is not a sufficient "basis" for an extraordinary demand for Utahns' sensitive personal data. The EAVS Report is a biennial survey that compiles aggregate public election-administration data submitted by all fifty states and U.S. territories; it provides a broad overview of the nation's decentralized electoral system and expressly reflects that registration practices vary significantly among states. It does not distinguish between lawful differences in state procedures and possible noncompliance with federal law, nor does it provide the underlying transactional or process-level data needed to evaluate whether a state has made a "reasonable effort" under the NVRA. The United States never pleaded—nor does it now explain— how any of these metrics EAVS captures could suggest that Utah's list maintenance program fails the NVRA's "reasonable effort" standard. *See Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 624–27 (6th Cir. 2025) (describing a "reasonable effort" as "a serious attempt that is rational and sensible" which "need not be perfect, or even optimal"), *cert. denied*, 2026 WL 568298 (U.S. Mar. 2, 2026). This cannot support a demand under the CRA.

17

Should this court find DOJ's factual basis insufficient, DOJ asks leave to file a "curing elaboration letter." *See* Opp. at 10. Whether or not DOJ could generate a sufficient factual basis to question Utah's list maintenance efforts, the history of this litigation, as well as that of the materially-identical suits across the country, would cast serious doubt on that hypothetical statement of facts being "the basis" for the request. 52 U.S.C. § 20703. And in any event, as explained below, DOJ would still lack any permissible purpose in collecting the requested records. *See Amore*, 2026 WL 1040637, at *6 (finding that such a letter would not cure deficiencies in a demand because it would still be pursuant to an improper purpose).

### B.    DOJ Also Fails to Offer a Plausible and Non-Pretextual Purpose Behind Its Demand.

DOJ's request under Title III fails for the independent reason that it has not offered "a statement of . . . the purpose" for its request for unredacted voter data. 52 U.S.C. § 20703. The August 14 Letter claims the purpose "is to ascertain Utah's compliance with the list maintenance requirements of the NVRA and HAVA." August 14 Letter at 2; *see also* Opp. at 12 (similar, though citing only the NVRA). But it nowhere explains why a moment-in-time look at Utah's voter registration list, which immediately would be out of date, is necessary or even helpful to this end. And more to the point, the CRA specifically calls for a statement of "the basis and the purpose" behind a request for records, meaning DOJ must provide the actual reasons for its demands, not merely some conceivable explanation generated after the fact.

On its face, DOJ's purpose is inadequate, because "each individual state, and not the U.S. Department of Justice, is the master of its voter list, entrusted with its administration and maintenance." *Bellows*, 2026 WL 1430481, at *7. The NVRA and HAVA do not displace states' primary authority over their voter lists, obligating them only to engage in a "reasonable effort" at list maintenance. *See* MTD Br. at 14. DOJ attempts to go much further than Congress has

authorized, by performing list maintenance itself in the guise of assessing compliance with federal law. In the Memorandum of Understanding it offered Utah on December 2, *see* Compl. ¶ 27, DOJ will be a "[c]ustodian" of the state's voter file and may identify purportedly ineligible voters for removal, *see* Email of Eric Neff to Ryan Cowley (Dec. 2, 2025) & Proposed Mem. of Understanding, Dkt. 36-5, at 4 ("MOU"). But the NVRA and HAVA "do not contemplate production of the unredacted computerized list to the Attorney General so that he might loom over the shoulder of the state election official to point out and demand the correction of inaccuracies in the list." *Bellows*, 2026 WL 1430481, at *8. Far from monitoring Utah's compliance with the NVRA and HAVA, this is a hostile takeover of the state's responsibilities under those laws. "[W]hatever investigatory purposes may support a Title III records demand, voter list maintenance is not among them." *Id.* at *7 & n.11.

Moreover, even assuming that DOJ wanted to ascertain Utah's compliance with federal law instead of simply displacing it, DOJ nowhere "provide[s] any reasonable explanation for why the Sensitive Voter Data in particular serves those purposes." *Oregon*, 2026 WL 318402, at *10 n.4. A statewide voter file reflects only a snapshot of current registration data. The NVRA requires states to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters," 52 U.S.C. § 20507(a)(4), and HAVA requires states to "perform list maintenance . . . on a regular basis" in accordance with the NVRA, *id.* § 21083(a)(2)(A). But both laws delegate the mechanisms for list maintenance to the states. And the requested records—a complete, unredacted voter file—would not, without more, allow the United States to evaluate Utah's compliance with these laws, because the file reflects just one point in time. This is the case even if DOJ identifies voters who could permissibly be removed under the NVRA. *See* MTD Br. at 14.

19

At the end of the day, discussion of ascertaining compliance with the NVRA is beside the point, because it is not the actual purpose motivating the request. Title III states DOJ must provide a statement of "the basis and the purpose," rather than some conceivable basis and purpose. 52 U.S.C. § 20703. Incredibly, DOJ distances itself from any obligation to provide the actual purpose for its request. *See* Opp. at 13–14 ("Congress did not indicate that the Attorney General is permitted to state only one purpose, or that only one purpose is the actual purpose."). But the statute is clear: "[A]s conveyed by the statute's use of the definite article, the statement must be 'the' factual basis, not just a conceivable or possible basis." *Galvin*, 2026 WL 972129, at *3. If, as DOJ claims, Congress contemplated "later stated additional purposes," Opp. at 13, it is hard to imagine why the demand letter must include a statement of "the purpose" rather than "a purpose." Instead, the much more natural reading of the statute is that DOJ must provide its actual purpose.

A growing mound of evidence confirms that DOJ has not done so, because determining states' compliance with the NVRA is not its actual purpose. Judicially-noticeable materials, including DOJ's own filings and public statements, shed light on its actual plans. *See* MTD Br. at 3–9, 17–19; *see also Bellows*, 2026 WL 1430481, at *3 n.6 (noting that DOJ's "efforts to assuage . . . concerns" about creation of a national voter database "were almost immediately undermined" by a recent executive order "directing the Department of Homeland Security to compile a 'State Citizenship List' in order to 'assist in verifying identity and Federal election voter eligibility'" (quoting Exec. Order No. 14,399, 91 Fed. Reg. 17125 (Apr. 3, 2026))). In addition to the materials previously provided, DOJ attaches a recently-issued memorandum from the Office of Legal Counsel. *See* Mem. for Harmeet K. Dhillon, Assistant Att'y General, Civil Rights Division (May 12, 2026), Dkt. No. 49-12 ("OLC Memo."). That memorandum explains that DOJ's efforts to seek statewide voter lists come "[i]n response to the President's order to identify those who may be

20

voting illegally," and that DOJ plans "to share the lists with Homeland Security Investigations . . . or another unit within DHS." *Id.* at 1 (stating the memorandum discusses whether DOJ "may share such lists with DHS for the purpose of identifying illegal aliens who are ineligible to vote"). Conspicuously, sharing the list is not meant to enforce the NVRA or HAVA, nor could it be, as DHS plays no role in enforcing those laws.

Internal documents recently produced in response to Freedom of Information Act (FOIA) requests confirm that DOJ plans to use Utah's data in collaboration with DHS, rather than for any purpose related to the NVRA or HAVA.[5] These documents show that DOJ entered into an agreement with the DHS in July 2025 to run state voter lists through the Systemic Alien Verification for Entitlements (SAVE) program.[6] Notwithstanding the NVRA and HAVA's delegation of authority to the States—not the federal government—to conduct list maintenance, these documents also reflect DOJ lawyers' intention to "inform" states that their "voter list should be run against [SAVE] . . . as part of their list maintenance responsibilities under the NVRA and HAVA."[7] The documents also indicate that DOJ contemplated using the data for criminal enforcement, noting "Crim Section may have some uses for the data . . . once we get results from SAVE."[8]

These are not the purposes that the United States disclosed to Utah or has advanced in this litigation. And the FOIA documents make clear that DOJ's silence on these additional uses was

---

[5] *See CREW Sues DOJ for Failing to Produce Records on Voter Data Collection*, Citizens for Resp. & Ethics in Wash. (published Dec. 19, 2025) https://www.citizensforethics.org/legal-action/lawsuits/crew-sues-doj-for-failing-to-produce-records-on-voter-data-collection/ [https://perma.cc/2BB3-WMN2] (last accessed June 1, 2026).

[6] *See id.*, Apr. 14, 2026, Records, Part 1, CREW v. DOJ-CRT-00828 [https://perma.cc/CQU6-68RR].

[7] *Id.* at CREW v. DOJ-CRT-00752.

[8] *Id.*, Apr. 14, 2026, Records, Part 2, CREW v. DOJ-CRT-001182 [https://perma.cc/T9B9-XJQW].

deliberate: DOJ lawyers simultaneously took the position in internal discussions that the Department had no obligation "to give the states information about what we are going to do with the data."[9] Put simply, the United States cannot say it has stated "the purpose" of its demand while internal documents show its lawyers meant to disavow any obligation to disclose its intended uses.

In response to LWV-UT's proffered evidence—from the MOU, to then-Attorney General Bondi's leveraging of federal immigration enforcement presence in Minneapolis, to President Trump's statements about nationalizing elections, to DOJ's admissions of mishandling sensitive information, *see* MTD Br. at 6, 8, 17–19—DOJ offers one sentence: "The United States is not building a 'national voter file' or similar device." Opp. at 27. Utah voters would be forgiven for viewing this statement skeptically, particularly given the lack of any reference to DOJ's plans with respect to DHS. Because DOJ has not provided the required statement of the actual purpose behind its request for the state's voter file, the Complaint should be dismissed.

## IV.     Even If Production Were Appropriate, Title III Permits Redactions.

Even if DOJ requested records covered by Title III and even if it complied with statutory requirements to provide a sufficient and non-pretextual statement of the basis and the purpose for its request—which it does not, on either count—it would *still* not be entitled to unredacted records. As the Tenth Circuit recently recognized, statutes providing for disclosure of voter registration records permit redaction of sensitive voter information, even without express authorization. *See Voter Reference Found. v. Torrez*, 160 F.4th 1068, 1083 n.14 (10th Cir. 2025); *see also Bellows*, 2026 WL 1430481, at *5 & n.7 (noting the similarity between the NVRA and Title III and applying Circuit caselaw allowing "the redaction of uniquely or highly sensitive personal information in records subject to disclosure" (quotation marks omitted)). So too here.

---

[9] *Id.* at CREW v. DOJ-CRT-001163.

DOJ claims that "[f]or decades" it "has obtained" unredacted voter information, including state voter registration lists, as part of its enforcement of federal election law, giving nine examples. Opp. at 16–19. However, closer inspection reveals a more complicated picture. For example, DOJ claims that Georgia, Maine, Texas, New Jersey, and Indiana all were "required" to produce various sensitive voter information. *See id.* at 17–18. However, DOJ cites only consent decrees it entered into with these states. *See* Second Neff Decl. ¶¶ 3–6, Dkt. No. 49-1; *id.* Ex. Nos. 12–16, Dkt. Nos. 49-3 to 49-7. A state's voluntary choice to turn over its sensitive voter information as part of a settlement has little probative value to assess DOJ's legal authority to demand these records over a state's objection. *See Bellows*, 2026 WL 1430481, at *1 ("The question before me now is whether [DOJ] can compel the type of access it once enjoyed through consent, in the face of a state's refusal."). Moreover, several of these states have actively contested DOJ's right to access their unredacted voter files in response to demands materially identical to the one Utah faces. *See id.* (Maine); Def.'s Br. in Supp. of Mot. to Dismiss Pl.'s Compl., *United States v. Raffensperger*, No. 1:26-cv-485-ELR, Dkt. No. 16 (N.D. Ga. Feb. 5, 2026) (Georgia); Br. in Supp. of Def.'s Mot. to Dismiss & Opp'n to Pl.'s Mot. to Compel, *United States v. Caldwell*, No. 3:26-cv-2025, Dkt. No. 50-1 (D.N.J. Feb. 26, 2026) (New Jersey).

DOJ also cites its efforts to enforce Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA") in Alabama and Vermont and the Voting Rights Act ("VRA") in Georgia. *See* Opp. at 18–19. Although it attaches demand letters that cite Title III, it provides no evidence that these states refused to comply with DOJ's requests for documents, or that any court credited DOJ's authority under the CRA to obtain unredacted records. *See* Second Neff Decl. ¶¶ 7–9; *id.* Ex. Nos. 17–20, Dkt. Nos. 49-8 to 49-11. Further, mechanisms to enforce UOCAVA and the VRA differ materially from Title III. They empower the United States to bring civil actions based on claimed

violations and obtain appropriate relief through ordinary litigation processes. *See, e.g.*, 52 U.S.C. § 20307(a) (authorizing U.S. Attorney General to "bring a civil action in an appropriate district court for such . . . relief as may be necessary to carry out" UOCAVA); 52 U.S.C. § 10308(d) (authorizing U.S. Attorney General to "institute . . . action for preventive relief"). That is precisely what the United States did in the actions that the United States cites. Neither UOCAVA nor the VRA eliminate the requirement that the government identify a factual predicate for its claims. So insofar as courts in those cases ordered or approved the production of voter-related information, they did so as part of court-supervised remedies tied to specific violations, not as a means of initiating an investigation untethered to concrete evidence of noncompliance.[10]

For similar reasons, the fact that Utah shares information through the Electronic Registration Information Center ("ERIC") does not entitle DOJ to its demanded records. *See* Opp. at 26. As a factual matter, Utah does not share voter information per se, because voter data is converted via a hashing algorithm into a sequence of random characters prior to transmission to ERIC, meaning it can be used to identify duplicate records without requiring the actual transmission of sensitive data.[11] In other words, voters' private data is not actually shared as part of participation in ERIC. In any event, even if sensitive information were shared with ERIC, a

---

[10] DOJ also cites the OLC Memo. *See* Opp. at 17. This is a non-binding memorandum from other lawyers at DOJ, which unsurprisingly concludes that DOJ's legal arguments are correct. The opinion takes the form of a response brief, for example referring to "counterargument[s] we have seen" and then citing to motions filed by state defendants contesting Plaintiff's demands for their unredacted voter files. *See* OLC Memo. at 16 & n.22; *see also id.* at 12 (referring to the *Benson* decision as "a court which has . . . disagreed with our advice"). It is difficult to see, therefore, why it should not be treated as no more than additional briefing, particularly because, even before the Supreme Court curtailed deference to federal agencies' legal interpretations, *see Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024), it recognized that "[i]nterpretations such as those in opinion letters . . . which lack the force of law [] do not warrant *Chevron*-style deference," *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000).

[11] *See* Elec. Registration Info. Ctr., *Technology & Security Overview* (Sept. 29, 2025), https://perma.cc/H8YU-MCB7.

24

state's voluntary participation in an interstate election-administration compact bears no resemblance to compelled disclosure to the federal government.

DOJ's remaining arguments—that Section 304 of the Civil Rights Act requires confidentiality, *see* Opp. at 23–24, and that DOJ is complying with federal privacy laws, *see id.* at 26–29—boil down to the following: Trust us. But "[t]he presumption of regularity that has been previously extended to Plaintiff that it could be taken at its word—with little doubt about its intentions and stated purposes—no longer holds." *Oregon*, 2026 WL 318402, at *11. Given the overwhelming amount of evidence that DOJ's demand for Utah's voter file is completely unrelated to any of the goals articulated in litigation, redactions are necessary to prevent chilling the right to vote. *See* MTD Br. at 19–23.

**CONCLUSION**

The United States' motion to compel production of Utah's full and unredacted electronic voter file should be denied and the Complaint dismissed.

Dated: June 3, 2026

William Hughes*
Theresa J. Lee*
Sophia Lin Lakin*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
whughes@aclu.org
tlee@aclu.org
slakin@aclu.org

Respectfully submitted,
/s/ William Hughes
Jason M. Groth (16683)
Masami T. Kanegae (20270)
American Civil Liberties Union of Utah
Foundation
311 South State Street, Suite 310
Salt Lake City, Utah 84111
(801) 521-9862
jgroth@acluutah.org
mkanegae@acluutah.org

* admitted pro hac vice

*Counsel for Intervenor-Defendant League of Women Voters of Utah*

25